RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 24a0212p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

NATIONAL REPUBLICAN SENATORIAL COMMITTEE;
NATIONAL REPUBLICAN CONGRESSIONAL COMMITTEE;
JAMES D. VANCE, Senator; STEVE CHABOT, former
Representative,

       *Plaintiffs-Appellants*,

     *v*.

FEDERAL ELECTION COMMISSION, et al.,

       *Defendants-Appellees*.

⎤
⎮
⎮
⎮
⎮
⎬  No. 24-3051
⎮
⎮
⎮
⎮
⎦

───────────────

On Certified Question of Constitutional Law
Transmitted by the United States District Court for the Southern District of Ohio at Cincinnati.
No. 1:22-cv-00639—Douglas Russell Cole, District Judge.

Argued En Banc:  June 12, 2024

Decided and Filed:  September 5, 2024

Before:  SUTTON, Chief Judge; MOORE, CLAY, GIBBONS, GRIFFIN, KETHLEDGE,
STRANCH, THAPAR, BUSH, LARSEN, NALBANDIAN, READLER,
MURPHY, DAVIS, MATHIS, and BLOOMEKATZ, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:**  Noel J. Francisco, JONES DAY, Washington, D.C., for Appellants.  Jason X.
Hamilton, FEDERAL ELECTION COMMISSION, Washington, D.C., for Appellees.  **ON
BRIEF:**  Noel J. Francisco, John M. Gore, E. Stewart Crosland, Brinton Lucas, JONES DAY,
Washington, D.C., Sarah Welch, JONES DAY, Cleveland, Ohio, for Appellants.  Jason X.
Hamilton, Shaina Ward, Blake L. Weiman, FEDERAL ELECTION COMMISSION,
Washington, D.C., for Appellees.  Charles J. Cooper, Peter A. Patterson, John D. Ohlendorf,
COOPER & KIRK, PLLC, Washington, D.C., T. Elliot Gaiser, OFFICE OF THE OHIO
ATTORNEY GENERAL, Columbus, Ohio, Brett R. Nolan, INSTITUTE FOR FREE SPEECH,
Washington, D.C., Tara Malloy, CAMPAIGN LEGAL CENTER, Washington, D.C., for Amici
Curiae.

SUTTON, C.J., delivered the opinion of the court in which GIBBONS, GRIFFIN, KETHLEDGE, THAPAR, BUSH, LARSEN, NALBANDIAN, MURPHY, and MATHIS, JJ., joined.   THAPAR, J. (pp. 13–24), delivered a separate concurring opinion in which KETHLEDGE, MURPHY, and NALBANDIAN, JJ., concurred.   BUSH, J. (pp. 25–44), delivered a separate concurring dubitante opinion.   STRANCH, J. (pp. 45–75), delivered a separate opinion concurring in the judgment, in which MOORE and CLAY, JJ., concurred in full, and DAVIS and BLOOMEKATZ, JJ., concurred in Parts I and II.  BLOOMEKATZ, J. (pg. 76), delivered a separate opinion concurring in the judgment.  READLER, J. (pp. 77–103), delivered a separate dissenting opinion.

---

**OPINION**

---

SUTTON, Chief Judge.  At issue is whether the Federal Election Campaign Act's limits on coordinated campaign expenditures, which restrict political parties from spending money on campaign advertising with input from the party's candidate for office, violate the First Amendment.  In 2001, the Supreme Court held that they do not.  *FEC v. Colo. Republican Fed. Campaign Comm.*, 533 U.S. 431, 465.  In this action, the plaintiffs argue that the law and facts have changed since 2001, making the *Colorado* decision no longer binding on lower courts.  The Supreme Court, they point out, has tightened the free-speech restrictions on campaign finance regulations in the last two decades.  *See, e.g.*, *McCutcheon v. FEC*, 572 U.S. 185, 227 (2014) (plurality opinion); *id.* at 231–32 (Thomas, J., concurring in the judgment); *FEC v. Ted Cruz for Senate*, 596 U.S. 289, 313 (2022).  And since then, they add, the terrain of political fundraising and spending has changed, most notably with 2014 amendments to the Act and with the rise of unlimited spending by political action committees.  These are fair points.  But none of them gives us authority to overlook or for that matter override the Supreme Court's decision in this case.  The key reality is that the Supreme Court has not overruled the 2001 *Colorado* decision or the deferential review it applied to these provisions of the Act.  In a hierarchical legal system, we must follow that decision and thus must deny the plaintiffs' First Amendment facial and as-applied challenges.

I.

The plaintiffs in today's case are the national senatorial and congressional committees of the Republican Party, Senator J.D. Vance, and former Representative Steve Chabot. Invoking the First Amendment to the United States Constitution, they challenge the validity of the current limits on political parties' coordinated expenditures. *See* 52 U.S.C. § 30116(d). They seek declaratory and injunctive relief that bars the defendants—the Federal Election Commission and its six commissioners—from enforcing these limits against them.

The political party committees, more specifically, wish to obtain input about their campaign advertisements from the candidates they support in order to unify their political message, something the Act's limits on coordinated party expenditures restrict. The no-coordination requirements also increase their costs, create redundancies, and discourage them from communicating effectively with their candidates and spending money efficiently to support them. The Federal Election Commission regularly updates the limits on coordinated party expenditures with which the plaintiffs are required to comply for any given election cycle. Under then-existing limits in the 2021–2022 election cycle, the National Republican Senatorial Committee spent roughly $15.5 million on coordinated party expenditures with Republican Senate nominees, and the National Republican Congressional Committee spent roughly $8.3 million on coordinated party expenditures with Republican House nominees. These coordinated party expenditures primarily fund political advertising.

The two individual plaintiffs support these requests. Senator Vance seeks the freedom to accept the party's funds and to give input about how they should be used in his political campaigns. Former Representative Chabot joins in that request.

Consistent with the Act, the plaintiffs asked the district court to certify the constitutional question to our en banc Court. 52 U.S.C. § 30110. The parties engaged in discovery for three months. After establishing a factual record and concluding that the plaintiffs raised a non-frivolous question, the district court certified this question to our full Court: "Do the limits on coordinated party expenditures in § 315 of the Federal Election Campaign Act of 1971, as amended, 52 U.S.C. § 30116, violate the First Amendment, either on their face or as applied to

party spending in connection with 'party coordinated communications' as defined in 11 C.F.R. § 109.37?" R.49 at 41.

## II.

Before turning to the merits, one procedural wrinkle deserves mention. Representative Chabot no longer serves in Congress, and he currently does not intend to run for office. That raises the possibility that his claim is moot. But that possibility makes no difference to our jurisdiction over this case. The claims of the party committees and Senator Vance remain live, which is all that matters when it comes to our authority to address the shared constitutional claims presented in this case. *See T.M. ex rel. H.C. v. DeWine*, 49 F.4th 1082, 1087 n.3 (6th Cir. 2022).

## III.

*Facial challenge.* The first question is whether the Federal Election Campaign Act's limits on coordinated party expenditures facially violate the First Amendment.

## A.

In 1972, Congress enacted the Federal Election Campaign Act to regulate fundraising and spending in federal political campaigns. Pub. L. No. 92-225, 86 Stat. 3 (codified as amended at 52 U.S.C. § 30101 *et seq.*). As amended in 1974, the Act limits the amount of money an individual or group may contribute to or spend on a political candidate. *See* Federal Election Campaign Act Amendments of 1974, Pub. L. No. 93-443, tit. I, sec. 101(a), § 608(b), (e), 88 Stat. 1263, 1263–65. It imposes similar restrictions on political parties. *Id.* § 608(f), 88 Stat. at 1265–66 (corresponds to current 52 U.S.C. § 30116(d)). The Federal Election Commission administers the Act and may promulgate regulations under it. 52 U.S.C. §§ 30106(b)(1), 30111(a)(8).

Since 1976, the Supreme Court has grappled with the relationship between the imperatives of the Act and the imperatives of the First Amendment. In *Buckley v. Valeo*, 424 U.S. 1 (1976) (per curiam), the Supreme Court held that the ceilings on individual campaign contributions do not violate the free-speech guarantees of the First Amendment because they

safeguard the electoral process from corruption and its appearance. *Id.* at 58. At the same time, the Court ruled that, when individuals and organizations spend money to voice their own political opinions, the First Amendment protects that right, prompting the Court to invalidate the Act's limits on independent expenditures. *Id.*

*Buckley* did not end debates over the intersection of the Act and the First Amendment. Over the years, the Court has addressed the validity of several of the Act's provisions, attempting to balance the free-speech interest of using one's resources to voice a political opinion against "[t]he governmental interest in preventing both actual corruption and the appearance of corruption." *FEC v. Nat'l Right to Work Comm.*, 459 U.S. 197, 210 (1982). For the most part, this formulation has led the Court to uphold contribution limits and to invalidate expenditure limits. *Compare Cal. Med. Ass'n v. FEC*, 453 U.S. 182, 201 (1981) (upholding contribution limit with respect to multi-candidate political committees), *with FEC v. Mass. Citizens for Life, Inc.*, 479 U.S. 238, 241 (1986) (invalidating expenditure limit with respect to the use of a company's treasury funds), *and FEC v. Nat'l Conservative Pol. Action Comm.*, 470 U.S. 480, 501 (1985) (invalidating expenditure limit with respect to independent political committees).

A pair of decisions arising from Colorado refined this approach with respect to the Act's spending limits on political parties. In the first decision, the Court addressed the Act's limits on a political party's own expenditures in favor of an electoral candidate. *See* 2 U.S.C. § 441a(d)(3) (transferred to 52 U.S.C. § 30116(d)(3)). In the context of a political party's "independent" expenditures—those spent without input from the candidate—the Court invalidated the limits under the "exacting scrutiny" standard, *Buckley*, 424 U.S. at 44, that applies to political expenditures, *Colo. Republican Fed. Campaign Comm. v. FEC* (*Colorado I*), 518 U.S. 604, 616 (1996) (opinion of Breyer, J.); *id.* at 627–29 (opinion of Kennedy, J.). Such campaign activity, the Court reasoned, amounted to "core" political speech, and the government had not shown that the limits were "necessary to combat a substantial danger of corruption of the electoral system." *Id.* at 616–18 (opinion of Breyer, J.).

In the sequel to that decision, the Supreme Court addressed the Act's application to "coordinated" political party expenditures—those made with input from the candidate the party supports. In this setting, the Court applied a more deferential level of review—the "scrutiny

appropriate for a contribution limit"—requiring the restriction only to be "'closely drawn' to match . . . the 'sufficiently important' government interest in combating political corruption." *FEC v. Colo. Republican Fed. Campaign Comm.* (*Colorado II*), 533 U.S. 431, 456 (2001) (quoting *Nixon v. Shrink Missouri Gov't PAC*, 528 U.S. 377, 387–88 (2000)).  The Court acknowledged that political parties play a unique role in American politics as "dominant players, second only to the candidates themselves, in federal elections."  *Id.* at 450 (quotation omitted). Still, the Court explained, coordinated party expenditures permit "donations" to a party to be "passed through to [the candidate] for spending on virtually identical items as his own campaign funds."  *Id.* at 460.  In that way, the Court worried, donors and candidates may sidestep the contribution limits that *Buckley* allowed, prompting the Court to hold that "a party's coordinated expenditures, unlike expenditures truly independent, may be restricted to minimize circumvention of contribution limits."  *Id.* at 465.  For these reasons and others, the Court rejected a facial challenge to the spending limits.

B.

That brings us to today's dispute and today's question:  Do the Act's limits on coordinated party expenditures facially violate the First Amendment?

The Supreme Court, as just shown, asked and answered that same question in *Colorado II*.  When faced with a question that the Supreme Court has answered, our choices generally end. "[L]ower courts must follow Supreme Court precedent."  *Thompson v. Marietta Educ. Ass'n*, 972 F.3d 809, 813 (6th Cir. 2020).  Even if a holding of the Supreme Court "appears to rest on reasons rejected in some other line of decisions," we must nonetheless follow it, "leaving to [the Supreme Court] the prerogative of overruling its own decisions."  *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989).  We have long recognized, and long adhered to, this principle.  *See United States v. Gibson*, 881 F.2d 318, 323 & n.2 (6th Cir. 1989); *Thompson*, 972 F.3d at 813; *Taylor v. Buchanan*, 4 F.4th 406, 408 (6th Cir. 2021).

The plaintiffs at one level agree.  They accept that, "if *Colorado II* directly controls" this case, we "should follow it."  *See* First Br. 41 (quotation omitted).  But they challenge the "if."  In their view, *Colorado II* no longer binds the lower courts because later decisions by the Supreme

Court have undermined its reasoning and because recent campaign finance developments have undermined several aspects of the decision.

*Changed doctrine.* Start with the plaintiffs' reliance on the Supreme Court's more recent campaign finance decisions. Since *Colorado II*, the plaintiffs maintain, the Supreme Court has "made clear that preventing *quid pro quo* corruption or its appearance is the only interest" that allows Congress to impose campaign finance restrictions and "that such restrictions must be narrowly tailored to that interest." *See id.* at 22. This change in reasoning, they say, leaves lower courts free to reassess *Colorado II*.

We accept the premise but not the conclusion. As to the premise, the plaintiffs point to several ways in which the Court's recent decisions create tension with *Colorado II*'s reasoning. First, since 2001, the Court "has recognized only one permissible ground for restricting political speech: the prevention of '*quid pro quo*' corruption or its appearance." *Cruz*, 596 U.S. at 305; *see* First Br. 41–42. While the First Amendment allows "restrictions on direct contributions," it does not allow Congress to "layer[] on top" additional restrictions, "ostensibly to prevent circumvention of the base limits." *McCutcheon*, 572 U.S. at 221. This kind of "prophylaxis-upon-prophylaxis approach," the Court has recently explained, is disfavored. *Id.* (quotation omitted). By contrast, when earlier cases like *Colorado II* discussed corruption, they did "not always sp[eak] about corruption in a clear or consistent voice," dimming "[t]he line between *quid pro quo* corruption and general influence." *Id.* at 208–09 (quotation omitted); *see also id.* at 239–40 (Breyer, J., dissenting) (explaining that *Colorado II* relied on the "undue influence" rationale, which is "considerably broader" than quid pro quo corruption).

Second, the Court's recent campaign finance decisions say that the government must show that a given campaign finance restriction will have a tangible effect on corruption. *See* First Br. 29. The later decisions demand "actual evidence" that a spending restriction will reduce "*quid pro quo* corruption or its appearance." *Cruz*, 596 U.S. at 310. Yet in this case, the plaintiffs argue, the government did not present sufficient evidence of corruption or its perception. *See* First Br. 34–35, 42.

Third, since *Colorado II*, the Court has strengthened the "closely drawn" test, emphasizing that this "rigorous" test demands "narrow[] tailor[ing]." *McCutcheon*, 572 U.S. at 197, 199, 218 (quotations omitted); *see* First Br. 42. *Colorado II*, however, made no mention of narrow tailoring and seemed to disavow it, saying it would not invalidate the coordinated spending limits based on "unskillful tailoring." 533 U.S. at 463 n.26.

All in all, the plaintiffs identify several ways in which tension has emerged between the reasoning of *Colorado II* and the reasoning of later decisions of the Court. If all we had were *Cruz* and *McCutcheon* to guide us, there would be much for us to analyze and much for us to independently determine about the validity of these coordinated expenditure limits.

But that is not all we have. *Colorado II* remains standing. Any shifts in reasoning do not shift the precedential terrain from our vantage point. The Supreme Court has never overruled the decision. Even when the Supreme Court embraces a new line of reasoning in a given area and even when that reasoning allegedly undercuts the foundation of a decision, it remains the Court's job, not ours, to overrule it. *Rodriguez de Quijas*, 490 U.S. at 484; *see also Agostini v. Felton*, 521 U.S. 203, 237–38 (1997). "[V]ertical *stare decisis* is absolute, as it must be in a hierarchical system." *Ramos v. Louisiana*, 590 U.S. 83, 124 n.5 (2020) (Kavanaugh, J., concurring in part). The Supreme Court might choose to knock down a "legal last-man-standing," or it might choose to prop it up. *Kimble v. Marvel Ent., LLC*, 576 U.S. 446, 458 (2015). Either way, the option is theirs, not ours. *Cf. Flood v. Kuhn*, 407 U.S. 258, 282, 284 (1972) (keeping in place an "aberration" in caselaw). The key function of a high court—providing the last word in resolving cases and controversies—would not work if lower courts could revisit the final resolution of a dispute every time tension emerges between that decision and a later one.

*Changed statute and changed facts.* It is not just the legal doctrine that has changed since 2001, the plaintiffs add. *See* First Br. 43. Congress itself altered the campaign finance laws in 2014. It exempted "segregated account[s] of a national committee of a political party" from the coordinated party expenditure limits if those accounts are used to "defray expenses incurred with respect to a presidential nominating convention," the "headquarters buildings of the party," or "the preparation for and the conduct of election recounts and contests and other legal proceedings." 52 U.S.C. § 30116(a)(9), (d)(5). The new exemptions, the plaintiffs maintain,

"radically altered [the Act's] nature and structure," *see* First Br. 44 (quoting *Libertarian Nat'l Comm. v. FEC*, 924 F.3d 533, 546 (D.C. Cir. 2019)), and showed that the other limits on coordinated party expenditures are not "narrowly tailored" to prevent quid pro quo corruption, *see id.* at 39–40.

Were we faced with a clear playing field, we could appreciate how these new exemptions might affect the analysis. In *McCutcheon*, for example, the Court reviewed the campaign finance regulations at issue for "narrow[] tailor[ing]." 572 U.S. at 218 (quotation omitted). If that test applied here, an increase in the Act's exemptions might show that the limit on coordinated party expenditures does too little for First Amendment purposes—that it addresses its policy target in underinclusive ways. The problem is, *Colorado II* applied a deferential form of review in upholding these precise provisions, refusing to invalidate the limits due to "unskillful tailoring." 533 U.S. at 456, 463 n.26. That Congress added three new exemptions— for party conventions, party headquarters, and election recounts—does not suffice to invalidate the Act's limits on coordinated party expenditures under the more deferential form of review that applies to contribution limits. These changes to the Act simply do not suffice to alter the verdict of *Colorado II*.

In a variation on this theme, the plaintiffs separately argue that a changed "factual backdrop" makes *Colorado II* inapplicable. *See* First Br. 45. From the rise of super "PACs" (political action committees) to the fall of political parties' power to the advent of social media, the plaintiffs argue that political campaigns and political spending have materially changed in the last two decades. *See id.* at 45–47. So they have. And so it may be that *Colorado II*'s assumption that "political parties are dominant players . . . in federal elections," 533 U.S. at 450 (quotation omitted), has a quaint ring to it. But, again, these changed circumstances do not change the deferential review that *Colorado II* applied to the same provisions. Even if *Colorado II*, like many Supreme Court precedents, did not fully anticipate the future, that does not empower the lower courts to look the other way every time a social change or new norm casts doubt on an earlier decision, particularly one that applied deferential review to the issue.

The plaintiffs point out that "at least 28 states largely give parties free rein to make coordinated expenditures on behalf of their state-level nominees," and that no evidence of

corruption has materialized. *See* First Br. 34–35. State practices can be telling, to be sure. *See New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting). And, yes, these practices could bear on whether coordinated expenditures run the risk of corruption. *See* First Br. 34–35. But, again, any changes in understanding about the impact of coordinated political party expenditures on the risk of corruption raise a question for the Court, not for us, under the level of review that *Colorado II* applied.

All of this makes it unnecessary for us to decide precisely when, if ever, changes to a statute or the underlying facts could permit a lower court to reach a different outcome from an earlier Supreme Court decision about the validity of the same statute. That's because each of the claimed changes would not alter *Colorado II* even on its own terms. Under these circumstances, any new assessment of the validity of the limits on coordinated party expenditures remains where it customarily does in a hierarchical legal system: the Supreme Court's province, not ours.

We are not the first court of appeals to confront arguments that *Colorado II* no longer controls facial challenges to the Act's limits on coordinated party expenditures. An en banc decision by the Fifth Circuit unanimously agreed that *Colorado II* would control facial challenges to these provisions. *In re Cao*, 619 F.3d 410, 431–32, 435 (5th Cir. 2010) (en banc); *id.* at 435 (Jolly, J., concurring in the result); *id.* at 437 n.3, 443 (Jones, C.J., concurring in part and dissenting in part).

IV.

*As-applied challenge.* The second question is whether the Act's limits on coordinated party expenditures violate the First Amendment as applied to the plaintiffs' coordinated expenditures.

Even if *Colorado II* requires us to reject this facial challenge to the Act's limits on coordinated party expenditures, the plaintiffs argue that the same is not true of their as-applied challenge. *See* First Br. 48–49. That is because *Colorado II* left open the possibility that future litigants could bring an "as-applied challenge focused on application of the limit to specific expenditures." 533 U.S. at 456 n.17. In sorting out what types of as-applied challenges *Colorado II* left open, it is useful to recall what *Colorado I* decided. Hewing to the

contribution/expenditure dichotomy, it deployed exacting scrutiny in invalidating the Act's limits on a political party's "independent" expenditures. 518 U.S. at 618–19. Thus, when *Colorado II* held that limits on "coordinated" party expenditures should be treated as a type of contribution that triggers less rigorous scrutiny, it raised the salience of what amounts to a "coordinated" expenditure. One type of expenditure that readily counted as coordinated, the Court in *Colorado II* explained, is the "payment of the candidate's bills." 533 U.S. at 456 n.17. But it did not say anything more about what counts as coordination. The upshot is that *Colorado II* left open the possibility that a future claimant could argue that an expenditure did not involve coordination, meaning that *Colorado I* would control and would prohibit any monetary limit on that advertisement or expenditure.

This reservation of authority—to treat future as-applied challenges as coming under the *Colorado I* rubric rather than the *Colorado II* rubric—does not apply to today's case, however, in view of the breadth of the plaintiffs' as-applied challenge. They do not target the Act's application to a specific type of non-coordination or to a specific advertising expenditure. They broadly challenge the coordinated expenditure limits "as applied to the political advertising addressed in 11 C.F.R. § 109.37." *See* First Br. 5. That regulation is not modest in scope. It defines a "party coordinated communication" to include a "communication . . . paid for by a political party committee or its agent" that (i) "disseminates, distributes, or republishes . . . campaign materials prepared by a candidate"; (ii) "expressly advocates the election or defeat of a clearly identified candidate for Federal office"; or (iii) "refers to a clearly identified" candidate for Congress, the presidency, or the vice-presidency. 11 C.F.R. § 109.37(a). Nothing in their complaint or briefs limits this challenge to specific settings that do not involve coordination or to a specific type of advertisement.

If we accepted the plaintiffs' invitation to grant as-applied relief in this setting, it is difficult to see what would be left of *Colorado II*. The record shows that roughly 97% of the committees' expenditures relate to the "political advertising" they wish to use. No less importantly, the only way to accept this as-applied challenge would be to reject the reasoning of *Colorado II*. While the rejection of a facial challenge does not eliminate all as-applied attacks to the same statute, it does eliminate as-applied challenges that rest on the same theory of

invalidation.

Today's circumstances, notably, differ from the as-applied challenge raised in the Fifth Circuit case. There, the plaintiffs targeted the Act's application to shared input about the *timing* of a *single* advertising expenditure. *In re Cao*, 619 F.3d at 424–26. Had the plaintiffs in our case challenged a single advertising expenditure with respect to one aspect of alleged coordination—timing—we would have to address the same complexities that the Fifth Circuit faced in handling such a narrow as-applied challenge. *Compare id.* at 428–35, *with id.* at 436–40, 443–49 (Jones, C.J., concurring in part and dissenting in part), *and id.* at 451–53 (Clement, J., concurring in part and dissenting in part). But that's not the kind of as-applied challenge the plaintiffs filed here. They wish to be freed of all of the limits on coordinated party expenditures with respect to all "political advertising" covered by the regulation. To honor that request would necessarily slight the reasoning of *Colorado II* and would leave little if any coordinated expenditures for that decision to cover. That simply is not the kind of as-applied challenge the Court left open for future litigants to bring.

For these reasons, we answer the certified question in the negative. The limits on coordinated party expenditures in § 315 of the Federal Election Campaign Act of 1971, as amended, 52 U.S.C. § 30116, do not violate the First Amendment, either on their face or as applied to party spending in connection with "party coordinated communications" as defined in 11 C.F.R. § 109.37.

———————————

**CONCURRENCE**

———————————

THAPAR Circuit Judge, concurring. I agree with the majority opinion that *FEC v. Colorado Republican Federal Campaign Committee* (*Colorado II*) controls here. 533 U.S. 431 (2001); *see* Majority Op. at 2. *Colorado II*, however, is an outlier in our First Amendment jurisprudence generally and in campaign-finance doctrine specifically. Indeed, even under *Buckley*'s ahistorical, tiers-of-scrutiny approach, coordinated-party spending limits pose grave constitutional concerns.

## I.

The First Amendment reads: "Congress shall make no law . . . abridging the freedom of speech, or of the press." U.S. Const. amend. I. When the founding generation appended these words to the Constitution, they weren't creating a rule "subject to future judges' assessments of its usefulness." *District of Columbia v. Heller*, 554 U.S. 570, 634 (2008). Rather, the First Amendment "codified a pre-existing right," the bounds of which are defined by "the scope [it was] understood to have when the people adopted [it]." *Id.* at 592, 634–35. For that reason, judges have long looked to practices "deeply embedded in the history and tradition of this country"—particularly those around the time of ratification—when defining the contours of the First Amendment. *Marsh v. Chambers*, 463 U.S. 783, 786 (1983). That makes sense. If the Free Speech and Press Clauses constitutionalized a historically defined right, then history is vital to correctly interpreting these Clauses.

History should therefore guide our First Amendment jurisprudence. Specifically, courts should engage in the two-step inquiry that our Second Amendment jurisprudence uses. *See N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 31–70 (2022). First, courts should ask "whether [an] Amendment's text covers an individual's conduct." *Oakland Tactical Supply, LLC v. Howell Twp.*, 103 F.4th 1186, 1203 (6th Cir. 2024) (Kethledge, J., dissenting); *see Bruen*, 597 U.S. at 31–33. If so, courts should move to a second step, in which "the government must justify its regulation by demonstrating that it is consistent with the Nation's historical tradition."

*Oakland Tactical Supply*, 103 F.4th at 1203 (Kethledge, J., dissenting); *see Bruen*, 597 U.S. at 33–70.

Applying this approach to the First Amendment, courts should first determine whether the challenger's "proposed course of conduct" falls within the Free Speech and Press Clauses' protections. *Bruen*, 597 U.S. at 32. Specifically, a litigant challenging a law on First Amendment grounds must show that his proscribed conduct has some speech or press element. And he must show that his speech doesn't fall into one of the "historic and traditional categories" of expression—like obscenity or defamation—that are outside "the freedom of speech" as the founding generation understood it. *United States v. Stevens*, 559 U.S. 460, 468–69 (2010) (citing *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571–72 (1942)). If a challenger can't locate his conduct in the First Amendment's scope, then his challenge fails.

But if a regulation *does* infringe on First Amendment-protected activity, courts would proceed to the second step. At this point, the burden would shift to the government to show that the challenged regulation is consistent with the historical understanding of the First Amendment. *Cf. Bruen*, 597 U.S. at 33–34. In this respect, history both defines the First Amendment's scope and sheds light on the kinds of regulations that comply with it. *See United States v. Rahimi*, 144 S. Ct. 1889, 1925 (2024) (Barrett, J., concurring) (noting that original history can inform both the meaning of a constitutional right and the kinds of regulations that are compatible with it).

Thus, if our court had to resolve a coordinated-spending case in the first instance, the plaintiffs would first need to show that a party's coordinated spending is within the Free Speech and Press Clauses' historical scope. *Cf. McConnell v. FEC*, 540 U.S. 93, 250–55 (2003) (Scalia, J., concurring in part) (collecting cases supporting the principle that "an attack upon the funding of speech is an attack upon speech itself"). Assuming that coordinated party spending is within-scope, the government would then need to show that the limits at issue here are nonetheless constitutional. To evaluate this second prong, litigants and courts might look to founding-era restrictions on political activity, such as anti-bribery laws. And we'd want to look at what kinds of prophylactic measures (if any) early Congresses took to reduce corruption. These examples would guide our assessment of whether coordinated-party-spending limits are compatible with the First Amendment.

When it comes to campaign-related speech, however, we "do not paint on a blank canvas." *Gunn v. Minton*, 568 U.S. 251, 258 (2013). For the past five decades, our campaign-finance doctrine has followed a two-tiered scrutiny approach that the Supreme Court set forth in *Buckley v. Valeo*. 464 U.S. 1 (1976) (per curiam). *See, e.g.*, *McCutcheon v. FEC*, 572 U.S. 185, 197 (2014) (plurality op.). When the government tries to limit how much someone may spend on election-related speech, strict scrutiny applies. *Id.* And when the government tries to limit how much money someone may give to another, a form of intermediate scrutiny applies. *Id.*

For good reason, there's a growing chorus of voices casting doubt on a tiers-of-scrutiny approach to constitutional law. *Bruen*, 597 U.S. at 17–19 (rejecting a two-tiered approach to the Keep and Bear Arms Clause). As others have noted, courts invented this doctrine by accident, and tiered scrutiny lacks any basis in our Constitution's text, history, and tradition. *See Rahimi*, 144 S. Ct. at 1921 (Kavanaugh, J., concurring) (citing *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 125 (1991) (Kennedy, J., concurring in the judgment)); J. Alicea & J. Ohlendorf, *Against the Tiers of Constitutional Scrutiny*, National Affairs 72, 73 (2019). Indeed, by giving judges free rein to weigh a statute's means and ends, tiered scrutiny sits in tension with the historically derived nature of our constitutional rights. *Bruen*, 597 U.S. at 25; *see also United States v. Virginia*, 518 U.S. 515, 568 (1996) (Scalia, J., dissenting) (arguing that tiers of scrutiny "cannot supersede . . . those constant and unbroken national traditions that embody the people's understanding of ambiguous constitutional texts").

What's more, a tiers-of-scrutiny approach strains courts' institutional competence. Courts, after all, are creatures of precedent and legal history. We discern legal rules from the "famous old cases" of our past, be they judicial precedents or political episodes like King Charles II's efforts to control the British press. Antonin Scalia, *A Matter of Interpretation* 6 (1997); *see Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 713–16 (1931). And then we apply those rules to the facts before us. *See, e.g.*, *United States v. Watson*, 423 U.S. 411, 418–19 (1976) (applying "ancient common-law" rules to a Fourth Amendment claim); *Crawford v. Washington*, 541 U.S. 36, 44–45 (2004) (using the takeaways from Sir Walter Raleigh's treason trial to guide Confrontation Clause jurisprudence).

By contrast, the tiers of scrutiny force courts to perform tasks for which we're "not institutionally suited." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 380–81 (2023) (plurality op.) (quoting *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 353 (2008)). Federal judges lack the econometric training (and democratic legitimacy) to make free-wheeling policy judgments. Simply put, judges are not equipped to evaluate whether campaign-finance regulations adequately reduce corruption. *See id.* at 382; *see also Bruen*, 597 U.S. at 22 (criticizing the tiers of scrutiny as a "judge-empowering interest-balancing inquiry"). Indeed, the Supreme Court has squarely rejected such a cost-benefit balancing approach to the First Amendment. *See Stevens*, 559 U.S. at 470 (calling such an approach "startling and dangerous").

Nevertheless, even where means-ends scrutiny reigns supreme, courts "still often rel[y] directly on history" to resolve cases. *Rahimi*, 144 S. Ct. at 1921 n.7 (Kavanaugh, J., concurring). After all, history can tell us "how and why" a government could regulate otherwise-protected activity. *Bruen*, 597 U.S. at 29. And that maps nicely onto the two things that courts evaluate under the tiers of scrutiny: the purpose a regulation serves, and the way in which it advances that purpose. *See id.* at 111–12 (Breyer, J., dissenting) (observing that history and tiered-scrutiny analyses both consider these aspects of a regulation). Perhaps for this reason, history has been dispositive for several recent First Amendment decisions. *See Vidal v. Elster*, 144 S. Ct. 1507, 1515–16 (2024) (declining to apply tiered scrutiny when a law has support in constitutional history and tradition); *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 477 (2022) ("What history suggests, we believe our contemporary doctrine confirms.").

Judge Stranch argues that turning to regulatory history and tradition to make sense of the First Amendment disserves democratic values because founding-era speech regulations were passed by white, property-owning men. Stranch Concurring Op. at 69. As judges, we cannot change the anti-democratic sins of the past, but we can avoid repeating them today. Our job is to interpret the Constitution. We need objective criteria to guide our interpretation if we are to avoid usurping the people's democratic authority to amend the Constitution as they see fit. By enforcing the law as it is, we stay in our lane and leave space for the people to change it as they please. "History, not policy," is therefore our "proper guide," because history is "less subjective" than open-ended policy considerations. *Rahimi*, 144 S. Ct. at 1912 (Kavanaugh, J.,

concurring).   Looking to history rather than policy to steer our constitutional interpretation ensures that we do only our jobs, so the people remain free to do theirs.

In any event, lower courts have an obligation to follow Supreme Court doctrine, ahistorical or otherwise.  And that means the tiers of scrutiny apply here.  But even under that framework, *Colorado II*'s holding is questionable.  Indeed, limits on party-coordinated speech fail even intermediate scrutiny.  *Contra Colorado II*, 533 U.S. at 446, 465.

## II.

Under *Buckley*'s version of intermediate scrutiny, campaign-finance limits must (A) advance a "sufficiently important" government interest and (B) be "closely drawn" to that interest.  *McCutcheon*, 572 U.S. at 197 (plurality op.) (quoting *Buckley*, 424 U.S. at 25).  While *Colorado II* purported to apply this scrutiny to coordinated-party-spending limits, its analysis is inconsistent with modern campaign-finance doctrine.  Under modern doctrine, these limits fail both prongs of intermediate scrutiny.[1]

### A.  *Important Government Interest*

The Supreme Court has made clear that the government has only one legitimate interest in limiting spending on campaign speech:  the prevention of quid-pro-quo corruption (i.e., bribery) and its appearance.  *FEC v. Cruz*, 596 U.S. 289, 305 (2022).  Even on this basic starting point, however, *Colorado II* is out of step with modern doctrine.  *Colorado II* held that the government has important interests in limiting "not only . . . quid pro quo agreements, but also . . . undue influence on an officeholder's judgment, and the appearance of such influence." 533 U.S. at 441.  As the majority opinion correctly explains, however, the Supreme Court has since narrowed the universe of permissible purposes.  *See* Majority Op. at 7.  Under current doctrine, preventing corruption and its appearance are the *only* valid goals for campaign-finance

---

[1]To be sure, not all forms of coordinated-party spending directly involve speech.  The spending limits here, however, apply broadly to any money spent "for the purpose of influencing any election for Federal office."  52 U.S.C. § 30101(9)(A); *see also id.* § 30101(9)(B) (carveouts).  And as a practical matter, nearly all coordinated-party spending is on speech- and press-related activities.  *See* Majority Op. at 11–12.  Thus, if the limits are unconstitutional as applied to campaign-related speech, they'd likely be overbroad under the Supreme Court's First Amendment doctrine.

restrictions. *See McCutcheon*, 572 at 206–08 (plurality op.) (holding the government may not limit "mere influence or access").

With that in mind, supporters of coordinated-spending limits must articulate a theory for how these limits prevent corruption. Over the years, courts and litigants have offered two. First, these limits prevent a party from corrupting its own candidates. Second, they prevent donors from circumventing donor-to-candidate contribution limits, which are themselves anti-corruption mechanisms. Consider each in turn.

*Preventing Party-Candidate Corruption.* Supporters of coordinated-spending limits have argued that a party's coordinated expenditures are functionally equivalent to direct contributions to a candidate. *See, e.g.*, *Colorado II*, 533 U.S. at 464. If that comparison holds true, then perhaps influential party members could dangle the promise of coordinated spending to "induc[e]" candidates into doing the party's bidding. *Id.* at 460 n.23. For example, a party could make a large, coordinated expenditure in a candidate's race in exchange for his vote on a piece of upcoming legislation. *Id.* Such arrangements, the argument goes, are a form of quid-pro-quo corruption.

The FEC doesn't rely heavily on this theory, and for good reason: it doesn't make any sense to think of a party as "corrupting" its candidates. After all, "[t]he very aim of a political party is to influence its candidate's stance on issues and, if the candidate takes office or is reelected, his votes." *Colorado Republican Fed. Campaign Comm. v. FEC* (*Colorado I*), 518 U.S. 604, 646 (1996) (Thomas, J., concurring in the judgment and dissenting in part). Thus, "[w]hen political parties achieve that aim, that achievement does not . . . constitute a subversion of the political process." *Id.* (internal quotation omitted). Moreover, parties tend to have numerous members with wide views and interests, meaning it's unlikely for any one "corrupting" interest to predominate. *Id.* at 646–47.

Additionally, this anti-corruption argument relies on a dubious premise: that coordinated spending is functionally the same as a direct contribution. Indeed, *Colorado II* openly admitted this isn't always the case. 533 U.S. at 456 n.17. For instance, imagine a party simply wanted to coordinate the timing of a $25,000 ad campaign with a candidate. *Cf. In re Cao*, 619 F.3d 410,

437–38 (5th Cir. 2010) (en banc) (Jones, C.J., concurring in part and dissenting in part).  Under FEC regulations, that counts as coordinated spending.  *See* 11 C.F.R. § 109.21(d)(2)(v).  Yet it strains credulity to argue that such coordination is the same as writing the candidate a $25,000 check.  Coordination comes in all shapes and sizes, and not all of it is equivalent to a direct contribution.  *See Colorado II*, 533 U.S. at 468 & n.2 (Thomas, J., dissenting).

Simply put, a supposed interest in preventing party-candidate "corruption" can't sustain coordinated-party-spending limits.

*Preventing Corruption-by-Circumvention*.  Before this court, the FEC primarily argues that coordinated-party-spending limits advance anti-corruption efforts by preventing donors from circumventing donor-to-candidate contribution limits.  *See also Colorado II*, 533 U.S. at 457.  And because those limits work to prevent bribery, the government has an interest in making sure would-be bribers can't circumvent them.  *See Buckley*, 424 U.S. at 46–47.  According to the FEC, this justifies coordinated-spending limits.  If parties could make unlimited coordinated expenditures, a donor who's maxed-out his candidate-contribution limit could circumvent these limits by channeling additional dollars through the candidate's party.  The party could then spend those dollars in coordination with the candidate.  As a result, the candidate receives more money from a donor than direct contribution limits permit, increasing the chances of corruption.

At least in the abstract, this "anti-circumvention" interest is sufficiently "important" to pass intermediate scrutiny.  *Cf. id.* at 35–36 ("[P]reventing individuals from evading the applicable contribution limitations" is a "permissible purpose.").  The government may limit large-dollar contributions to a candidate to reduce corruption; it follows that the government may limit contributions funneled to a candidate through an intermediary, like a political party.

Nevertheless, courts must "greet the assertion of an anti[circumvention] interest with a measure of skepticism."  *Cruz*, 596 U.S. at 306.  That's because coordinated-party-spending limits reflect a "prophylaxis-upon-prophylaxis approach to regulating campaign finance."  *Id.* (internal quotation omitted).  Recall that the only permissible goal of campaign-finance regulations is preventing bribery and its appearance.  In service of that goal, the Federal Election Campaign Act imposes *five* prophylaxes.  *First*, the donor-to-candidate contribution limits:  most

contributions to a candidate aren't bribes, but the government may limit all contributions as a prophylactic measure. *Id.*; 52 U.S.C. § 30116(a)(1)(A). *Second*, the donor-to-party limits: to prevent donors from circumventing donor-to-candidate limits, the government also limits how much donors may contribute to parties. *Cf. California Med. Ass'n v. FEC*, 453 U.S. 182, 193–200 (1981) (plurality op.); *id.* at 201–03 (Blackmun, J., concurring in part); *McConnell*, 540 U.S. at 144–46; 52 U.S.C. § 30116(a)(1)(B). *Third*, the earmarking rule: to further prevent circumvention, the Act treats "earmarked" party contributions as direct contributions to the earmarked candidate. *See* 52 U.S.C. § 30116(a)(8). *Fourth*, disclosure requirements: to shine sunlight on any potential bribery, a party must publicly report its own spending, as well as its donors' names and donation amounts. *See id.* § 30104(b). And *fifth*—in the event (1) a donor wants to bribe a candidate, (2) the donor-to-party limits are large enough to facilitate bribe-sized contributions, (3) the donor has evaded FEC earmarking enforcement, and (4) a donor isn't discouraged by the fact his bribe will be reported publicly—the Act sets another safeguard. It limits how much a party may spend in coordination with its candidates. *See id.* § 30116(d). "Such a prophylaxis-upon-prophylaxis[-upon-prophylaxis-upon-prophylaxis-upon-prophylaxis] approach . . . is a significant indicator that the regulation may not be necessary for the interest it seeks to protect." *Cruz*, 596 U.S. at 306.

The Act's exceptions for certain kinds of coordinated-party spending only reinforce my doubts. In general, the government can't prove a compelling interest when a policy has exceptions that cut against its proffered goal. *See, e.g.*, *Fulton v. City of Philadelphia*, 593 U.S. 522, 542 (2021); *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546–47 (1993). And here, the Act creates an exception for coordinated-party spending on election-recount lawsuits. 52 U.S.C. § 30116(a)(9)(C), (d)(5). This flatly undermines the government's anti-circumvention arguments. If the government is worried donors will launder bribes to candidates through parties, why permit such bribery for recount lawsuits? Does funneling money to a candidate's election-night recount really pose less of a bribery risk than funneling money to his advertisements? Of course not. Yet the Act permits the former expenditure while forbidding the latter. If strict scrutiny applied to coordinated-spending limits, these exceptions would be fatal. But even under intermediate scrutiny, these exceptions provide one more reason to reject the FEC's anti-circumvention rationale.

Putting these weighty concerns aside, the FEC faces a lofty challenge to prove an anti-circumvention interest. Under *Cruz*, the FEC must provide "record evidence or legislative findings demonstrating" that coordinated-party-expenditure limits "further[] a permissible anti-corruption goal." 596 U.S. at 307, 313. Specifically, the FEC needs to identify an instance of "quid pro quo corruption in this context"—an instance in which (1) a donor gave money to a political party, (2) the party coordinated the spending of that money with a candidate, (3) in furtherance of a bribery scheme between the donor and the candidate. *Id.* at 307.

Despite having decades to look for such examples, the FEC identifies only one case that comes close to meeting these criteria.**[2]** Specifically, it points to an incident in which an Ohio school-board member allegedly helped a construction company secure a $96,000 government contract. *See* Plea Agreement 40, *United States v. Pumper*, No. 09-CR-00317 (SL), (N.D. Ohio Dec. 4, 2013). In exchange, the construction company made a $6,000 earmarked contribution to the county-level Democratic Party. *Id.* The party then *allegedly*—this fact is notably absent from the plea agreement—used $4,850 of that money to pay for the board member's campaign ads. *Compare id.*, *with* Information 26–27, *United States v. Pumper*, No. 09-CR-00317 (SL), (N.D. Ohio July 8, 2009). To be sure, this example fits the bill: a donor used coordinated-party spending to facilitate a quid pro quo. At the same time, this lone example is a rather thin reed on which to hinge a nationwide limit on parties' core political speech. After all, federal anti-bribery laws addressed the corruption in that case. *See generally* Plea Agreement, *Pumper*, No. 09-CR-00317 (SL).

In short, the FEC's anti-circumvention case is rather paltry. We're left with a quintuple-prophylactic statutory scheme, nonsensical exceptions to the spending limits, and a lone supporting example.

---

**[2]**The FEC's other examples aren't up to spec for numerous reasons. Some allege only campaign-finance law violations, not quid-pro-quo corruption. Others don't include any specific allegations that the parties in question coordinated expenditures with the allegedly corrupt candidate. And other examples are simply instances of "influence" or "access" that fall short of quid-pro-quo corruption.

B. *Closely Drawn*

Things look even worse for the FEC on the "closely drawn" prong. To prevail at this step, the FEC needs to show that party-coordinated-spending limits "avoid unnecessary abridgment of associational freedoms," *Buckley*, 424 U.S. at 25, and are "narrowly tailored to achieve the desired objective," *McCutcheon*, 572 U.S. at 218 (plurality op.). Again, *Colorado II* shows its age here. As the majority opinion points out, *Colorado II*'s closely drawn analysis afforded Congress significant deference. *See* Majority Op. at 9. The Court held that Congress was "entitled to its choice" among different approaches to regulating campaign finance, and that "unskillful tailoring" isn't enough to invalidate a restriction. *Colorado II*, 533 U.S. at 463 n.26, 465. Since then, however, the Court has likened the "closely drawn" analysis to the "narrowly tailored" prong of heightened scrutiny. *See McCutcheon*, 572 U.S. at 218, 221 (striking down limits when "there [were] multiple alternatives available to Congress that would serve the Government's anti-circumvention interest, while avoiding unnecessary abridgment of First Amendment rights" (internal quotation omitted)). And the Court has openly rejected arguments that it should simply "defer to Congress's legislative judgment" about which campaign-finance limits to enact. *Cruz*, 596 U.S. at 312–13. When subjected to this more rigorous form of closely drawn scrutiny, coordinated-party-spending limits fail to pass muster.

Why does the FEC think coordinated-spending limits are necessary to prevent circumvention? Its argument boils down to this: without such limits, "[a]n individual maximizing contributions to a candidate ($3,300) and maximizing contributions to a party committee such as the NRSC ($41,300) . . . [could] functionally raise[] the base limit for what the donor can directly contribute for the candidate's use by more than 12 times." Second Br. 32 (emphasis deleted). But this logic runs into an immediate problem: to the extent donors could legally do this,[3] it's because *the government* set party-contribution limits twelve times higher than candidate-contribution limits. *Compare* 52 U.S.C. § 30116(a)(1)(A), *with id.* § 30116(a)(1)(B); *see also Buckley*, 424 U.S. at 58 n.66 (noting that similar disparities allegedly give national parties and their candidates a financial advantage over independents and regional third parties). Having created this fundraising disparity, the government can't use it as an excuse

---

[3]They couldn't, as it would flagrantly violate the Act's earmarking rules. *See* 52 U.S.C. § 30116(a)(8).

to curtail parties' speech. *Cf. Republican Party of Minnesota v. White*, 536 U.S. 765, 788 (2002). If the government's worried about the disparity between party- and candidate-contribution limits, the solution is simple: just lower the party-contribution limits.

Moreover, coordinated-party-spending limits target the wrong actor. The FEC's anti-corruption argument focuses primarily on *donors* corrupting candidates. Yet the spending limits here restrict the *parties*. In other words, there's a "substantial mismatch" between these limits' application and the supposed corruption they target. *McCutcheon*, 572 U.S. at 199 (plurality op.). By contrast, if the government simply lowered the amount donors could give to parties, the limits would more closely track the government's anti-corruption interest.

For its part, the FEC never argues that lowering donor-to-party limits would be less effective in preventing circumvention. Instead, the FEC simply contends that lowering donor-to-party limits would "harm[] parties much more dramatically than [coordinated-spending limits], that is, by drastically limiting what they may raise in the first instance." Second Br. 55. In making that argument, the FEC contravenes five decades of Supreme Court precedent. Since *Buckley*, the Court has made clear that spending limits "impose far greater restraints on the freedom of speech and association than . . . contribution limits." 424 U.S. at 44. Lowering donor-to-party limits would therefore pose a smaller First Amendment burden than the spending limits challenged here. And in the campaign-finance realm, the government is usually required to avoid unnecessarily burdening speech.

At base, coordinated-party-spending limits (1) punish parties for a government-created fundraising disparity, (2) target the wrong actor for anti-corruption purposes, and (3) pose a greater First Amendment burden than comparable contribution limits would. Thus, these limits are not "closely drawn" and fail intermediate scrutiny.

## III.

Under *Buckley*'s tiers-of-scrutiny approach, coordinated-party-spending limits do not fare well. But as the majority opinion thoughtfully explains, vertical stare decisis precludes us from disturbing *Colorado II*'s holding here. *See* Majority Op. at 8–10. Notwithstanding changes in Supreme Court jurisprudence, it's the Court's job to overrule its precedents, not ours.

*Truesdell v. Friedlander*, 80 F.4th 762, 782 (6th Cir. 2023) (collecting cases). And while the Court has held that changes in statutes or facts can justify *its* departure from past precedents, it hasn't granted us similar license. *Cf. South Dakota v. Wayfair, Inc.*, 585 U.S. 162, 184 (2018) (changes in "real world" facts permitted the Supreme Court to overrule its precedents); *McCutcheon*, 572 U.S. at 200–203 (plurality op.) (changes in the applicable statutory regime permitted the Court to depart from *Buckley*).

To be sure, *Colorado II* left the door open for as-applied challenges. *See* 533 U.S. at 456 n.17; *see also Wisconsin Right to Life, Inc. v. FEC*, 546 U.S. 410, 411–12 (2006) (per curiam) ("In upholding [a campaign-finance regulation] against a facial challenge, we did not purport to resolve future as-applied challenges."). And here, plaintiffs challenge spending limits as applied to party-coordinated communications. *See* 11 C.F.R. § 109.37. As the majority opinion notes, however, these communications constitute ninety-plus percent of parties' coordinated spending. *See* Majority Op. at 11. Thus, a judgment invalidating the limits as applied to communications "would cover such a substantial number" of coordinated expenditures that the limits "would be rendered substantially overbroad." *FEC v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 498 (2007) (Scalia, J, concurring in part and concurring in the judgment). Such a holding would effectively nullify *Colorado II*—and that's not our prerogative.

*        *        *

*Colorado II* allows us to dodge the grave constitutional issues posed by coordinated-party-spending limits. These limits run afoul of modern campaign-finance doctrine and burden parties' and candidates' core political rights. For the plaintiffs, however, our court is not the proper audience for these concerns.

—————————————————————

## CONCURRENCE / DUBITANTE

—————————————————————

JOHN K. BUSH, Circuit Judge, concurring dubitante. I agree with the majority that we are bound to uphold the limits on coordinated party expenditures in § 315 of the Federal Election Campaign Act of 1971 (FECA), as amended, 52 U.S.C. § 30116, based on the reasoning of *FEC v. Colorado Republican Federal Campaign Commission*, 533 U.S. 431 (2001) (*Colorado II*). I write separately, however, to consider the historical record not addressed by the majority.

In recent years, the Supreme Court has applied history and tradition to review the constitutionality of laws under many federal constitutional provisions, including the First Amendment. *See, e.g.*, *Vidal v. Elster*, 602 U.S. 286, 301 (2024) (First Amendment speech rights); *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 536 (2022) (First Amendment Establishment Clause rights); *United States v. Rahimi*, 144 S. Ct. 1889, 1897 (2024) (Second Amendment rights); *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 24 (2022) (same); *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008) (same); *City of Grants Pass v. Johnson*, 144 S. Ct. 2202, 2215–16 (2024) (the Eighth Amendment's Cruel and Unusual Punishments Clause); *Dep't of State v. Munoz*, 144 S. Ct. 1812, 1822 (2024) (substantive due process rights); *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 250 (2022) (same); *United States v. Texas*, 599 U.S. 670, 676 (2023) (Article III justiciability); *Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 426 (2024) (the Appropriations Clause). Yet in most cases involving campaign finance regulations, beginning with *Buckley v. Valeo*, 424 U.S. 1 (1976), and also in *Colorado II*, the Court has not fully engaged with—and sometimes, has not even mentioned—evidence of history or tradition.

To its credit, the Federal Election Commission (FEC) sought to address such proof in this case. *See* Second Br. at 49–50; Defs.' Proposed Findings of Facts at 3–23, R. 43, PageID 5118–38. In doing so, the FEC argued that historical precedent aligns with the holding of *Colorado II*. *See* Second Br. at 48–50. But, in fact, the pertinent history and tradition appear to cut against, not support, the FEC's position.

The Supreme Court should consider revisiting *Colorado II* for two reasons. First, it conflicts with recent decisions of the Court, as explained in Judge Thapar's concurrence and Judge Readler's dissent. Second, as explained below, *Colorado II* does not address history and tradition that also calls its holding into question.

## I.

Before addressing evidence of the past, though, one asks: why should this type of proof even matter here? In *Buckley*, for example, the Supreme Court considered some history from the Founding era and subsequent years in the part of its opinion that reviewed the constitutionality of the FEC under the Appointments Clause and separation-of-powers principles, *see* 424 U.S. at 1204–34, but otherwise the Court made no use of historical research to address constitutional challenges to FECA provisions. Likewise, in *Colorado II*, the Court did not mention examples from the past apart from case law.

The dearth of historical analysis in *Colorado II* contrasts with many recent decisions of the Court that emphasize history and tradition together with case law as necessary for constitutional interpretation. Although the Justices differ on the degree of emphasis depending on the constitutional issue, they all appear to agree that evidence of the past may be relevant in a wide variety of constitutional cases. *See generally Vidal*, 602 U.S. 286; *United States v. Rahimi*, 144 S. Ct. 1889. Indeed, Justice Sotomayor recently observed that "history proves a lot to me and to my colleagues generally." Transcript of Oral Argument at 10, Trump v. Anderson, 601 U.S. 100 (2024) (No. 23-719).[1]

History proves a lot for many reasons. Three immediately come to mind.

---

[1]The emphasis on history is not, as Judge Stranch's concurrence implies, a "great experiment." Stranch Concurring Op. at 75. Rather, it is a return to the traditional method of interpreting the Constitution according to its reasonable meaning when created. *See, e.g.*, 1 Joseph Story, Commentaries on the Constitution of the United States § 405, 387–88 (1833) (noting that "[w]hen [the Constitution's] words are plain, clear, and determinate, they require no interpretation," though contemporary history and interpretation may help interpret less-than-clear text). The great experiment in constitutional jurisprudence was the theory of a "Living Constitution," first hypothesized in the 20th century, that purported to allow for meanings of constitutional provisions to change through means other than the amendment process of Article V of the Constitution. *See, e.g.*, Jack M. Balkin, *Framework Originalism and the Living Constitution*, 103 Nw. U. L. Rev. 549, 590 (2009).

First, history allows us to understand linguistical meaning at the time of ratification. All interpretation of the Constitution "begin[s] with its text." *City of Boerne v. Flores*, 521 U.S. 507, 519 (1997). Historical evidence reveals word usage then, which may differ from what it is today. *Heller*, 554 U.S. at 576. As explained by Justice Barrett, "[o]riginal history" serves to "elucidate[] how contemporaries" in the ratification generation "understood the text—for example, the meaning of the phrase 'bear Arms'" in the Second Amendment. *Rahimi*, 144 S. Ct. at 1925 (Barrett, J., concurring).[2]

Second, history allows us, at least with respect to some constitutional provisions, to determine categories of private conduct that were typically subject to regulation by government when the relevant constitutional text was ratified. As Justice Kavanaugh observed, this pre-ratification history is particularly relevant for "vague constitutional text." *Id.* at 1912 (Kavanaugh, J., concurring). If government never or seldom regulated a type of conduct during the pre-ratification era, then that may suggest that such conduct is constitutionally protected. But if government did typically regulate the conduct pre-ratification, then that may support an inference that the constitutional text does not bar government intervention. From an individual's perspective, such history helps "determin[e] the affirmative scope or contours of . . . [the] constitutional right" that the person holds. *Id.* at 1912 n.1. From the government's perspective, such history helps "determine[e] the exceptions to a constitutional right," *id.,* thus defining those areas in which the government is empowered to regulate the individual.

Third, evidence of how Americans ordered their lives after ratifying a particular constitutional text—what we call tradition—also may help reveal that text's original meaning. If there was no regulation of a particular type of private conduct for a long and uninterrupted period, then this post-ratification evidence may show that government was not understood to have the constitutional authority to regulate that conduct. And, conversely, if over the post-

---

[2]Finding the original linguistical meaning, or fixed communicative content, of words should not be a matter for controversy, as Judge Stranch seems to imply it is. *See* Stranch Concurring Op. at 72–73. As Professor Lawrence Solum has explained, even some non-originalist jurisprudential methods value the original linguistical meaning of constitutional text. Lawrence B. Solum, *The Fixation Thesis: The Role of Historical Fact in Original Meaning*, 91 Notre Dame L. Rev. 1, 9 (2015). The issue is not whether there is an original meaning, but rather whether a judge should be constrained by it. And no one seriously questions that, in analyzing words used in the Constitution, linguistical history from the era of constitutional ratification is probative of that original meaning. *See, e.g.*, Story, *supra* note 1, at § 405, 387.

ratification period there is evidence of regulation, then that proof may be relevant to show that constitutional power to regulate was understood to exist. As Justice Kavanaugh explained, "[p]ost-ratification interpretations and applications by government actors—at least when reasonably consistent and longstanding—can be probative of the meaning of vague constitutional text" and "[t]he collective understanding of Americans who, over time, have interpreted and applied the broadly worded constitutional text can provide good guidance for a judge who is trying to interpret that same text decades or centuries later." *Id.* at 1916. Such evidence of historical tradition "becomes especially important" if the only alternative to its use is "the judge simply default[ing] to his or her own policy preferences." *Id.*[3]

The usefulness of history and tradition, however, is tempered by the fact that the world in which we live is not the same world as when the Constitution was ratified or the worlds of the post-ratification generations who came before us. Whether because of progress in how we live (think technological advancements), how we treat each other (think social transformation such as the abolition of slavery), or some other reason, today's America is not your Founding Fathers' America. Perhaps because of the differences, the Supreme Court in *Rahimi* observed that its emphasis on history and tradition is "not meant to suggest a law trapped in amber." *Id.* at 1897 (majority opinion); *see also id.* at 1925 (Barrett, J., concurring) ("21st-century regulations" need not "follow late 18th-century policy choices."). But, except as it has been amended, the Constitution remains the same for us as it existed for those before us. *See id.* at 1908 (Gorsuch, J., concurring) ("Developments in the world may change, facts on the ground may evolve, and new laws may invite new challenges, but the Constitution the people adopted remains our enduring guide."). Unless amended, original guarantees of liberty in the Constitution remain undiminished over time. Thus, *Rahimi* reaffirmed that the Second Amendment should be applied today based on the full scope of its original meaning.[4]

---

[3]Judge Stranch argues that even though a private activity may not have been regulated in the pre-ratification and early post-ratification eras, such history and tradition do not necessarily mean that government lacked the power to regulate. *See* Stranch Concurring Op. at 73–74. Judge Stranch's point is valid in the abstract but, under the *Rahimi* framework, the FEC bears the burden of justifying the regulation with historical analogues. 144 S. Ct. at 1897. To explain how the FEC fails that burden, I offer historical examples below.

[4]As Judge Stranch recognizes, the Constitution has been amended to extend its original guarantees of freedom to all Americans without regard to race or sex. *See* Stranch Concurring Op. at 69. But that is not a reason

In doing so, we find guidance from general, not identical, historical analogues. For Second Amendment jurisprudence, the Court does not search for "a 'dead ringer' or a 'historical twin'" as the standard for historical relevance. *Id.* (majority opinion). Rather, to determine original meaning, "[a] court must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.'" *Id.* (quoting *Bruen*, 597 U.S. at 29 & n.7). By "relevantly similar" the Court means historical analogues that reveal conceptual, not necessarily exact, parallels. As Justice Barrett put it, "[h]istorical regulations reveal a principle, not a mold." *Id.* at 1925 (Barrett, J., concurring).

The principle to be drawn, however, must not be at too high a level of abstraction. So, for example, the Court rejected "the Government's contention that Rahimi may be disarmed simply because he is not 'responsible.'" *Id.* at 1903 (majority opinion). The Court noted: "'Responsible' is a vague term" and "[i]t is unclear what . . . a rule would entail" if it based the government's power to disarm on whether someone is "responsible" or not. *Id.* Instead, the Court upheld the disarmament law at issue because it did "not broadly restrict arms use by the public generally" and because the burden and penalty of the law "fit[] within the regulatory tradition" of historical examples—namely, surety and going armed laws. *Id.* at 1901.

Having just rendered its decision in *Rahimi,* the Court has yet to consider how that case applies beyond the Second Amendment. But many of the concurring opinions in *Rahimi* suggest that it will have broader constitutional importance. Justice Gorsuch, for example, conveyed in his concurrence that consideration of historical evidence is appropriate in every constitutional case: "Come to this court with arguments from text and history, and we are bound to reason through them as best we can." *Id.* at 1909 (Gorsuch, J., concurring). And Justice Barrett, while disclaiming "freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights," nonetheless invoked generally a theory of constitutional interpretation "built on two core principles: that the meaning of constitutional text

---

to deny to all Americans today the full scope of liberty enjoyed by those who adopted and ratified the Constitution. The Constitution has been amended to *extend* its rights protections, not to reduce the scope of those protections. As explained below, my concern about *Colorado II* is that it appears to countenance an America in which we have less liberty under the First Amendment than the Founders enjoyed.

is fixed at the time of its ratification and that the 'discoverable historical meaning . . . has legal significance and is authoritative in most circumstances.'" *Id.* at 1924 (Barrett, J., concurring) (quoting Keith E. Whittington, *Originalism: A Critical Introduction*, 82 Ford. L. Rev. 375, 378 (2013)). Justice Kavanaugh likewise wrote broadly of reliance on not only text and precedent but also history and tradition, and he repeatedly cited the First Amendment in particular as appropriate for historical analysis: "When performing that Article III duty, the court does not implement its own policy judgments about, for example, free speech or gun regulation. Rather, the Court interprets and applies the Constitution by examining text, pre-ratification and post-ratification history, and precedent." *Id.* at 1910 (Kavanaugh, J., concurring) (emphasis added); *see id.* at 1911, 1915 (citing the First Amendment).

With these directions in mind, it appears that many, and perhaps a majority, of Justices would consider evidence of history and tradition as relevant to analyze the constitutionality of the regulation at issue here. It is to the FEC's arguments based on such proof that I now turn.

## II.

The FEC does not make any argument about the linguistics history of the First Amendment in support of its position. Instead, the FEC makes three points about historical practice generally. First, it relies on pre-ratification history to argue that "concerns about political party corruption animated the Founding." Defs.' Proposed Findings of Fact 3, R. 43, PageID 5118 (capitalization and bolding omitted). Second, it assesses "text of the Constitution" that "addresses corruption and faction." *Id.*, PageID 5124 (capitalization and bolding omitted). And third, the FEC argues based on a combination of pre- and post-ratification history: "Founding-era thinkers viewed legislative efforts to promote the public good as valid, including through laws impacting speech rights." *Id.*, PageID 5133 (capitalization and bolding omitted).

In support of its arguments, however, the FEC fails to meet the *Rahimi* standard. The FEC advances no fairly drawn principle from history or text showing that the restriction at issue "is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.'" *Rahimi*, 2024 WL 3074728, at 1898 (quoting *Bruen*, 597 U.S. at 29 & 29 n.7). In fact, pre- and post-ratification

history confirms the plain meaning of the constitutional language: when the people ratified the guarantee of First Amendment that "Congress shall make no law . . . abridging the freedom of speech," U.S. Const. amend I, there was no exception relevantly similar to the restriction at issue here that was understood to permit Congress to abridge citizens' freedom to coordinate their speech.

## A. Evidence of Founders' Concerns About Political Parties and Government Corruption

The FEC begins with evidence from the Constitutional Convention that the Founders were concerned about government corruption. *See* Defs.' Proposed Findings of Fact 3–5, R. 43, PageID 5118–20. No one disputes that. Indeed, American disgust with corrupt British officials was a principal reason for the War of Independence.[5] But the FEC's high-level definition of government corruption finds no support in the historical record when it gets down into the weeds: it categorizes a wide swath of coordinated private conduct related to speech as potential sources of "corruption" even though such conduct was never regulated in the Founding era or early American Republic. In those years there were never any per se limitations on the ability of individuals or groups to contribute and coordinate political expenditures.

Tellingly, while the FEC argues that the Framers opposed government corruption, it does not point to a single piece of historical evidence that anyone in the Founding generation considered the *amount* or *degree of coordination* for political contributions to be sanctionable. The FEC cites no pre-First Amendment or early American law that provides historical support for congressional authority to generally regulate in the manner challenged here.

Perhaps to divert attention from this absence of proof, the FEC instead cites evidence that "the Framers identified 'faction'-related corruption as dangerous to the nation, including to elections." Defs.' Proposed Findings of Fact 5, R. 43, PageID 5120 (capitalization and bolding omitted). The FEC's logic appears to be that the Founders considered "factions" to be causes of

---

[5]Gouverneur Morris colorfully captured the American attitude to perceived British corruption: "Trust Crocodiles, trust the hungry Wolk in your Flock, or a Rattle Snake in your Bosom, you may yet be something Wise. But trust the King, his Ministers, his Commissioners, 'tis Madness in the Extreme." Gouverneur Morris, *Oration on the Necessity for Declaring Independence from Britain (1776)*, *in* To Secure the Blessings of Liberty: Selected Writings of Gouverneur Morris 24 (J. Jackson Barlow ed., 2012).

government corruption, that political parties were labelled as factions, and therefore the First Amendment permits the regulation of how political parties coordinate their speech. What is missing from the FEC's syllogism, however, is any evidence linking the Framers' general concerns about factions and corruption to any specific law that regulated the coordination of expenditures and spending for political speech. The FEC's argument is similar to the government's proposed test based on "responsible" citizens that was rejected in *Rahimi*. Unmoored from any historical example of a government restriction to define its application, the FEC's "faction" and "corruption" test is similarly vague and overinclusive.

The FEC is correct about one thing: political parties did not exist at the Founding, at least in their modern sense. But even before ratification, and in the early days of the Republic, there were competing ideological groups in America. Like-minded groups sought to advance their political causes through coordination of messaging, candidates, and supporters.

These groups campaigned vigorously against one another, as political parties do today. The political group divisions included the Patriots versus the Loyalists in the runup to and during the American Revolution;[6] the Federalists versus the Antifederalists during the debates over the adoption and ratification of the Constitution;[7] and the Federal (or Anti-Republican) Party versus the Anti-Administration Party (or Jeffersonian Republicans, later Democratic-Republicans) in the early Republic.[8] James Madison may have derided political groups as motivated by "the spirit of party and faction," The Federalist No. 10 (James Madison), but he—and indeed every

---

[6]*See, e.g.*, Robert G. Parkinson, *Print, the Press, and the American Revolution* (Sept. 3, 2015), https://doi.org/10.1093/acrefore/9780199329175.013.9 (describing the political division between, on the one hand, the Patriots and those printers with whom they coordinated, and on the other hand, those persons who remained loyal to the Crown and the printers who "made their newspapers available for loyalists to submit essays that criticized patriot resistance efforts").

[7]*See, e.g.*, Michael J. Klarman, The Framers' Coup: The Making of the United States Constitution 8 (2016) (noting that the "contest" between Federalists and Antifederalists "over ratification was, perhaps to a surprising degree, fought largely with the weapons of ordinary politics").

[8]*See, e.g.*, Jon Meacham, Thomas Jefferson: The Art of Power 295 (2012) (Jefferson describing the "two parties" that existed in the United States as of 1795 as "The Republican part of our Union" and the "Anti-republicans").

prominent Founder, including purportedly neutral George Washington[9]—aligned with at least one of these competing groups at one time or another. And throughout this history of American political contests, speech by political groups and candidates inevitably included combined political contribution and spending on each side of the political spectrum.

For example, in the period leading to the American Revolution, coordination of speech was necessary to rally the American colonies, later states, in their fight for independence. In the 1760s the Sons of Liberty and other aligned groups used committees of correspondence, which had long existed "as a way for colonial legislature to communicate with their agents in London," "to organize resistance between cities."[10] Similarly, in the 1770s "there were three consecutive systems of committees of correspondence: the Boston-Massachusetts system, the inter-colonial system, and the post-Coercive Acts system," all employed throughout the colonies to effect fundamental political change.[11]

Along with coordinated correspondence came coordinated funding for Patriot politicians. One example: Boston merchant John Hancock joined with other benefactors to anonymously fund Samuel Adams, a leader of the Sons of Liberty who represented Massachusetts in the Continental Congress.[12]

Also, "Patriot leaders from the mid-1760s through the Treaty of Paris spent a great deal of time and, more illuminating, money supporting all kinds of print: subsidizing printers, aiding in paper supplies, contributing private correspondence to newspapers, ordering the publication of certain documents, treating printing presses as military contraband, sending pamphlets in

---

[9]*See, e.g.*, Williard Sterne Randall, The Founders' Fortunes: How Money Shaped the Birth of America 275 (2022) (noting that Washington eventually sided with Federalists over Jeffersonian Republicans in relation to revolutionary France).

[10]Catherine Treese, *Committees of Correspondence*, Digital Encyclopedia of George Washington, https://www.mountvernon.org/library/digitalhistory/digital-encyclopedia/article/committees-of-correspondence/#:~: text=Committees%20of%20correspondence%20had%20existed,to%20organize%20resistance%2 0between%20cities.

[11]*Id.*

[12]*See* Stacy Schiff, The Revolutionary: Samuel Adams 61, 219 (2022).

diplomatic packets, arranging for illustrations for a child's book of British atrocities."[13]  Another example: Robert Morris, the Superintendent of Finance for the Office of Finance of the Continental Congress, joined with his assistant Gouverneur Morris, future stylist of the Constitution—along with George Washington and New York politician Robert R. Livingston—to provide a stipend of "$800 a year (about $10,000 today)" to political-tract author Thomas Paine "to write articles 'informing the people and rousing them into action.'"[14]  The payments to Paine were kept "secret, as 'a Salary publicly and avowedly given . . . would injure the Effect of Mr. Paine's Publications, and subject him to injurious personal Reflections.'"[15]

Paine's chief benefactor, Philadelphia trader Robert Morris, was called "the Financier of the Revolution" for good reason.  He, along with Haym Salomon, another Philadelphia businessman, were among a small group who personally contributed large sums to the American Confederation to help finance the war effort.[16]  General Washington himself was part of that funding group: he spent around $160,000 (around $5 million today) of his wealth to pay for war-related expenses of the Continental Army.[17]

Coordinated political money thus not only talked; it fought for our nation's independence.  In 1781, the year of Yorktown, Alexander Hamilton observed: "Tis by introducing order into our financing—by restoring public credit, not by gaining battles, that we are finally to gain our object."[18]  The public credit of which Hamilton wrote found restoration

---

[13]Parkinson, *supra* note 6.

[14]Richard Brookhiser, Gentleman Revolutionary: Gouverneur Morris—The Rake Who Wrote the Constitution 70 (2003) (quoting John Keane, Tom Paine 218 (1995)); *see also* Melanie R. Miller, Envoy to the Terror: Gouverneur Morris & the French Revolution 106 (2005).

[15]Charles Rappleye, Robert Morris: Financier of the American Revolution 296 (2010) (quoting Agreement with Robert Livingston and George Washington (Feb. 10, 1782), *in* 4 The Papers of Robert Morris, 1781–1784, at 201 (E.J. Ferguson ed., 1973)).

[16]*Id.* at 245.

[17]*Revolution and the New Nation (1754-1820s)*, Nat'l Archives and Recs. Admin., http://www.archives.gov/exhibits/american_originals/acctbk.html (last updated July 1, 1998).

[18]Letter From Alexander Hamilton to Robert Morris (Apr. 30, 1781), *in* 2 The Papers of Alexander Hamilton 1779-1781, 604 (Harold C. Syrett ed., 1961) https://founders.archives.gov/documents/Hamilton/01-02-02-1167.

from funding provided by three foreign nations (France, Spain, and the Netherlands)[19] and a handful of affluent Americans.[20]

The Confederation Congress accepted money with no limit imposed by that Congress or the newly formed state governments on the amount that anyone could contribute to the public fisc or on the degree of cooperation between private citizens to raise and spend such funds. The Founders addressed government corruption not through restrictions on political spending levels or coordination, but through measures against bribery and similar activity.

In that regard, there are several episodes from the Founding Era and early American Republic when charges of corruption were raised against government officials for allegedly accepting improper payments. Among these examples are the "Silas Deane affair" in 1778, when Deane, an American diplomat in France, was accused of receiving inappropriate compensation related to his mission, and the "Fauchet scandal" in 1795, when then-Secretary of State Edmund Randolph resigned from Washington's cabinet after being accused, like Deane, of taking a French bribe.[21] Benjamin Franklin also came under scrutiny when Louis XVI gave him an incredibly valuable gift at the end of his time in France.[22]

Investigations of such charges centered on whether the government official was paid to do something to directly benefit a private interest—the essence of bribery.[23] And this quid pro

---

[19]Office of the Historian, *Milestones in the History of U.S. Foreign Relations: U.S. Debt and Foreign Loans, 1775–1795*, United States Department of State, https://history.state.gov/milestones/1784-1800/loans#:~:text=During%20the%20Revolution%2C%20the%20French,from%20Dutch%20bankers%20in%201782 (describing financial support from the French, Dutch, and Spanish during the American Revolution).

[20]*See* Thomas Shachtman, The Founding Fortunes: How the Wealthy Paid for and Profited from America's Revolution 109 (2019) (noting that war funding came from "some of the wealthy" who had "dug into their pockets"). One example: On June 8, 1780, Robert Morris "and several score 'men of property' gathered at the London Coffee House [in Philadelphia] to raise a fund 'to be given in bounties to promote the recruiting service of the United States.' Before the week was out, Philadelphia's merchants and traders had raised four hundred pounds in hard money and more than one hundred thousand dollars in Continental paper." Rappleye, *supra* note 15, at 215.

[21]*See* Brookhiser, *supra* note 14, at 56 ("Historians sometimes treat the fight over Deane as the seed time of American political parties, the conservative revolutionaries defending Deane, the radical ones attacking him."); John J. Reardon, Edmund Randolph: A Biography 306–13 (1974) (describing the Fauchet scandal).

[22]*See* Randall, *supra* note 9, at 252.

[23]Bribery today is defined much the same as it was at the Founding. *Compare Snyder v. United States*, 144 S. Ct. 1947, 1951 (2024) ("As a general matter, bribes are payments made or agreed to before an official act in order to influence the official with respect to that future official act." (emphasis omitted)), *with* Giles Jacob, New-

quo corruption was what the Founding generation recognized as outside the scope of state constitutional, statutory, or common law protection for free speech. Bribery was investigated and prosecuted if warranted. Coordinated political contributions and spending were not.

After the war, this condition of affairs continued, including during the state debates over ratification of the Constitution. In New York, for example, "Federalists dominated the newspapers in the state," but "Antifederalists were more successful in getting their views publicly circulated than were their counterparts in most other states. Both parties established county committees to supervise the nomination of candidates for the ratifying convention and to coordinate with allies across the state."[24] "The Federalists' shrewd strategizing illustrates how the ratifying contest was a political campaign not very different from ordinary politics, much more than it was an abstract debate between proponents of competing political philosophies."[25]

It has been argued that the Antifederalists lost the constitutional ratification debate, in large part, because their message was scattershot—"immense and heterogeneous, encompassing speeches, pamphlets, essays, and letters."[26] Federalists, in contrast, directed much of their messaging at least in New York through a singular channel controlled by just three people— Alexander Hamilton, John Jay, and James Madison.[27] They wrote under the singular pseudonym of "Publius" to produce *The Federalist Papers*, which they disseminated through combined efforts.[28] Their political advocacy—what one historian called a "Triumvirate"—thus serves as

---

Law Dictionary: Containing the Interpretation and Definition of Words and Terms Used in the Law (10th ed. 1782) (defining bribery: "taken largely it signifies the receiving, or offering, any undue reward, to or by any person concerned in the administration of public justice whether judge, officer &c to act contrary to his duty, and sometimes it signifies the taking or giving a reward for a public office").

[24]Klarman, *supra* note 7, at 485.

[25]*Id.* at 612; *see also* Pauline Maier, Ratification: The People Debate the Constitution 1787–1788, at 328 (2010) ("The contest for delegates in New York was distinctive. More than in any other state, the fight was between two organized parties.").

[26]*The Essential Antifederalist*, at xii (W. B. Allen et al. eds., 2d ed. 2002).

[27]Maier, *supra* note 25, at 84.

[28]*Id.*

an early example where coordination of privately produced and financed speech was perhaps as important as its content to achieve political victory.[29]

Federalists did their messaging through news media paid for, at least in part, by Federalist politicians and their supporters. "[A]lmost all newspapers were published in cities," where most people supported the Constitution, unlike rural areas, where most Antifederalists lived.[30] "[T]hose rare newspaper editors" who printed pieces opposing ratification faced "economic boycotts launched by their overwhelmingly Federalist advertisers and readers."[31] "Federalists also tended to control printing offices and taverns, the latter of which served as unofficial post offices and thus could block circulation of Antifederalist pamphlets."[32]

And just after the Constitution was ratified, coordinated political fundraising and spending continued through nascent political parties and their newspaper affiliates. During President Washington's administration, cabinet sniping between Secretary of Treasury Alexander Hamilton (a leader of the Federal Party) and then-Secretary of State Thomas Jefferson (the leader of the emerging Jeffersonian Republican Party) drove a partisan newspaper war, financed through private subscriptions as well as secret payments coordinated by Federalists on the one hand and Jeffersonian Republicans on the other.[33]

"To build his political party, Jefferson needed financial backers, a publicity machine, and a large constituency of loyal voters."[34] "Always quicker than Jefferson, Hamilton already had

---

[29]*See* Bruce Chadwick, Triumvirate: The Story of the Unlikely Alliance That Saved the Constitution and United the Nation 27 (2009) ("There was no known formal written note between them [*i.e.*, Jefferson, Madison, and Jay] acknowledging the formation of the Triumvirate, but any study of their activities leaves no doubt that they not only put one together, but planned one of the great lobbying campaigns in American history to get the Constitution ratified.").

[30]Klarman, *supra* note 7, at 408.

[31]*Id.*

[32]*Id.*

[33]*See* H.W. Brands, Founding Partisans: Hamilton, Madison, Jefferson, Adams, and the Brawling Birth of American Politics 188–89 (2023); David Stephen Heidler & Jeanne T. Heidler, Washington's Circle: The Creation of the President 251 (2016); Brookhiser, *supra* note 14, at 159.

[34]Harlow Giles Unger, "Mr. President": George Washington and the Making of the Nation's Highest Office 129 (2013).

all three, tapping wealthy New York bankers for financial support and votes and corralling political workers from the nearly five hundred customs officials, tax collectors, and Treasury Department employees who depended on him for employment."**35**

So, in 1791, Jefferson and Madison made a trip together to New York City to start building their political party. No longer closely aligned with Hamilton's politics, Madison now allied more with Jefferson. The two met with Robert R. Livingston, Aaron Burr, and "Philip Freneau, a writer they hoped to recruit to start a newspaper to compete with the pro-Hamilton *Gazette of the United States*."**36** Freneau "was to be subsidized by the Department of State, where Jefferson employed him as a translator."**37** "The Freneau appointment was a critical step for the emerging [Jeffersonian] Republican Party."**38**

Historian H.W. Brands made the point that the FEC emphasizes—that "[p]arties had been something the framers identified with corrupt monarchies; most would have been horrified at the thought parties would spring up in republican America."**39** But Brands added that "parties *did* spring up, and with each year after the midpoint of Washington's president, they grew stronger."**40**

Indeed, as evidenced by the activities of Jefferson, Madison and others, the parties had their genesis even earlier than Brands suggests—in 1791, the year when the First Amendment was ratified. And it was no secret to the Americans who ratified the Amendment that political parties were being formed. In 1792, U.S. Senator Rufus King (a future Federal Party presidential nominee) wrote another Federalist, Gouverneur Morris (who then was the U.S. minister plenipotentiary in revolutionary France), that American newspapers allowed a reader to "form a pretty good opinion of the State of parties here. The gazette of the U.S. published at Philadelphia

---

**35***Id.*

**36**Meacham, *supra* note 8, at 256.

**37***Id.*

**38***Id.*

**39**Brands, *supra* note 33, at 299.

**40***Id.* at 299–300.

by [John] Fenno is one side"—the Federal Party—"and the national Gazette published at the same place by [Jeffersonian Republican Philip] Freneau, a clerk in Jefferson's Office, is on the other."[41]

King explained to Morris that the division between American political parties "proceeds from that Rivalry which always has & will prevail in a free country."[42] Morris could understand King's point from his vantage point in France. In the early days of the French Revolution—the time of "the Reign of Terror"—political competition had disappeared in France, thanks to the Jacobins' guillotine-enforced censor of dissent from any opposing party.[43] When Morris sent Jefferson some French gazettes in 1792, he cautioned that they were "written not only in the Spirit of a Party but under the Eye of a Party. The first must influence the most honest Printer in the Coloring of some Facts and the second will restrain the boldest Printer in the publishing of other Facts."[44]

But in America, with its emerging rival-party system, things were very different, and freedom of political speech flourished. In October 1795, Jefferson wrote in his notes: "Two parties then do exist within the US."[45] The parties competed throughout the nation during the election of 1796. As historian John Ferling wrote, "[s]ome degree of party organization, however primitive, existed in almost every state. What is more, each party was identified with a core set of ideas. Those who followed politics knew what the parties stood for, understood the stakes in this election, and—as has largely been true throughout America's political history—

---

[41]Letter from Rufus King to Gouverneur Morris (Sept. 1, 1792), *in* 2 A Diary of the French Revolution by Gouverneur Morris 566 (Beatrix Cary Davenport ed., 1939).

[42]*Id.* at 567.

[43]In 1793 Morris wrote Washington from Paris: "The revolutionary Tribunal establish'd here to judge on general Principles give unlimited Scope to Will. It is an emphatical Phrase in Fashion among the Patriots that *Terror is the order of the Day.*" Letter from Gouverneur Morris to George Washington (Oct. 18, 1793), *in* 14 The Papers of George Washington, 1 September–31 December 1793, at 229 (David R. Hoth ed., 2008), https://founders.archives.gov/documents/Washington/05-14-02-0162; *see also* Randall, *supra* note 9, at 275 (noting "the mass guillotining of the Reign of Terror").

[44]Letter from Gouverneur Morris to Thomas Jefferson (Aug. 16, 1792), *in* 24 The Papers of Thomas Jefferson 1 June-31 December 1792, at 301 (John Catanzariti ed., 1990) https://founders.archives.gov/documents/Jefferson/01-24-02-0287.

[45]Meacham, *supra* note 8, at 295.

believed that the election of a candidate who was affiliated with a party afforded a general expectation of how that candidate could be expected to act once in office."[46]   And government imposed no restrictions on how the emerging political parties communicated  to the public who their candidates were and where they stood on the issues.   To be sure, Congress passed the constitutionally questionable Sedition Act of 1798, 1 Stat. 596, but not even that legislation attempted to limit, as does the law at issue here, contributions and spending on political speech or the coordination of such.[47]

Left unregulated, political parties became even more intertwined with their respective candidates in the bitterly contested election of 1800.  Shortly afterward, Jefferson met with John Adams, the Federalist he had defeated in that election:

> Mr. Adams, said I, this is no personal contest between you [and] me. [T]wo systems of principles on the subject of government divide our fellow-citizens into two parties. [W]ith one of these you concur, [and] I with the other. [A]s we have been longer on the public stage than most of those now living, our names happen to be more generally known. [O]ne of these parties therefore has put your name at its head, the other mine. [W]ere we both to die today, tomorrow two other names would be in the place of ours, without any change in the motion of the machine. [Its] motion is from [its] principle, not from you or myself.[48]

---

[46]John Ferling, Adams vs. Jefferson: The Tumultuous Election of 1800, at 87 (2004).

[47]The Sedition Act was one of several statutes now collectively known as the Alien and Sedition Acts. *Ludecke v. Watkins*, 335 U.S. 160, 172 n.18 (1948).  The Sedition Act prohibited any person from writing, printing, or uttering criticism of the federal government.  Sedition Act of 1798, 1 Stat. 596; *see New York Times Co. v. Sullivan*, 376 U.S. 254, 273–74 (1964) (summarizing the Act).  The Supreme Court has indicated that the Sedition Act does not reflect the Founding generation's consensus view of the First Amendment: it was "vigorously and contemporaneously attacked as unconstitutional." *Ludecke*, 335 U.S. at 172 n.18.  Jefferson and Madison ghostwrote the initial drafts of the Virginia and Kentucky Resolutions, the final versions of which openly challenged the constitutionality of the Sedition Act, among other statutes within the Alien and Sedition Acts. *See generally* Wayne D. Moore, *Reconceiving Interpretive Autonomy: Insights from the Virginia and Kentucky Resolutions*, 11 Const. Comment. 315 (1994) (providing historical background to the Resolutions).  But the Supreme Court did not review the Sedition Act before President Jefferson allowed it to expire in 1801. *Sullivan*, 376 U.S. at 276 & 276 n.16 (1964).  Ultimately, Congress repaid the fines levied against those prosecuted under the Sedition Act "on the ground that it was unconstitutional," and President Jefferson "pardoned those who had been convicted and sentenced under the Act and remitted their fines." *Id.* (summarizing this history, related legislation, and later assessments by Supreme Court justices as "reflect[ing] a broad consensus that the [Sedition] Act, because of the restraint it imposed upon criticism of government and public officials, was inconsistent with the First Amendment").

[48]Letter from Thomas Jefferson to Benjamin Rush (Jan. 26, 1811), *in* 3 The Papers of Thomas Jefferson, Retirement Series, 12 August 1810 to 17 June 1811, at 304 (J. Jefferson Looney ed., 2006) https://founders.archives.gov/documents/Jefferson/03-03-02-0231.

As Jefferson's words reveal, candidates were known by their political parties, and vice versa, in the early Republic. No law restricted the coordination of their speech. Delegates to the Constitutional Convention may have condemned factions as a talking point, but political parties were not condemned in practice through any restriction on their activities in support of candidates under the Constitution. That history and tradition stand in bold contrast to the FEC's historically unsupported attempt to justify its restriction of First Amendment liberty here.

B.  The Constitutional Text

To bolster its shaky First Amendment historical evidence, the FEC turns to other provisions of the Constitution besides the First Amendment. The FEC cites a number of provisions that it contends "address[] corruption and faction": the Foreign Emoluments Clause; the Domestic Emoluments Clause; the Ineligibility Clause; the provision regarding size of the legislature in Article I, Section 2; the provision regarding the president's veto power in Article I, Section 7, Clause 2; the Elections Clause of Article I, Section 4; and various constitutional amendments. Defs.' Proposed Findings of Fact 9–18, R. 43, PageID 5124–33. But none of these constitutional provisions cited by the FEC contain any language creating an exception to the First Amendment supporting the FEC's regulation of speech in this case.

Besides the constitutional text cited by the FEC, the People's representatives in the Constitutional Convention, the state ratifying conventions, and the early Congresses combatted government corruption at the national level in at least three other ways. First, the Constitution delineated a structure of government to protect against tyranny—the separation of powers, checks and balances between branches of the national government, and division of powers between the national and state governments.[49] Second, the nation's charter listed "Bribery" as a ground for impeachment of "the President, Vice President, and all civil Officers of the United States." *See* U.S. Const. art. II, § 4 ("The President, Vice President and all civil Officers of the United States, shall be removed from Office on Impeachment for, and Conviction of, Treason, *Bribery*, or other high Crimes and Misdemeanors." (emphasis added)). Third, through statutes, Congress criminalized bribery and similar misconduct—what the Supreme Court has since called

---

[49]*See* Maier, *supra* note 25, at 463 ("The division of power between the states and the nation, like that among the branches of the federal government, provided a structural check on potentially oppressive power.").

prohibitions of "*quid pro quo* corruption."[50] *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 197 (2014) (plurality opinion); *see, e.g.*, the Crimes Act of 1790 § 29, 1 Stat. 112 (criminalizing federal judge bribery); Act of July 31, 1789, ch. 5, § 35, 1 Stat. 29 (criminalizing customs officials bribery); Act of Mar. 3, 1791, ch. 15, § 47, 1 Stat. 199 (criminalizing tax official bribery).[51]  Again, none of these laws at the Founding and in the early Republic prohibited coordinated political contributions and spending.

Judged by this early legal landscape, the FECA restriction here is far afield from those methods of regulation recognized by relevant history and tradition to be within the national government's power.

C.  Regulation of Speech for the Public Good

Finally, the FEC argues that "Founding-era thinkers viewed legislative efforts to promote the public good as valid, including through laws impacting speech rights."  Defs.' Proposed Findings of Fact 18, R. 43, PageID 5133 (capitalization and bolding omitted).  This argument rests on two premises: first, that "political theorists in the Framers' time viewed speech as subject to regulation for the public good," and second, that "Founding-era courts generally did not overturn important regulations of speech."  *Id.*, PageID 5133–35 (capitalization and bolding omitted).  Again, the FEC offers no evidence in support of those general propositions that bears upon the specific type of political speech regulation here.  As noted, not even the most egregious

---

[50]Congress did not legislate on a blank slate.  William Blackstone, "whose works constituted the preeminent authority on English law for the founding generation," *Alden v. Maine*, 527 U.S. 706, 715 (1999), described the "the infamous practice of bribery and corruption" within Parliament.  1 William Blackstone, Commentaries *179.  English law was primarily concerned with candidates from giving bribes to electors to secure office.  *Id.*  As punishment, both the bribed elector and bribing officer were fined and "forever disabled from voting and holding any office in any corporation."  *Id.*

[51]Some uncertainty existed in that period as to how to punish bribery, though.  In *United States v. Worrall*, a panel addressed whether a prosecutor could indict a defendant in federal court for bribery when Congress did not punish that offense.  2 U.S. 384 (C.C.D. Pa. 1798).  Justice Chase—riding circuit—concluded that the Constitution limited federal courts to punish only crimes defined by Congress, and federal criminal common law did not exist, so the defendant there could not be indicted for attempting to bribe a tax official.  *Id.* at 394–95.  Justice Chase's panel colleague, Judge Peters, determined that the power to punish an offense is inherent to governing, so the defendant could be indicted for bribery absent a congressional statute punishing that crime.  *Id.* at 395.  That position found support in English common law.  *See* Blackstone, *supra* note 50, at *179 n.51 (noting that "bribery [was] a crime at common law").  The divided panel in *Worrell* ultimately split the difference: it mitigated the defendant's sentence to three months in prison and a $200 fine.  *Worrall*, 2 U.S. at 396.

regulation of speech in the early Republic, the Sedition Act, abridged speech in the way that the law at issue does here. The FEC thus points to no "[h]istorical regulation" that "reveal[s] a principle" of government authority to regulate in the manner the FEC seeks to justify. *Rahimi*, 2024 WL 3074728, at 1925 (Barrett, J., concurring).

## III.

The FEC attempts to get around its failure of proof by trying to shoehorn the challenged rule into the category of laws that it claims may be justified as indirect means to combat quid pro quo corruption. Essentially, the FEC's reasoning is that (1) the larger a campaign contribution is, the more likely there is to be a quid pro quo, and (2) it is therefore reasonable to place limits on coordinated contributions and spending because donors otherwise could increase their contributions to a candidate by coordinating funds given to a political party with funds donated directly to a candidate from that party. Second Br. at 31.

But as explained above, the historical record, in fact, shows that the Founding generation did not view coordinated political contributions and spending as sanctionable in and of themselves. In fact, individuals who combined sizable resources to support the American Revolution and the Constitution were met with applause, not opprobrium. And substantial coordination of activities for political parties and their respective candidates soon took root in the early American Republic. The FEC offers no evidence of any legislated limits on coordinated political contributions and spending in this era.

## IV.

This case is not the first time that our *en banc* court has held that we are bound by Supreme Court constitutional precedent, though many of us disagree with the logic or historical underpinnings of that precedent and some of us even offer a dissent that argues the precedent can be distinguished. *See, e.g.*, *Turner v. United States*, 885 F.3d 949, 953 (6th Cir. 2018); *id.* at 955 (Bush, J., concurring dubitante); *id.* at 966 (Clay, J., concurring in the judgment only); *id.* at 976–77 (White, J., concurring); *id.* at 977–78 (Stranch, J. dissenting). So I am not concerned, as Judge Stranch appears to be, by the majority opinion's reasoning that outlines relevant issues or the separate writings of judges who concur or dissent in this case.

None of us is vested with Supreme Court authority.  In this case, all that we can do as lower court judges is essentially make suggestions for that Court to consider.  This is a legitimate function for our court, especially where, has here, the case is a strong candidate for certiorari.

I, therefore, concur with the Court's opinion, but respectfully submit this opinion to explain my doubts about the precedent that binds us.  The dearth of historical examples supporting the FEC's position calls for the Supreme Court to reexamine its First Amendment jurisprudence that applies here.  I respectfully submit that it is time to read some American history, which suggests that coordinated party expenditure limits violate the First Amendment.

---------------------------------------------

**CONCURRING IN THE JUDGMENT**

---------------------------------------------

JANE B. STRANCH, Circuit Judge, concurring in the judgment.  The plaintiffs filed this lawsuit to ask the Supreme Court to overrule its decision in *FEC v. Colorado Republican Federal Campaign Committee*, 533 U.S. 431 (2001), a case now known as "*Colorado II*," and urge us to rule against them "promptly" to facilitate the higher court's review.  *See* First Br. 49-54.  That posture should have made this an easy case, one we could unanimously resolve in a handful of pages.  It instead produces handfuls of opinions encouraging the Supreme Court to rework campaign finance, First Amendment, and constitutional law in new and audacious ways.  The en banc majority tells the Justices that *Colorado II* is "a 'legal last-man-standing'" primed for the Court to "knock down."  Maj. Op. at 8 (quoting *Kimble v. Marvel Ent., LLC*, 576 U.S. 446, 458 (2015)).  The dissent seizes the prerogative of overturning Supreme Court precedent for itself and would do that work now.  The concurrences go further still, urging the Court to import the history and tradition test it devised in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022) to the First Amendment and substantive constitutional law more broadly.  I, too, must therefore write to explain why each is wrong.

I.

Enacted in 1971 and amended in 1974 to become the pantheon of campaign finance law it is today, the Federal Election Campaign Act, "FECA," set out to regulate federal elections in four main ways:  disclosure requirements, campaign contribution limits, campaign expenditure limits, and public campaign financing.  Its canonical regulation is the base contribution limit, which limits the amount an individual may donate directly to a candidate.  Set at $3,300 in 2024, the base limit has checked actual and apparent "quid pro quo" corruption in U.S. federal elections for the last fifty years.  *Buckley v. Valeo*, 424 U.S. 1, 26-29 (1976) (per curiam).

The base limit is no mere figurehead.  It is fortified by a series of regulations that prevent circumvention by donors masking de facto contributions under more creative labels.  These companion regulations ensure that the Act limits not only contributions in name, but also those

employing other aliases.  They prohibit individual donors and outside political committees from evading the base limit by routing contributions through a corporation or labor union, 52 U.S.C. § 30118; by supplying goods or services for pennies on the dollar, 11 C.F.R. § 100.52; or by simply paying the candidate's bills or purchasing advertisements at the candidate's direction, *id.* § 109.21.  For what has now been decades, the Supreme Court has upheld FECA's contribution limits in both name and substance.  *See, e.g.*, *Buckley*, 424 U.S. at 29; *Colorado II*, 533 U.S. at 465; *FEC v. Beaumont*, 539 U.S. 146, 155 (2003).

Among these anti-circumvention measures is the so-called "party coordinated expenditure limit," a regulation that moderates the extent to which a political party may coordinate its spending with a candidate.  52 U.S.C. § 30116(d).  When individual donors and outside committees spend in coordination with candidates, they are subject to the usual base contribution limits, but party committees are authorized to engage in additional coordinated spending beyond the base limits, even though that spending may be tantamount to a contribution. *Id.*  FECA extends this unique privilege to political parties subject to a state-by-state cap:  in Ohio, from which this case hails, a national party committee may coordinate expenditures with a candidate up to $61,800 in the House and $1,138,000 in the Senate, orders of magnitude above the $5,000 the same committee could contribute to the candidate directly.[1]

The plaintiffs—the National Republican Senatorial Committee (NRSC), the National Republican Congressional Committee (NRCC), Ohio Senator James D. Vance, and former Ohio Representative Steve Chabot—claim that the party privilege to engage in coordinated expenditures must go even further, arguing that any limit on such spending violates the First Amendment.  And they are not the first to challenge FECA's party spending limits.  As originally drafted, the party expenditure limits applied not only to party coordinated spending but to all party spending, including independent expenditures.  The Supreme Court considered an as-applied challenge to the original provision in *Colorado Republican Federal Campaign Committee v. FEC*, 518 U.S. 604 (1996), now called "*Colorado I*," and a facial challenge to the provision in *Colorado II*.  *Colorado I* held the provision unconstitutional as applied to purely

---

[1]*See Contribution limits for 2023-2024 federal elections*, FEC, https://perma.cc/UM3X-XKTQ; *Coordinated party expenditure limits*, FEC, https://perma.cc/BA9L-UE4V.

independent expenditures. *Colorado I*, 518 U.S. at 618 (opinion of Breyer, J.). *Colorado II* held the limits were facially valid regulations of "coordinated expenditures." *Colorado II*, 533 U.S. at 465. The "constitutionally significant fact" distinguishing the decisions was the Court's distinction between "coordinated expenditures" and "expenditures truly independent." *Id.* at 464-65 (quoting *Colorado I*, 518 U.S. at 617 (opinion of Breyer, J.)).

The plaintiffs take up again the constitutional challenge to the party coordination limits in this suit. They moved to certify the constitutional question under a FECA provision that directs district courts confronting challenges to the Act's constitutionality to certify such questions to the en banc court of appeals. *See* 52 U.S.C. § 30110. The district court concluded that Senator Vance and NRSC have standing and that the constitutional question was non-frivolous. It also entered findings of adjudicative fact on the plaintiffs' coordinated spending and other campaign finance activities. It then certified the question to the en banc court.

II.

All recognize that "our work" here is, at most, "a warm-up for eventual Supreme Court review." Dissenting Op. at 78. The plaintiffs spend the warm-up trying out their Supreme Court strategy, testing their stare decisis arguments for why *Colorado II* can be overruled and their merits arguments for why it should be. The en banc majority rightly concludes that we lack authority to reach the merits of the plaintiffs' claims, but along the way it wrongly and unnecessarily validates the plaintiffs' stare decisis theories. Maj. Op. at 6-10. The dissent recruits those inapt theories to reach the conclusion that our court may overrule Supreme Court precedent. I begin by addressing these errors.

A.

The Supreme Court "asked and answered" the constitutional question raised here in *Colorado II*, holding that the party coordinated expenditure limits are facially valid corollaries to the base contribution limit. *Id.* at 6. Intending to ask the Supreme Court to revisit that decision, the plaintiffs revive the question here in its identical form. Still, for purposes of this stop on the road to the certiorari pool, the plaintiffs argue that *Colorado II* does not control their facial challenge by contending that the decision is inconsistent with the Court's more recent campaign

finance doctrine. They also add a challenge, styled "as-applied," to the party coordinated communication limits, asserting that because *Colorado II* addressed no such challenge, we are free to do so here.

As a lower federal court operating under "one supreme Court," our court has a "constitutional obligation to follow" Supreme Court precedent "unless and until it is overruled by" the Supreme Court. *Ramos v. Louisiana*, 590 U.S. 83, 124 n.5 (2020) (Kavanaugh, J., concurring) (quoting U.S. Const., art. III, § 1). When Supreme Court precedent "has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to" the Supreme Court "the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989). It is "for the Supreme Court to tell the courts of appeals when the Court has overruled one of its decisions, not for the courts of appeals to tell the Court when it has done so implicitly." *Taylor v. Buchanan*, 4 F.4th 406, 409 (6th Cir. 2021). All this holds true even when a plaintiff offers a theory "technically distinguishable" from the theory considered in the applicable Supreme Court decision but that would, if accepted, "functionally overrule the decision." *Thompson v. Marietta Educ. Ass'n*, 972 F.3d 809, 814 (6th Cir. 2020).

The plaintiffs' facial claim is not even "technically distinguishable" from *Colorado II*—it *is* the claim presented in *Colorado II*. *Id.* They challenge the same regulation (the party coordinated expenditure limits) on the same grounds (that the limits violate the First Amendment) under the same theory (the one articulated in Justice Thomas's dissent and rejected by the majority) seeking the same relief (a declaration that the limits are unconstitutional and an injunction barring the FEC from enforcing them). *Colorado II* "directly controls" that challenge and deprives this court of the authority to overrule it. *Rodriguez de Quijas*, 490 U.S. at 484. The purportedly "as-applied" challenge, meanwhile, is directed at the limits' application to party coordinated communications. *See* 11 C.F.R. § 109.37. The plaintiffs concede, however, that "virtually all" party independent expenditures are party coordinated communications. *See* First Br. 27. For that reason, the as-applied challenge could succeed only if we rejected the "principle of law" on which *Colorado II* rests, *In re Cao*, 619 F.3d 410, 430 (5th Cir. 2010) (quoting *Penry v. Lynaugh*, 492 U.S. 302, 354 (1989) (Scalia, J., dissenting)), and granting the challenge would

"functionally overrule" *Colorado II*, *Thompson*, 972 F.3d at 814.  We are "preclude[d]" from taking that leap.  *In re Cao*, 619 F.3d at 430 (quoting *Penry*, 492 U.S. at 354 (Scalia, J., dissenting)).

For these simple reasons, the plaintiffs' facial and as-applied challenges are equally controlled by *Colorado II* and the majority rightly answers the certified question "in the negative."  Maj. Op. at 12.

B.

The en banc majority could have left things there and would likely have reached near consensus on our court.  It instead reaches out to "accept the premise" of the plaintiffs' claim that post-*Colorado II* developments have fatally undermined the decision, even as it ultimately rejects "the conclusion" that those changes empower us to overrule *Colorado II* ourselves.  *Id.* at 7.  The dissent likewise parrots the plaintiffs' premise as an excuse to reach the merits.  I cannot accept either the premise or the conclusion.

1.

The plaintiffs start with changed doctrine.  They argue that the Supreme Court has tightened the parameters of the "closely drawn" test since *Colorado II* to the point of nullifying the framework that decision applied.  As *Buckley* explained it, the test asks whether a regulation serves an "important interest" using "means closely drawn to avoid unnecessary abridgment of" First Amendment freedoms.  *See Buckley*, 424 U.S. at 25.  The plaintiffs assert that post-*Colorado II* cases have filled out the test's details, clarifying that the "only" government interest that can justify campaign finance regulation is preventing quid pro quo corruption or its appearance and suggesting that such regulations must be "narrowly tailored" to their objectives, a "rigorous" level of review.  *McCutcheon v. FEC*, 572 U.S. 185, 199, 206-07, 218 (2014) (plurality opinion) (first quoting *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989); and then quoting *Buckley*, 424 U.S. at 29).  They contend that *Colorado II* is inconsistent with this framework because it accepted a theory of corruption broader than quid pro quo corruption and applied a level of scrutiny more forgiving than narrow tailoring.  The majority endorses this argument; the dissent hangs its hat on it.

As for corruption, *Colorado II* made clear that the core "danger" addressed by the party coordination limits was "quid pro quo" corruption. *Colorado II*, 533 U.S. at 464 (italics omitted) (quoting *Buckley*, 424 U.S. at 47). That understanding follows directly from the recognition that limiting coordinated spending serves an "identical" function to limiting direct contributions, *see id.* at 460, themselves long understood as targeting "quid pro quo" corruption, *Buckley*, 424 U.S. at 26. *Colorado II* did, to be sure, reference in a single parenthetical the premise generally accepted at the time that regulable corruption included "not only . . . quid pro quo agreements, but also . . . undue influence." *Colorado II*, 533 U.S. at 441 (italics omitted). But the Court's brief observation that undue influence might be regulable generally did not drive its conclusion that coordinated expenditures could be limited specifically. Its actual discussion of party coordinated spending focused explicitly on quid pro quo corruption. *See id.* at 441, 464-65. This analysis is consistent with current doctrine.[2]

As for tailoring, *Colorado II* engaged in just the kind of analysis assessing a contribution limit calls for. It applied the traditional *Buckley* test, as more recent cases have, asking whether the party coordination limits were "'closely drawn' to match what we have recognized as the 'sufficiently important' government interest in combating political corruption." *Id.* at 456 (quoting *Nixon v. Shrink Missouri Gov't PAC*, 528 U.S. 377, 387-88 (2000)); *see McCutcheon*, 572 U.S. at 199 (applying the same test). Cases have defined the demands of that test with different language: *Buckley* described it as weeding out "unnecessary abridgment of associational freedoms," 424 U.S. at 25; *Colorado II* referred to it as requiring skillful tailoring, *see* 533 U.S. at 463 n.26; *McCutcheon* characterized it as looking for "a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is 'in proportion to the interest served,' that employs not necessarily the least restrictive means but a means narrowly tailored to achieve the desired objective," 572 U.S. at 218 (ellipses omitted) (quoting *Fox*, 492 U.S. at 480). Whatever the adjectives employed, the test has always been understood as a "rigorous standard of review." *Buckley*, 424 U.S. at 29. And *Colorado II*

---

[2]The majority claims that Justice Breyer's dissenting opinion in *McCutcheon* made clear that "*Colorado II* relied on the 'undue influence' rationale." Maj. Op. at 7 (quoting *McCutcheon*, 572 U.S. at 239-40 (Breyer, J., dissenting)). What Justice Breyer in fact explained, however, was that the Court's conception of the term corruption had until *Citizens United* "includ[ed] 'undue influence.'" *McCutcheon*, 572 U.S. at 239-40 (Breyer, J., dissenting). His dissent never asserted that *Colorado II* turned on the broader understanding.

undertook that review faithfully, considering each of the posited alternatives to the coordination limits and explaining why they were inadequate substitutes. *See Colorado II*, 533 U.S. at 461-65; *accord McCutcheon*, 572 U.S. at 221-23 (applying the same framework).

The majority also invokes a third purported change in doctrine not advanced in the plaintiffs' briefing, claiming that the Supreme Court's more recent campaign finance cases "demand," for the first time, "'actual evidence' that a spending restriction will" achieve its objectives. Maj. Op. at 7 (quoting *FEC v. Cruz*, 596 U.S. 289, 310 (2022)). Again, however, the substance of this argument is nothing new—the Court has long looked to "record evidence," "legislative findings," and experience as justification for campaign finance regulations. *See Colorado I*, 518 U.S. at 618, 621 (opinion of Breyer, J.). *Colorado II* continued this tradition, identifying "substantial evidence" that placed "beyond serious doubt" that "contribution limits would be eroded" absent limits on party coordinated spending. *Colorado II*, 533 U.S. at 457.

All told, I do not perceive "tension" between *Colorado II*'s reasoning and the reasoning of more recent Supreme Court decisions. Maj. Op. at 7-8. Like its progeny, *Colorado II* evaluated the party coordinated spending limits against a quid pro quo corruption rubric, identified evidence that the limits in fact serve their anti-corruption goal, and conducted a rigorous tailoring analysis checking the law's fit with its objectives.

2.

The plaintiffs turn from perceived changes in doctrine to a perceptible change in FECA's text. They contend that the Consolidated Appropriations Act of 2014, popularly known as the "Cromnibus" amendments, created a "distinct legal backdrop" that now renders the coordination limits "fatally underinclusive." First Br. 43. The majority cosigns this argument, "appreciat[ing] how these new exceptions might affect the analysis" were we writing on a blank slate, and positing that the "increase in the Act's exemptions might show that the limit on coordinated party expenditures does too little for First Amendment purposes—that it addresses its policy target in underinclusive ways." Maj. Op. at 9. The dissent claims we "owe it to the parties before us to address the constitutional significance of these statutory changes head on." Dissenting Op. at 89.

The First Amendment, to be clear, "imposes no freestanding 'underinclusiveness limitation'"—we would not say "that a law violates the First Amendment by abridging *too little* speech." *See Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 448-49 (2015) (quoting *R.A.V. v. St. Paul*, 505 U.S. 377, 387 (1992)). There is thus "no constitutional basis for attacking contribution limits on the ground that they are too high." *Davis v. FEC*, 554 U.S. 724, 737 (2008). The significance of underinclusiveness is instead that it "can raise 'doubts about whether the government is in fact pursuing the interest it invokes'" or "reveal that a law does not actually advance a compelling interest." *Williams-Yulee*, 575 U.S. at 448-49 (quoting *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 802 (2011)).

The Cromnibus amendments increased individual contribution limits for funding of three special-purpose categories of party spending—presidential nominating conventions; party headquarters; and election recounts and legal proceedings—and exempted spending through those accounts from the party coordinated expenditure limits. *See* 52 U.S.C. § 30116(a)(9). These special-purpose categories create a new allowance for spending largely targeted at general party-building activities while leaving in place limits on funds designed "to benefit federal candidates directly." *See McConnell v. FEC*, 540 U.S. 93, 167 (2003) (opinion of Stevens & O'Connor, JJ.), *overruled in part on other grounds by Citizens United v. FEC*, 558 U.S. 310 (2010). The result relaxes limits on contributions that carry a lighter risk of quid pro quo corruption while maintaining existing limits on "contributions that pose the greatest risk." *Id.* Far from raising doubts about the purpose the party coordinated spending limits serve, the Cromnibus amendments instead tighten the limits' fit with their anti-corruption goals. That only bolsters *Colorado II*'s conclusion.

3.

The plaintiffs round out their facial challenge by positing factual developments. They say three factual changes undermine *Colorado II*'s premise that political parties are dominant players in federal elections and the corresponding corruption risks that attended that assumption. One, Super PAC spending injected billions of dollars in undisclosed campaign outlays to the 2020 presidential election from a source that did not exist until 2010, "stripp[ing] parties of any former 'dominance' in the electoral sphere." First Br. 47 (brackets omitted) (quoting *Colorado*

*II*, 533 U.S. at 450); *see* R. 49-1, PageID 5535.  Two, soft money produced nearly $500 million in campaign funding in 2000 and is now off the table.[3]  Three, the internet today provides "significant information about political candidates and issues."  *Citizens United*, 558 U.S. at 364. The majority accepts the plaintiffs' characterization of these changes, agreeing, without citing the record, that the notion of political party import in federal elections "has a quaint ring to it." Maj. Op. at 9.  The dissent does too, finding "authority" for the proposition in a footnote to a district court opinion penned in 2010.  Dissenting Op. at 89.

The record says otherwise.  The data show that the major political parties raised over $2.5 billion during the 2020 presidential election cycle, more than double their haul in the 2000 campaign.  R. 49-1, PageID 5531-34.  This lawsuit itself reveals how valuable party spending remains to federal candidates—precisely because, the plaintiffs tell us, parties may coordinate spending with candidates.  *See* R. 49-1, PageID 5515.  At the same time, none of the factual changes on which the plaintiffs and majority fixate displace *Colorado II*'s fundamental concern with coordinated spending, "the constitutionally significant fact" in its analysis and a tool that remains alive and well for party actors.  *Colorado II*, 533 U.S. at 464 (quoting *Colorado I*, 518 U.S. at 617 (opinion of Breyer, J.)).  Super PAC spending has of course skyrocketed, but it is, by definition, "not coordinated with a candidate," reducing its value to candidates and mitigating the "danger" that it "will be given as a quid pro quo."  *Citizens United*, 558 U.S. at 357, 360 (emphasis omitted) (quoting *Buckley*, 424 U.S. at 47).  The same was true of soft money.  *See McConnell*, 540 U.S. at 123.  And no one explains how technological advances reduce the danger that parties will be used as conduits for quid pro quo exchanges.  What the record ultimately shows is parties continuing to spend vast amounts in federal elections while maintaining a unique privilege to coordinate spending with candidates, funding that is "as useful to the candidate as cash" and particularly susceptible to being "given 'as a quid pro quo for improper commitments from the candidate.'"  *Colorado II*, 533 U.S. at 446 (italics omitted) (quoting *Buckley*, 424 U.S. at 47).  The corruptive risk of that spending remains as real and acute today as it was in *Colorado II*.

---

[3]Nathaniel Persily, Robert F. Bauer & Benjamin L. Ginsberg, *Campaign Finance in the United States: Assessing an Era of Fundamental Change* at 15 tbl. 1 (2018), https://bipartisanpolicy.org/download/?file=/wp-content/uploads/2019/03/BPC-Democracy-Campaign-Finance-in-the-United-States.pdf.

4.

The plaintiffs end with a fallback position, contending that even if *Colorado II* forecloses their facial challenge, it leaves their as-applied challenge open to plenary review. The majority here sees through this argument, but the dissent sees what the fifteen remaining members of the en banc court have purportedly missed: that it is "abundantly clear" the as-applied challenge "is fairly before us for resolution." Dissenting Op. at 91-92.

*Colorado II* left open the possibility that certain coordinated expenditures might be susceptible to an as-applied challenge. The majority there acknowledged that "specific" coordinated expenditures might not be tantamount to contributions. *See Colorado II*, 533 U.S. at 456 n.17. Justice Thomas's dissent fleshed the idea out, explaining that the coordination limits cover "a broad array of conduct" that runs the spectrum from de facto contributions on one end to outlays that "largely resemble" ordinary independent expenditures on the other. *Id.* at 467 (Thomas, J., dissenting). The dissent hypothesized that a party paying "a candidate's media bills" would be "virtually indistinguishable" from a party contributing to that candidate directly, but that a party-developed "advertising campaign" aired after simply consulting the candidate "on which time slot the advertisement should run" would be constitutionally indistinguishable from a purely independent expenditure. *Id.* at 467-68 (Thomas, J., dissenting) (quoting *Colorado I*, 518 U.S. at 624 (opinion of Breyer, J.)). An as-applied challenge under *Colorado II*, then, must carve out a distinction based on "the degree of coordination with the candidate." *See In re Cao*, 619 F.3d at 430.

The plaintiffs ask us to invalidate the party coordinated expenditure limits as they apply to party coordinated communications. The phrase "party coordinated communication" is a term of art covering "public political advertising" that "is coordinated with a candidate" and "paid for by a political party committee." 11 C.F.R. §§ 109.37(a), 100.26. Like the facial challenge in *Colorado II*, party coordinated communications span "a broad array of conduct." *See Colorado II*, 533 U.S. at 467 (Thomas, J., dissenting). On the one hand, such communications cover expenditures with which a candidate is heavily involved, such as political advertisements prepared by the candidate and disseminated at the candidate's request on the party's dime. *See* 11 C.F.R. §§ 109.37(a), 109.21(d)(1), 100.26. On the other, such communications also cover

expenditures where a candidate may be less involved, like party-developed advertisements run with material input from the candidate on the "timing or frequency of the communication." 11 C.F.R. § 109.21(d)(2)(v); *see id.* §§ 109.37(a), 100.26. In total, party coordinated communications amount to "between 96.5% and 100%" of the plaintiffs' independent expenditures. R. 49-1, PageID 5513-14. The plaintiffs seek to invalidate the limits as they apply to all party coordinated communications, drawing no distinction based on degree of coordination.

The en banc Fifth Circuit addressed a similar challenge in *In re Cao*. The Republican National Committee in that case challenged the party coordinated spending limits as applied to its "own speech." *In re Cao*, 619 F.3d at 425. It argued that its "own speech," defined as speech "attributable" to the Committee, could not be regulated regardless of whether and to what extent it was coordinated with a candidate. *Id.* Under that position, a communication created by a candidate and passed along to a party for dissemination could not be limited as a party coordinated expenditure so long as the party adopted the message. *Id.* at 429. The Fifth Circuit explained that this "exceedingly broad argument," agnostic to "the degree of coordination," would "effectively overrule all restrictions on coordinated expenditures" and "eviscerate" the holding of *Colorado II*. *Id.* at 428-30. Recognizing that a plaintiff may not "successfully bring an as-applied challenge to a statutory provision based on the same factual and legal arguments the Supreme Court expressly considered when rejecting a facial challenge to that provision," that en banc court turned away the plaintiffs' suit. *Id.* at 430 (quoting *RNC v. FEC*, 698 F. Supp. 2d 150, 157 (D.D.C. 2010), *summ. aff'd*, 561 U.S. 1040 (2010)).[4]

The plaintiffs' challenge here is a variation of the suit the Fifth Circuit addressed in *In re Cao.* The plaintiffs seek to invalidate the party coordinated communication limits writ large, foregoing any distinctions based on "degree of coordination." *Id.* at 429. They readily admit

---

[4]The majority recasts the challenge in *In re Cao* as narrowly addressing FECA's "application to shared input about the *timing* of a *single* advertising expenditure." Maj. Op. at 12. The en banc Fifth Circuit went out of its way to prevent that mischaracterization, using italics to emphasize that the plaintiffs' "*only*" argument was the "exceedingly broad" one that Congress may not regulate any speech attributable to the Committee "regardless of the extent of coordination with the candidate." *In re Cao*, 619 F.3d at 425, 428. It even explained that in "response to friendly questions from the en banc bench," the plaintiffs' counsel "refused to adopt the position that the level of coordination should affect whether an expenditure may be regulated." *Id.* at 425. The argument transcript reflects the insistence of counsel for the Committee that "the degree of coordination does not affect whose speech it is at all. . . . There is no degree of being pregnant. You're either or not." *Id.* at 425-26. All this makes clear that *In re Cao* concerned far more than "input about the *timing* of a *single* advertising expenditure." Maj. Op. at 12.

that "virtually all" party independent expenditures fall into this category. *See* First Br. 27. The challenge sweeps in candidate-developed advertisements when the parties pick up the tab, even if it also covers ads for which the candidate just consults on timing, taking on conduct all nine justices in *Colorado II* considered "indistinguishable" from contributions. *See Colorado II*, 533 U.S. at 444, 456 n.17; *id.* at 467 (Thomas, J., dissenting). As even the dissent acknowledges, granting the plaintiffs' relief would permit a candidate to "create and produce an advertisement before handing it off to a party committee for publication and payment." Dissenting Op. at 91. The as-applied challenge could thus succeed only if we rejected the "principle of law" set forth in *Colorado II*, *In re Cao*, 619 F.3d at 430 (quoting *Penry*, 492 U.S. at 354 (Scalia, J., dissenting)), and accepting it would "functionally overrule" the *Colorado II* decision. *Thompson*, 972 F.3d at 814. That "broad position . . . must fail." *In re Cao*, 619 F.3d at 430.

\* \* \*

*Colorado II* answers the certified question here, and that is all we needed to say. The en banc majority nonetheless reaches out to endorse the plaintiffs' view that doctrinal, statutory, and factual changes undermine *Colorado II*, paving the way for the stare decisis analysis it apparently believes the Supreme Court will soon conduct. The dissent does not just endorse the plaintiffs' view, it ratifies it, seizing the Supreme Court's authority for itself. I would not have opined on these issues, but because my colleagues do, I must respectfully disagree.

III.

The dissent, and several of my concurring colleagues, conduct a plenary review of the plaintiffs' facial challenge on the merits, assessing whether the party coordinated spending limits are constitutional on their face. So, I must do the same.

"A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). That means the plaintiffs cannot succeed merely by showing that the modest forms of communication the statute limits are unconstitutional (e.g., consulting a candidate on media buy timing), they must also "shoulder the[] heavy burden" of showing that spending involving near-total coordination (e.g.,

paying a candidate's media bills) violates the First Amendment as well. *See id.* As do the parties, I assess whether the plaintiffs have met that burden applying closely drawn scrutiny to ask whether the limits serve a "sufficiently important interest" using "means closely drawn to avoid unnecessary abridgment of associational freedoms." *Buckley*, 424 U.S. at 25; *see Colorado II*, 533 U.S. at 456; *McCutcheon*, 572 U.S. at 218.[5]

A.

The Supreme Court "has recognized only one permissible ground for restricting political speech:  the prevention of 'quid pro quo' corruption or its appearance." *Cruz*, 596 U.S. at 305 (emphasis omitted) (quoting *McCutcheon*, 572 U.S. at 207). Quid pro quo corruption is the "direct exchange of an official act for money," at its worst, "dollars for political favors." *McCutcheon*, 572 U.S. at 192 (quoting *FEC v. Nat'l Conservative Pol. Action Comm.*, 470 U.S. 480, 497 (1985)); *see Shrink Missouri*, 528 U.S. at 389. The government's interest in preventing quid pro quo corruption is "compelling," *McCutcheon*, 572 U.S. at 199 (quoting *Nat'l Conservative Pol. Action Comm.*, 470 U.S. at 496), and stemming the appearance of such corruption is of "almost equal concern," *Shrink Missouri*, 528 U.S. at 388 (quoting *Buckley*, 424 U.S. at 27).[6]

---

[5]A different standard, facial overbreadth, applies in some cases "when a facial suit is based on the First Amendment." *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2397 (2024). That standard asks whether "a substantial number of the law's applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Id.* (brackets omitted) (quoting *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021)). "The overbreadth claimant," however, "bears the burden of demonstrating, 'from the text of the law and from actual fact,' that substantial overbreadth exists." *Virginia v. Hicks*, 539 U.S. 113, 122 (2003) (brackets omitted) (quoting *N.Y. State Club Ass'n., Inc. v. City of New York*, 487 U.S. 1, 14 (1988)). But the plaintiffs have not even attempted to "lay the groundwork for [a] facial overbreadth claim" here. *Colorado II*, 533 U.S. at 456 n.17. We must therefore conduct an ordinary facial analysis.

[6]Grafting a statutory definition of bribery from criminal law cases onto the definition of quid pro quo corruption in campaign finance cases, the dissent invents a new meaning of that term:  "campaign finance regulations must narrowly target the exchange of money for an official's formal exercise of the powers of her office." Dissenting Op. at 86. That circumscribed definition ignores *McCutcheon*'s characterization of the "hallmark of corruption" as "the financial *quid pro quo*: dollars for political *favors*." *McCutcheon*, 572 U.S. at 192 (second emphasis added) (quoting *Nat'l Conservative Pol. Action Comm.*, 470 U.S. at 497). It ignores too *Buckley*'s explanation that federal bribery laws "deal with only the most blatant and specific" forms of quid pro quo corruption. *Buckley*, 424 U.S. at 639. And finally, that definition ignores that the cases it relies on involved interpretation of defined terms in specific federal statutes, interpretation that was informed by concern with "overzealous prosecutions," statutory vagueness, and "federalism." *McDonnell v. United States*, 579 U.S. 550, 576 (2016). None of those concerns are relevant here. Indeed, an expansive definition of quid pro quo corruption is

When the Government defends a campaign finance regulation, it "bears the burden of proving" that the regulation in fact addresses quid pro quos. *McCutcheon*, 572 U.S. at 210 (quoting *United States v. Playboy Ent. Grp.*, *Inc.*, 529 U.S. 803, 816 (2000)). That proof can come from record evidence, legislative findings, or experience under the law. *See Cruz*, 596 U.S. at 307; *McCutcheon*, 572 U.S. at 219. It is considered with an eye to context, minding the "difficulty of mustering evidence to support long-enforced statutes," *Colorado II*, 533 U.S. at 457, and recognizing "that no data can be marshaled to capture perfectly the counterfactual world in which" the regulation does "not exist," *McCutcheon*, 572 U.S. at 219. For these reasons, the "quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised." *McConnell*, 540 U.S. at 144 (quoting *Shrink Missouri*, 528 U.S. at 391).

Under this framework, the Supreme Court has repeatedly "held that Congress may regulate campaign contributions to protect against corruption or the appearance of corruption." *McCutcheon*, 572 U.S. at 191. It has also confirmed that "circumvention is a valid theory of corruption." *McConnell*, 540 U.S. at 144 (quoting *Colorado II*, 533 U.S. at 456); *see McCutcheon*, 572 U.S. at 218; *Beaumont*, 539 U.S. at 155. The question here, then, is whether limits on party coordinated spending in fact "prevent circumvention of the base limits." *McCutcheon*, 572 U.S. at 210.

The theory for coordination as circumvention is straightforward: coordinated spending, at least, as relevant to this facial challenge, in its strongest forms, is "virtually indistinguishable from simple contributions." *Colorado I*, 518 U.S. at 624 (opinion of Breyer, J.); *see Colorado II*, 533 U.S. at 444-45; *id.* at 467 (Thomas, J., dissenting). The reason is self-evident. A supporter who underwrites a candidate's media bills is as valuable to the candidate as the supporter who contributes to the candidate directly. *Colorado I*, 518 U.S. at 624 (opinion of Breyer, J.); *see Colorado II*, 533 U.S. at 444-45; *id.* at 467 (Thomas, J., dissenting). The base limit would have little meaning if candidates could simply forward their media bills on to maxed-out donors. Coordination limits prevent that possibility. With such a straightforward theory of corruption

_____

called for in this context, especially to address the risk of "the appearance of corruption," which is of "almost equal concern as the danger of actual quid pro quo arrangements." *Buckley*, 424 U.S. at 27.

under a law so long on the books, the empirical support needed to validate it is modest.  *See McConnell*, 540 U.S. at 144.

Experience confirms that, absent regulation, political actors will in fact pursue circumvention via party conduits.  *Colorado II* identified a circumvention strategy popular with the Democratic Party known as "tallying."  The scheme enabled donors to "give to the party with the tacit understanding that the favored candidate [would] benefit."  *Colorado II*, 533 U.S. at 458-59.    Candidates encouraged donors who had maximized their contributions to the candidate's campaign to continue giving to the party on the understanding that the party would allocate the contributions to spending on the candidate.  *See id.* at 459.  Candidates understood that the support they received from the party would be a function of the amount they raised for it; contributors understood that the amount they contributed to the party would be credited to their preferred candidate.  *Id.*  The party maintained this system by tallying contributions "to connect donors to candidates."  *Id.*   The scheme is direct evidence that coordination limits target circumvention of the base contribution limits and that opening "the floodgates" on coordinated spending would close the door on meaningful base limits.  *Id.* at 459 n.22.

A decade after *Colorado II*, the en banc Fifth Circuit concluded in *In re Cao* that the risks identified in *Colorado II* persisted.  The plaintiffs in that case, including the RNC, admitted they had "taken steps to circumvent the Act's individual donor contribution limits."  *In re Cao*, 619 F.3d at 429.  "The district court found that 'the RNC encourages its candidates to tell their "maxed out" donors to contribute to the RNC.'"  *Id.* (brackets omitted) (quoting *Cao v. FEC*, 688 F. Supp. 2d 498, 526 (E.D. La. 2010)).   The candidate in that case, Representative Cao, confirmed the practice, testifying in his deposition that he had "personally suggested to donors who had given the maximum amount to his campaign that they could also contribute to the party."  *Id.* (quoting *Cao*, 688 F. Supp. 2d at 526).  The RNC later exchanged donor lists with its candidates so the party could see who had contributed to a campaign and vice versa.  *Id.*

These practices confirm that the circumvention risk identified in *Colorado II* still lurks beneath the coordination limits' surface.[7]

The FEC also goes a step beyond showing that the coordination limits are in fact anti-circumvention measures by identifying a storied tradition of quid pro quo corruption capitalizing on party conduits. It starts with examples as infamous as Teapot Dome, recounting how two oil industry executives relieved the Republican Party of a $1.5 million debt in apparent exchange for executive action granting them a favorable lease on Teapot Dome's oil reserves. The scandal helped motivate Congress's early campaign finance laws. Those laws, however, did not remove political parties from the funneling business. The dairy industry in the 1970's channeled millions of dollars to President Nixon through the Republican Party and its various committees, milking a $100 million subsidy from President Nixon in exchange. *See Buckley v. Valeo*, 519 F.2d 821, 839 & n.36 (D.C. Cir. 1975). President Nixon's misconduct, in turn, motivated the 1974 FECA amendments that form the heartland of the law today. *See Wagner v. FEC*, 793 F.3d 1, 12-13 (D.C. Cir. 2015). But parties have nonetheless continued serving as conduits for quid pro quo exchanges. Representative Bob Ney, as just one example, pleaded guilty in 2006 "to a series of quid pro quos with the lobbyist Jack Abramoff" that included contributions to the NRCC that Ney solicited as quids in return for legislative quos. *See id.* at 15.

States tell the same story. Wisconsin Senate Majority Leader Charles Chvala pleaded guilty to felony corruption charges in response to a criminal complaint alleging that he distributed political favors in exchange for contributions to the state's Democratic committees. *See generally* R. 38-38. Ohio business executive Steven Pumper pleaded guilty to contributing funds to the Cuyahoga County Democratic Party that he knew would be earmarked for a school board member's campaign in exchange for the board member using his position to help award construction contracts to Pumper's company. *See Construction Executive Steven Pumper Sentenced To Eight Years In Prison For Paying Bribes To Public Officials*, U.S. Att'ys Off. N.D.

---

[7]This dynamic operates in other contexts as well. *McConnell* explained how in the lead up to BCRA, parties worked with donors and candidates to use the soft money loophole to circumvent the base contribution limits. *See McConnell*, 540 U.S. at 146. A similar dynamic exists under the so-called "internet exemption." *Campaign Legal Ctr. v. FEC*, No. 22-5336, --- F.4th ---, 2024 WL 3335909, at *1 (D.C. Cir. July 9, 2024). This is all the more evidence that donors capitalize on circumvention opportunities wherever they are presented.

Ohio (Dec. 4, 2013), https://perma.cc/M87Z-P9P7. Another Ohio business executive, Karen L. Finley, pleaded guilty to charges of conspiracy to commit bribery for her role in funneling campaign funds to Columbus elected officials through contributions to the Franklin County Democratic Party and the Ohio Democratic Party in exchange for local government contracts. *See* Information, *United States v. Finley*, No. 2:15-CR-148, ECF No. 3, PageID 6-11 (S.D. Ohio 2015).

All this evidence demonstrates that contributions to parties are in fact used to circumvent the base contribution limits and that parties are indeed vulnerable conduits for quid pro quos. Coordinated expenditures offer "special value" to a candidate, leaving it "beyond serious doubt" that "contribution limits would be eroded" and the "inducement to circumvent" the base limit "enhanced" were party coordinated spending declared "wide open." *Colorado II*, 533 U.S. at 457, 464-65.[8]

The plaintiffs resist this conclusion in three ways. They argue first that Congress enacted the coordinated spending limits not to combat quid pro quo corruption but for the forbidden goal of reducing "what it saw as wasteful and excessive campaign spending." *Colorado I*, 518 U.S. at 618 (opinion of Breyer, J.). They draw that conclusion from *Colorado I* and *Buckley*, which speculated that "limitations on *overall* campaign expenditures" may have been calculated to serve that end. *Buckley*, 424 U.S. at 54 (emphasis added); *see Colorado I*, 518 U.S. at 618 (opinion of Breyer, J.). But those cases nowhere suggested that *coordinated* expenditure limits served such a function. To the contrary, FECA defined coordinated expenditures as a form of contribution under its "functional" conception of that term, and there can be no doubt that FECA's contribution limits were imposed to combat quid pro quo corruption and its appearance. *Colorado II*, 533 U.S. at 438, 440-41; *see Buckley*, 424 U.S. at 26. *Colorado II* therefore

---

[8]To put the scale of the new enticement in concrete terms, unleashing coordinated spending would immediately multiply donor contribution power by 13.5 times in House races and 38.5 times in Senate races. That is because absent coordinated spending limits, an individual donor could contribute to her preferred candidate not only the $3,300 base contribution amount per election, but, acting through the party, the additional $41,300 annual party contribution amount. Over the course of a two-year House election cycle, that enables the donor to increase the $6,600 she could have contributed to the candidate directly (assuming maximum contributions to both the primary and general elections) to $89,200 (assuming maximum annual contributions). Over a six-year Senate cycle, contributing through a party enables a donor to increase the $6,600 she could have contributed to the candidate directly to $254,400 (making the same assumptions).

concluded that the party coordinated spending limits were in fact valid anti-corruption measures, and the plaintiffs have provided no independent evidence undermining that conclusion. *Colorado II*, 533 U.S. at 456-57 & n.19.

The plaintiffs, joined now by my concurring and dissenting colleagues, next contend that the FEC's evidence of quid pro quo corruption, a sampling of which is discussed above, does not show that the limits in fact target corruption. They claim the FEC can satisfy its evidentiary burden only by identifying specific instances of a donor funding party coordinated spending in exchange for an official act, and that it has failed to do so. But the Supreme Court sees things differently: the Commission need only show that the coordination rules "prevent circumvention of the base limits." *McCutcheon*, 572 U.S. at 210. And despite the "difficulty of mustering evidence to support long-enforced statutes," *Colorado II*, 533 U.S. at 457, the FEC has adduced that evidence here and more, showing not only that the limits serve their anti-circumvention goal, but also that party spending remains a conduit for quid pro quo corruption, with coordinated spending the most "efficient and effective" form that spending takes, R. 49-1, PageID 5515. That evidence discharges the Commission's burden.

The plaintiffs' final rejoinder, again echoed by my colleagues, is that the limits are too underinclusive to be characterized as anti-corruption measures. They observe that FECA permits unlimited coordinated spending on get-out-the-vote activities and licenses coordinated spending on party infrastructure at many times the base limit, exceptions they say cannot be squared with the proposition that the more general limits combat corruption.

As explained, however, the First Amendment "imposes no freestanding 'underinclusiveness limitation,'"—its significance, again, is in rooting out "whether the government is in fact pursuing the interest it invokes'"—and lawmakers may "focus on their most pressing concerns" without addressing "all aspects of a problem in one fell swoop." *See Williams-Yulee*, 575 U.S. at 448-49 (first quoting *R.A.V.*, 505 U.S. at 387; and then quoting *Brown*, 564 U.S. at 802). Laws "that conceivably could have restricted even greater amounts of speech in service of their stated interests" may therefore pass even strict scrutiny. *Id.* at 449.

The first exception the plaintiffs invoke—get-out-the-vote activity—comes from the Bipartisan Campaign Reform Act, or "BCRA." The "prime motivating force" behind BCRA was closing the soft money loophole for sham issue advertising that Congress concluded had "virtually destroyed our campaign finance laws, leaving us with little more than a pile of legal rubble." *McConnell*, 540 U.S. at 169-70 (quoting S. Rep. No. 105-167, pt. 3, at 4535 (1998) (additional views of Senator Collins)). Congress was entitled to address those "pressing concerns" without restricting ancillary forms of speech that had not proven so corrosive, *see Williams-Yulee*, 575 U.S. at 449—indeed, had it restricted financing of volunteer-distributed yard signs without evidence of corruption, BCRA would surely have met with accusations of *over*-inclusiveness. The law does not betray an improper government interest motivating the party coordinated expenditure limits.

The second exception the plaintiffs identify—special-purpose accounts—comes from the Cromnibus amendments. As discussed, the Cromnibus amendments increased contribution and coordinated spending allowances for three categories of party-building activities. These special-purpose categories involve relatively "benign" spending, most of which does not benefit any one candidate directly, that Congress could reasonably have concluded poses a less acute risk of corruption than contributions like those that fund television advertisements for a specific race. *Libertarian Nat'l Comm., Inc. v. FEC*, 924 F.3d 533, 550 (D.C. Cir. 2019). The special-purpose accounts are thus entirely consistent with the anti-corruption goal of the party coordinated expenditure limits. In fact, taken together, the increased allowances for get-out-the-vote and party-building activities reflect limits precisely tailored to Congress's "most pressing concerns"—not evidence of improper motivation. *See Williams-Yulee*, 575 U.S. at 449.

All in all, the Commission's evidence and experience show both that the party coordinated spending limits prevent circumvention of the base limits and that parties have throughout history been used as conduits in quid pro quo corruption schemes. Congress limits coordinated spending for precisely these reasons, and it has over the years calibrated the limits in connection with the corruptive risk of various campaign activities. Even despite the "difficulty of mustering evidence to support long-enforced statutes," the FEC has demonstrated that the

party coordination limits combat quid pro corruption and its appearance. *Colorado II*, 533 U.S. at 457.

B.

A contribution limit that addresses quid pro quo corruption must also be "closely drawn to avoid unnecessary abridgment of associational freedoms." *McCutcheon*, 572 U.S. at 218 (quoting *Buckley*, 424 U.S. at 25). Closely drawn tailoring is less stringent than strict scrutiny. *Id.* It requires "a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is 'in proportion to the interest served,' that employs not necessarily the least restrictive means but a means narrowly tailored to achieve the desired objective." *Id.* (ellipses omitted) (quoting *Fox*, 492 U.S. at 480).

The party contribution limit reflects Congress's careful balancing of two competing interests: preventing quid pro quo corruption on the one hand and promoting strong political parties on the other. FECA strengthens political parties by licensing them to receive larger individual contributions than candidates may accept and to engage in coordinated spending other groups may not conduct. It checks that power through moderate limits on coordinated spending, without which the base contribution limit—a valid anti-corruption measure, all agree—would become a nullity. These coordination limits are themselves neatly tailored. The limits vary by candidate depending on the office sought and voting age population served, increasing parties' capacity for speech in states where each contribution's value is diluted. The limits exempt spending on volunteer get-out-the-vote activities, which pose a less urgent risk of corruption. And they are relaxed for three special-purpose party-building functions that pose a similarly moderate threat. All this has produced limits carefully tuned to the particular evils Congress identified over years of investigation and experience.

The plaintiffs maintain that this tailoring is not enough, identifying three alternative measures they contend would accomplish Congress's anti-circumvention goals through less restrictive means. My colleagues agree on each score. Tellingly, all do so only after omitting most of the closely drawn standard laid out in *McCutcheon*, erasing its acceptance of a "reasonable" fit, *McCutcheon*, 572 U.S. at 218 (quoting *Fox*, 492 U.S. at 480), and reducing the

test to three words plucked from a 40-page opinion:  a "rigorous" form of "narrow tailoring," Maj. Op. at 8; *see* Thapar Concurring Op. at 22; Dissenting Op. at 93; First Br. 42; *McCutcheon*, 572 U.S. at 197, 218.  The dissent acknowledges that the test does not call for "the least restrictive means" available, but nonetheless goes on to fault the FEC for settling on the coordination limits when "a less restrictive alternative" remained available.  Dissenting Op. at 102 (quoting *McCutcheon*, 572 U.S. at 218).  These views collapse the distinction between expenditures and contributions that the Supreme Court has repeatedly upheld.

The plaintiffs' alternatives are, in any event, unavailing.  The first alternative the plaintiffs propose is the base limit on individual contributions to parties.  They argue that reducing the limit on contributions a party may accept, $41,300 per year in 2024, would reduce the power of any individual to channel a corrupting amount through a party committee while preserving the ability of parties to coordinate freely with candidates.  That solution, however, ignores Congress's competing interest in maintaining party strength.  Reducing the limit on contributions to parties would inevitably curtail party fundraising ability, taking party capacity for independent spending—the category of political speech with the greatest constitutional protection—down with it.  That replaces a moderate First Amendment burden with a more extreme one, a proposal at odds with constitutional tailoring.  Given the choice between "competing constitutional interests in" this area in which Congress "enjoys particular expertise," *McConnell*, 540 U.S. at 137, Congress was "entitled to its choice," *Colorado II*, 533 U.S. at 464-65.

The plaintiffs' second alternative is FECA's existing disclosure requirement.  They contend that disclosure is "a less restrictive alternative to flat bans on certain types or quantities of speech" and is now "effective to a degree not possible at the time [of] *Buckley*."  *McCutcheon*, 572 U.S. at 223-24.  But the Supreme Court has never suggested that disclosure is an adequate substitute for the base contribution limits, to which coordinated expenditures are the "functional equivalent."  *Colorado II*, 533 U.S. at 447.  And disclosure seems a particularly poor deterrent for party conduit quid pro quos.  In a world of unlimited coordinated spending, disclosures would continue to reveal only who made reportable contributions to a party and how much that party spent in coordination with each candidate, failing to identify the tacit candidate-contributor

agreements that motivated specific pass-through contributions. The prospect of disclosing coordinated spending should deter corruption even less effectively in the context of coordinated spending than it does in the context of direct candidate contributions. Indeed, it is not hard to imagine a wary donor eschewing direct contributions to a candidate altogether when presented with the equally valuable, and more discreet, possibility of supplying uncapped party coordinated expenditures. Just as Congress's tools for preventing quid pro quo corruption are not confined to disclose-on-the-front-end, prosecute-on-the-back-end in the world of contributions to candidates, they are not so limited in the world of party coordinated expenditures.

The plaintiffs' third alternative is earmarking. FECA's earmarking provision treats contributions "earmarked or otherwise directed through an intermediary or conduit to [a] candidate" as contributions to that candidate. 52 U.S.C. § 30116(a)(8). FEC regulations define earmarking as any "designation, instruction, or encumbrance, whether direct or indirect, express or implied, oral or written, which results in all or any part of a contribution or expenditure being made to, or expended on behalf of, a clearly identified candidate." 11 C.F.R. § 110.6(b)(1). The plaintiffs contend that these earmarking provisions prohibit the collusion that party coordinated spending limits are designed to capture, rendering the limits unnecessary. In other words, the plaintiffs ask the FEC to count on illicit contributors exercising financial power over beholden candidates so openly that they will have to self-report their transactions.

That is never how "actual political conditions" have played out. *Colorado II*, 533 U.S. at 462. In practice, candidates solicit donations from well-heeled supporters, supporters contribute to the party once they have hit their preferred candidate's contribution limit, and the party spends to support their candidates in proportion to the amount each candidate has raised for the party. This well-oiled machine ensures that contributions will be effectively allocated without the agreements necessary to trigger earmarking, and these dynamics are at play in both major parties. *See id.* at 458-60; *In re Cao*, 619 F.3d at 429. Common sense and this experience make clear that earmarking captures "only the most clumsy attempts to pass contributions through to candidates." *Colorado II*, 533 U.S. at 462.

The potential for earmarking to neutralize party conduit corruption has, moreover, eroded over time with the rise of joint fundraising committees. Joint fundraising committees enable a

single donor to consolidate their support in a joint committee that links federal party committees, state party committees, and outside PACs aligned with the same party. Br. of *Amici Curiae* Campaign Legal Ctr. & CREW at 22-27. Candidates and parties alike may solicit single checks to a joint committee—often named after a candidate, e.g., John Doe's Victory Fund—which is then divided among the participating committees according to a predetermined allocation formula and capped only by the applicable contribution limits. *Id.* With the aggregate limits on such contributions dissolved by *McCutcheon*, joint committee contributions can now approach $1 million per donor. *Id.* at 24-25. And joined party committees may transfer these funds to a single party committee, arming that committee with a war chest to unleash on the headlining candidate's race. *See* 52 U.S.C. § 30116(a)(4); 11 C.F.R. §§ 102.6(a)(1)(ii), 110.3(c)(1). This leaves the beneficiary candidate, well aware of who contributed what to the joint fundraising committee and how the selected party committee intends to use the funds, with even more reason to reward generous donors with political favors. No form of earmarking can check that risk.

\* \* \*

The plaintiffs' facial challenge must show that every application of the party coordinated spending limits is unconstitutional. Yet the Supreme Court has recognized since *Buckley* that coordinated expenditures, at least in some forms, "have virtually the same value to the candidate as a contribution" and pose the same "dangers of abuse." *See Buckley*, 424 U.S. at 46 & n.53. Even the *Colorado II* dissenters recognized that the statute "covers a broad array of conduct" that includes spending, like "direct payment of a candidate's media bills," that is "virtually indistinguishable from simple contributions." *Colorado II*, 533 U.S. at 462 (Thomas, J., dissenting) (quoting *Colorado I*, 518 U.S. at 624 (opinion of Breyer, J.)). And the dissent here does too, acknowledging that a "candidate could create and produce an advertisement before handing it off to a party committee for publication and payment, leaving the committee in essence to foot the candidate's bill." Dissenting Op. at 91. My colleagues would nevertheless invalidate the limits because "coordination between a party and its candidate may well occur in more mundane ways" as well. *Id.*; *see* Thapar Concurring Op. at 18-19. But the focus must be on "circumstances in which" the limits are "most likely to be constitutional," not "hypothetical scenarios where" the limits "might raise constitutional concerns." *United States v. Rahimi*,

144 S. Ct. 1889, 1903 (2024). Confronted with this constitutional application of the coordination limits, the plaintiffs' facial challenge fails.

IV.

The concurrences, in many respects, would rework the law even more dramatically than the dissent. My concurring colleagues respect the rule of vertical stare decisis but share no such taste for horizontal stare decisis. Judge Thapar and Judge Bush explain in their separate but related writings that were they vested with Supreme Court authority, they would jettison a century of well-trodden First Amendment law and replace it with the nascent "history and tradition" test installed two terms ago in *Bruen*. *See* Thapar Concurring Op. at 13-14; Bush Concurring Op. at 26-28. As they see it, when parties raise a First Amendment question, we should offer a two-step answer. First, ask whether the "Amendment's text covers an individual's conduct." Thapar Concurring Op. at 13 (quoting *Oakland Tactical Supply, LLC v. Howell Twp.*, 103 F.4th 1186, 1203 (6th Cir. 2024) (Kethledge, J., dissenting)); *see* Bush Concurring Op. at 27. Second, assuming it does, ask whether the government has justified the "regulation by demonstrating that it is consistent with the Nation's historical tradition." Thapar Concurring Op. at 13-14 (quoting *Oakland Tactical Supply*, 103 F.4th at 1203 (Kethledge, J., dissenting)); *see* Bush Concurring Op. at 27-28.

I would pause before grafting *Bruen*'s Second Amendment framework onto the First Amendment and other areas of American constitutional law. The test is, as the concurrences bring to the fore, plagued by theoretical and practical pitfalls. Its expansion risks undermining the judiciary's democratic legitimacy, straining its institutional competence, and doubling down on the series of flawed and underdeveloped premises that support it. I close by explaining why I would stick to "the well-trodden path." *Vidal v. Elster*, 602 U.S. 286, 325 (2024) (Sotomayor, J., concurring).

A.

Judge Thapar calls for adopting *Bruen*'s "history and tradition" test to "guide our First Amendment jurisprudence," offering two principal justifications for expanding the standard's reach. Thapar Concurring Op. at 13. He asserts that the history and tradition approach frees

judges from making "free-wheeling policy judgments," preserving the judiciary's "democratic legitimacy." *Id.* at 16. He also maintains that by directing judges to plumb the reserves of "legal history," the test returns the judiciary to its core "institutional competence." *Id.* at 15-16. These objectives and hypotheses are, as theories, fair enough. But let's be clear: Judge Thapar's proposal to make history and "tradition dispositive is *itself* a" policy judgment. *Vidal*, 602 U.S. at 324 (Barrett, J., concurring). And it does not score well on his own rubric.

I begin with the appeal to democratic legitimacy. Judge Thapar would "defin[e] the contours of the First Amendment" by looking to regulations that existed "around the time of ratification." *See* Thapar Concurring Op. at 13. Those regulations are, however, an odd place to locate democratic values. When the First Amendment was ratified in 1791, the franchise was generally limited to white and "property-owning men." Gilda Daniels, *Democracy's Destiny*, 109 Cal. L. Rev. 1067, 1099 (2021). And only they could "hold office." Reva B. Siegel, *She the People: The Nineteenth Amendment, Sex Equality, Federalism, and the Family*, 115 Harv. L. Rev. 947, 976 (2002). It took generations to extend political participation to Black men; generations more to relinquish it to women. *See id.* at 961, 1043. The history and tradition test would nevertheless constrict constitutional meaning to the understandings endorsed only by the most privileged white men of the founding generation, arrogating to that plutocratic minority retroactive and everlasting authority to delimit the Constitution's bounds today. Whatever merits may attend stopping constitutional time in that era, democratic legitimacy cannot be among them.

I turn next to institutional competence. Judge Thapar's theory is that judges are "creatures of precedent and legal history," not policy and "econometric training." Thapar Concurring Op. at 15. So, the argument runs, blinkering considerations outside the historical record keeps us in our rightful lane. But how we get from the premise that judges are creatures of precedent to the conclusion that judges should shirk that precedent in favor of becoming armchair historians is anyone's guess. Far from connecting those dots, the Supreme Court's latest exploration of history and tradition in *Rahimi* generated seven conflicting writings, leaving lower courts to guess, as Judge Bush's concurrence does here, what "perhaps a majority" of the

Supreme Court "appears" to think about using "history and tradition" to assess "the constitutionality of [a] regulation" in a particular case. Bush Concurring Op. at 30.

And if the test has thrown the high court into disagreement, it has hurled lower courts into "chaos." *Rahimi*, 144 S. Ct. at 1929 n.3 (Jackson, J., concurring); *see id.* at 1897 (majority opinion) (lower "courts have misunderstood" the history and tradition test); *id.* at 1907 (Sotomayor, J., concurring) ("lower courts [are] struggling to apply" the history and tradition test); *id.* at 1923 (Kavanaugh, J., concurring) (lower courts may have a "difficult" time "[d]eciding constitutional cases" under the Court's "still-developing" history and tradition test); *id.* at 1925 (Barrett, J., concurring) (lower courts "have struggled with [the] use of history in" applying the history and tradition test); *id.* at 1926 & 1927 n.1 (Jackson, J., concurring) ("lower courts are struggling" to apply the history and tradition test); *id.* at 1930-47 (Thomas, J. dissenting) (the Court itself misapplies the history and tradition test). Courts applying *Bruen* have reached "conflicting conclusions on virtually every consequential Second Amendment issue to come before them." *Rahimi*, 144 S. Ct. at 1927 (Jackson, J., concurring) (quoting Brief for Second Amendment Law Scholars as Amici Curiae 4-5). As one district court put it, trial judges are not, it turns out, "experts in what white, wealthy, and male property owners thought about [] regulation in 1791." *United States v. Bullock*, No. 3:18-CR-165-CWR-FKB, 2022 WL 16649175, at *1 (S.D. Miss. Oct. 27, 2022) (order).

Judge Bush's concurrence well-exemplifies lower courts' inability to apply the history and tradition standard. That test, the Supreme Court explained in *Rahimi*, calls for "considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Rahimi*, 144 S. Ct. at 1898. Courts "must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'applying faithfully the balance struck by the founding generation to modern circumstances.'" *Id.* (brackets omitted) (quoting *Bruen*, 597 U.S. at 29). "Why and how the regulation burdens the right are central to this inquiry." *Id.* "The law must comport with the principles underlying the" constitutional provision, "but it need not be a 'dead ringer' or a 'historical twin.'" *Id.* (quoting *Bruen*, 597 U.S. at 30).

Nevertheless, the history and tradition test results in the hunt for just such a long-lost twin.  Ignoring *Rahimi*'s focus on legal principles—the why and how of founding era regulation—Judge Bush's concurrence casts aside "the Framers' general concerns about factions and corruption" as the appropriate level of generality for the inquiry.  Bush Concurring Op. at 32.  His concurrence instead digs "into the weeds" of the historical record in search of "per se limitations on the ability of individuals or groups to contribute and coordinate political expenditures."  *Id.* at 31.  The writing emphasizes its belief that this degree of specificity is required, underscoring that the FEC failed to "point to a single piece of historical evidence that anyone in the Founding generation considered the *amount* or *degree of coordination* for political contributions to be sanctionable."  *Id.*  It insists on a "specific law that regulated the coordination of expenditures and spending for political speech."  *Id.* at 32.  That is precisely the approach the Court rejected in *Rahimi*.  *Rahimi*, 144 S. Ct. at 1903.  And though this search for a dead ringer is dead wrong, the effort spent "slaying a straw man" captures perfectly the foibles of the history and tradition test.  *Id.*

In short, Judge Thapar's democratic justifications for the history and tradition test would not generate democratic legitimacy in our society, they would ensure a society "trapped in amber," petrified in the antidemocratic past.  *Rahimi*, 144 S. Ct. at 1897.  His institutional competency justifications, meanwhile, are irreconcilable with the experience of Supreme Court Justices, legions of lower courts, and our own colleague in this case, all of whom have struggled to apply his test.

B.

Judge Bush starts from a premise similar to Judge Thapar's, arguing that history and tradition alone can ensure a "court does not implement its own policy judgments about, for example, free speech or gun regulation."  Bush Concurring Op. at 30 (quoting *Rahimi*, 144 S. Ct. at 1910 (Kavanaugh, J., concurring)).  That is a sympathetic aim.  But as already stressed, "rendering tradition dispositive is *itself* a" policy judgment.  *Vidal*, 602 U.S. at 324 (Barrett, J., concurring).  And the policy judgments do not end there.  What is "the right level of generality" at which to interpret the historical record?  *Rahimi*, 144 S. Ct. at 1926 (Barrett, J., concurring).  "[H]ow many cases or laws would suffice" to show a tradition?  *Bruen*, 597 U.S. at 112 (Breyer,

J., dissenting). "How long after ratification may subsequent practice illuminate original public meaning?" *Id.* at 82 (Barrett, J., concurring). Which individual rights should be frozen in 1791, which reimagined in 1868? *See Rahimi*, 144 S. Ct. at 1898 n.1. When is history and tradition "dispositive," *Vidal*, 602 U.S. at 324 (Barrett, J., concurring), when does it simply "confirm[]" evidence amassed from other inputs, *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 477 (2022), and when must it yield to "competing considerations," *Trump v. United States*, 144 S. Ct. 2312, 2331 (2024); *see generally Trump v. Anderson*, 601 U.S. 100 (2024) (per curiam)? Policy decisions all.

Judge Bush's concurrence offers three features of the history and tradition test that he says make it a valuable constitutional guide. His first claim is that "history allows us to understand linguistical meaning at the time of ratification." Bush Concurring Op. at 27. The Constitution's "'original history' serves to 'elucidate how contemporaries' in the ratification generation 'understood the text—for example, the meaning of the phrase "bear Arms"'" in the Second Amendment." *Id.* (brackets omitted) (quoting *Rahimi*, 144 S. Ct. at 1925 (Barrett, J., concurring)).

Judge Bush's promise that constitutional text has a "discoverable historical meaning" that "is fixed at the time of its ratification" and ascertainable now may have some theoretical appeal, but the theory runs into unresolvable practical restraints. *Rahimi*, 144 S. Ct. at 1924 (Barrett, J., concurring) (quoting K. Whittington, *Originalism: A Critical Introduction*, 82 Ford. L. Rev. 375, 378 (2013)). At the outset, Judge Bush's proposal that we confine ourselves to digging through historical legal analogues to discern the fixed "original public meaning" of the Constitution's "communicative content," *see* Randy E. Barnett, Lawrence B. Solum, *Originalism After Dobbs, Bruen, and Kennedy: The Role of History and Tradition*, 118 Nw. U. L. Rev. 433, 436 (2023), is a dangerously skewed, and oddly myopic, way of going about the task. Why leave other evidence of meaning off the table?

Beyond that, judges, as demonstrated, do not become "oracles" when asked to search "far into the dimmy past." *See Conroy v. Aniskoff*, 507 U.S. 511, 519 (1993) (Scalia, J., concurring). And who can blame us? History tells a murky tale, and what some jurists will see as a historical record whose conclusions are "not debatable," *District of Columbia v. Heller*, 554 U.S. 570, 636

(2008), others will see as "provid[ing] a clear answer" in the other direction, *id.* at 637 (Stevens, J., dissenting), and still others will decry as rewritten in "one of the greatest pieces of fraud, I repeat the word 'fraud,' on the American public by special interest groups that I've ever seen in my lifetime," *MacNeil/Lehrer NewsHour: Interview by Charlayne Hunter-Gault with Warren Burger* (PBS television broadcast Dec. 16, 1991). This bug, it bears emphasizing, frustrates not only the exercise of judicial judgment in the "construction zone" of constitutional interpretation—where interpretive methods inexorably clash whatever the method—but at the antecedent stage of setting the terms of the debate. *See* Barnett & Solum, *supra*, at 436-38. And as the historical record grows more opaque, the risk grows more acute that judges will commit the historical "equivalent of entering a crowded cocktail party and looking over the heads of the guests for one's friends"—the very evil history and tradition is supposed to guard against. *Conroy*, 507 U.S. at 519 (Scalia, J., concurring). Neither Judge Bush nor Judge Thapar offers a solution to the problem that their proposed test licenses forays into "the dimmy past," without objective criteria to cabin judicial cherry-picking. *Id.*

Judge Bush's second claim is that pre-ratification history enables us "to determine categories of private conduct that were typically subject to regulation by government when the relevant constitutional text was ratified." Bush Concurring Op. at 27. The inference is that if conduct went unregulated, that "conduct is constitutionally protected," and that if conduct was regulated, "the constitutional text does not bar government intervention." *Id.*

This argument rests on three unstated and untenable premises. The theory starts with the assumption that pre-ratification lawmakers exercised the full universe of their regulatory powers. It presumes, in other words, that if pre-ratification policymakers declined to prohibit the use of, say, "muskets," they did so not as matter of policy but because of some external constraint on their authority. *See Rahimi*, 144 S. Ct. at 1897-98. The next premise is the converse inference— that if a practice was proscribed in the pre-ratification era, that prohibition was consistent with individual rights as they were understood at the time. Founding era regulations, the argument runs, prevailed because they were legitimate, not because in an era that predated the constitution, and the power of judicial review that followed it, no court had yet had "occasion" to address them. *See id.* at 1923 (Kavanaugh, J., concurring). The last premise is that ratifying the

constitution did nothing to change our constitutional order.  Regulations permissible pre-ratification remained permissible post-ratification; laws impermissible pre-ratification remained impermissible afterward.

I cannot accept this logic.  To be sure, there is an element of truth to each premise as far as each goes—pre-ratification legislatures may have acted with some measure of respect for what they conceived as individual rights, and some of those rights may have been codified in the Constitution.  But just as surely, our forebears were as constrained by policy as much as power, tested the limits of their authority as much as today's lawmakers test theirs, and ratified the Constitution to perfect the status quo, not to enshrine it wholesale.  That reality is essential to placing pre-ratification history in its proper context and underscores the folly of treating past as providence.

Judge Bush's third claim is that we can use post-ratification history to the same ends.  The absence of post-ratification regulation of certain conduct, he contends, shows "government was not understood to have the constitutional authority to regulate that conduct"; the presence of it shows "that constitutional power to regulate was understood to exist."  Bush Concurring Op. at 27-28.

The post-ratification theory, like the pre-ratification one, makes the same faulty assumption that ratification-era legislatures exercised the full extent of their powers, but only the full extent of their powers (the Alien and Sedition Acts would like a word).[9]  And it brings with it a host of additional problems (many of which apply with similar force to the pre-ratification conundrum).  How "widespread" must "a historical practice [] have been" to carry constitutional significance?  *Rahimi*, 144 S. Ct. at 1916 n.4 (Kavanaugh, J., concurring).  When must the practice "have started?"  *Id.* (Kavanaugh, J., concurring).  How long must it "have endured?"  *Id.* (Kavanaugh, J., concurring).  No one, on the Supreme Court or our court, quite knows.  *See id.* (Kavanaugh, J., concurring); *Bruen*, 597 U.S. at 81-83 (Barrett, J., concurring).  Rest assured, we

---

[9]*See New York Times Co. v. Sullivan*, 376 U.S. 254, 273, 276 (1964) (cataloging the "broad consensus" that the Alien and Sedition Acts, which made it a crime to "write, print, utter or publish any false, scandalous and malicious writing or writings against the government of the United States" and were "never tested in" the Supreme Court, were "inconsistent with the First Amendment").

are told, the nation's most "[r]espected scholars are" working on it. *Rahimi*, 144 S. Ct. at 1916 n.4 (Kavanaugh, J., concurring). But I am not assured by that suggestion, and I would not leave our time-tested body of First Amendment jurisprudence to forge down such a fraught path.

*    *    *

The concurrences of Judges Thapar and Bush underscore the theoretical flaws and practical limitations of the history and tradition test. Raising more questions than answers, they uncurtain the paradigm as an exercise in judicial and academic experimentation.[10] Our country always has, to be sure, been a "great experiment." Letter from George Washington to Catharine Sawbridge Macaulay Graham (January 9, 1790). But I would exercise restraint before subjecting it to more of this one.

V.

Though, respectfully, I would not have reached many of the issues my colleagues raise, I concur in the en banc majority's answer to the certified question. The "limits on coordinated party expenditures in § 315 of the Federal Election Campaign Act of 1971, as amended, 52 U.S.C. § 30116," do not "violate the First Amendment, either on their face or as applied to party spending in connection with party coordinated communications as defined in 11 C.F.R. § 109.37." *See* R. 49, PageID 5494.

---

[10]Judge Bush objects to this characterization and instead casts his vote for a different "great experiment." Bush Concurring Op. at 26 n.1. The fact remains, however, that until this year, the Supreme Court "ha[d] never applied th[e] history-and-tradition test to a free-speech challenge." *Vidal*, 602 U.S. at 327 (Sotomayor, J., concurring). The application of this nascent test to new areas of constitutional law is, in my view, the epitome of judicial experimentation, as the notable struggle of judges to apply this test reveals.

---
**CONCURRING IN THE JUDGMENT**
---

BLOOMEKATZ, Circuit Judge, concurring in the judgment.  I agree that *FEC v. Colorado Republican Federal Campaign Committee*, 533 U.S. 431 (2001) ("*Colorado II*") remains binding precedent and the plaintiffs' arguments for abandoning it are unpersuasive, as articulated in Parts I and II of Judge Stranch's concurrence.  That is all that is needed to resolve this case.

---

**DISSENT**

---

CHAD A. READLER, Circuit Judge, dissenting.  As a visit to any social media site makes abundantly clear, political speech, in particular speech on electoral matters, holds a central place in American life.  That political opinions are so widely expressed, if not widely shared, has a long pedigree, tracing back to the founding.  As James Madison put the point while criticizing the 1798 Sedition Act, which punished speech against Congress: "the essential difference between the British government and the American constitutions" was that, on this side of the Atlantic, the people possessed "absolute sovereignty."  4 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 569 (Jonathan Elliot ed., 1836) (Madison's Report on the Virginia Resolutions, House of Delegates, Session of 1799–1800).  Inherent in that sovereignty is the ability to speak openly against public officials as well as candidates for office.  "[T]he right of electing the members of the government," Madison explained, "constitutes more particularly the essence of a free and responsible government." *Id.* at 575.  Exercising that right, in turn, requires "examining and discussing [the] merits and demerits of the candidates." *Id.*

These principles are embodied by the First Amendment to the United States Constitution, which prohibits the government from "abridging the freedom of speech."  U.S. Const. amend. I.  The Amendment protects a range of expressive activity.  But it "has its fullest and most urgent application precisely to the conduct of campaigns for political office." *FEC v. Cruz*, 596 U.S. 289, 302 (2022) (quoting *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971)).  As judges, then, we are required "to err on the side of protecting political speech rather than suppressing it" when faced with a legal challenge to regulations restricting such conduct. *Id.* at 308 (quoting *McCutcheon v. FEC*, 572 U.S. 185, 209 (2014) (plurality opinion)).

With this understanding in mind, we confront a law limiting coordinated expressive activity between political party committees and their candidates.  The National Republican Senatorial Committee, Republican Senator J.D. Vance, and former Republican Representative Steve Chabot together challenge the limits imposed by § 315 of the Federal Election Campaign

Act of 1971 (FECA) on coordinated party committee expenditures. *See* 52 U.S.C. § 30116(d). Plaintiffs view those limits as at odds with the First Amendment, both facially and as applied to a subset of coordinated party expenses called "party coordinated communications," in essence, campaign advertising. *See* 11 C.F.R. §§ 109.37(a)(1)–(2), 100.26.

The challenging nature of the task before us bears emphasis. As this case touches election law, and as we find ourselves in the middle of an election season, we aimed to resolve the matter as expeditiously as possible. But because the district court was required to certify plaintiffs' challenge "immediately" to this Court sitting en banc, 52 U.S.C. § 30110, we act without the benefit of either a panel opinion or a decision on the merits by the district court. Much of the district court's efforts, rather, were directed to sifting through voluminous proposed findings of fact to prepare a more confined record for appellate review. Equally true, by all accounts our work is simply a warm-up for eventual Supreme Court review. *See* First Br. at 23 (preserving in the alternative the argument that the Supreme Court should revisit its earlier campaign finance jurisprudence); Second Br. at 3 (suggesting that plaintiffs' "challenge before this Court is a necessary step in seeking Supreme Court relief"); *see also* Stranch Concurring Op. at 47 (acknowledging the same).

Even in this unusual posture, however, the weakness of the Federal Election Commission's position is apparent. The agency seeks to enforce a regulatory regime curtailing free speech. *See* 52 U.S.C. § 30106(b)(1) (authorizing the FEC to enforce FECA). Not just any speech, but political speech. And not just any speaker, but political parties, whose primary mission is to promote candidates for office. To that end, FECA limits a national party committee's coordinated expenditures, which the FEC defines as those expenditures "made in cooperation, consultation or concert with, or at the request or suggestion of, a candidate [or] a candidate's authorized committee." 11 C.F.R. § 109.20. A party committee may not exceed certain coordinated expense thresholds based on a candidate's state, the office sought, voting-age population, and inflation. 52 U.S.C. § 30116(d). In practice, this means that in 2024, party committee spending coordinated with Senate candidates has a limit ranging from $123,600 in the eight least-populated states to $3,772,100 in California. *See id.* § 30116(d)(3)(A)(i)–(ii). Coordinated spending on House races is similarly constrained. *See id.* § 30116(d)(3)(A)(i)–(ii),

(d)(3)(B) (capping spending for House candidates in states with only one representative at $123,600, and at $61,800 per candidate in all other states); *see also Coordinated Party Expenditure Limits*, Fed. Election Comm'n, https://perma.cc/25VD-83D9. In a world where overall campaign spending dwarfs these amounts, the FEC's enforcement efforts handcuff parties and their candidates alike. *See, e.g.*, *Raising: By the Numbers*, Fed. Election Comm'n, https://perma.cc/8Z5C-NJER (reporting $1,038,702,441 raised by all Senate candidates running in 2024 as of August 28, 2024).

These realities help reveal FECA's constitutional flaws. The Act's spending limits "operate in an area of the most fundamental First Amendment activities." *Buckley v. Valeo*, 424 U.S. 1, 14 (1976) (per curiam). They target political debate, an "integral" aspect "of the system of government established by our Constitution." *Id.* And they serve to "reduce[] the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached." *Id.* at 19. Measured by the "rigorous standard of review" the Supreme Court requires, the coordinated expenditure limits fail to honor First Amendment guarantees. *McCutcheon*, 572 U.S. at 197 (citation omitted) (describing the scrutiny applicable to contribution limits).

Against all of this, the FEC points to a lone, largely obsolete precedent. Contrary to the FEC's suggestion, we may not turn back the jurisprudential clock some two decades to save an undeniably infirm law. Accordingly, I would reach the merits of plaintiffs' claims and find that the coordination restrictions violate the First Amendment.

I.

A. Much of the FEC's briefing is dedicated to the notion that we may not reach the weighty legal questions before us as part of a facial challenge to FECA. To the FEC's mind, resolution of those issues is directly controlled by the Supreme Court's decision in *FEC v. Colorado Republican Federal Campaign Committee (Colorado II)*, 533 U.S. 431 (2001). Second Br. at 24–30. True, *Colorado II* rejected a facial challenge to coordinated party committee expenditure limits. *Colorado II*, 533 U.S. at 465. And all agree that "lower courts must follow Supreme Court precedent," *Thompson v. Marietta Educ. Ass'n*, 972 F.3d 809, 813

(6th Cir. 2020), even when a directly applicable decision "appears to rest on reasons rejected in some other line of decisions." *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989). As an "inferior Court[]," after all, we understandably take our lead from the Supreme Court. *See* U.S. Const. art. III, § 1.

Yet even those commands have their limits. In the rare case where doctrinal developments have entirely displaced an earlier Supreme Court decision, we must acknowledge as much. *See Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 534 (2022) (criticizing lower courts for continuing to adhere to a dated precedent when it had become "apparent" that the Supreme Court had "long ago abandoned" the legal reasoning undergirding that precedent); *Limbach v. Hooven & Allison Co.*, 466 U.S. 353, 361 (1984) (finding "error" in a lower court applying a precedent that, while not "expressly overruled," failed to "retain[] current validity" in light of subsequent legal developments); *Ceres Terminals, Inc. v. Indus. Comm'n*, 53 F.3d 183, 184–85 (7th Cir. 1995) (Easterbrook, J.) (recognizing the possibility that "an inferior tribunal may disregard opinions that exist more as spectral apparitions than as living forces in the law"); *see also Rowe v. Peyton*, 383 F.2d 709, 714 (4th Cir. 1967), *aff'd* 391 U.S. 54 (1968) ("[T]here are occasional situations in which subsequent Supreme Court opinions have so eroded an older case . . . as to warrant a subordinate court in pursuing what it conceives to be a clearly defined new lead from the Supreme Court to a conclusion inconsistent with an older Supreme Court case."). Said differently, we do not mechanically apply earlier Supreme Court doctrine when "events subsequent to the [Supreme Court's] last decision . . . approving the doctrine—especially later decisions by that court, or statutory changes—make it almost certain that the [Supreme Court] would repudiate the doctrine if given a chance to do so." *Olson v. Paine, Webber, Jackson & Curtis, Inc.*, 806 F.2d 731, 734 (7th Cir. 1986) (Posner, J.); *see also Hobbs v. Thompson,* 448 F.2d 456, 473 (5th Cir. 1971) (declining to apply Supreme Court doctrine that is "out of harmony with . . . a long line of cases decided subsequently"). As a lower court, remember, our concern is less with the precise outcome of a past case than it is with its reasoning and analysis. *See* Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. Chi. L. Rev. 1175, 1177 (1989). And we do not apply that reasoning sightless to the context of the earlier decision or ensuing developments. As Justice Gorsuch recently reminded us, "[a] later court assessing a past decision must . . . appreciate the possibility that different facts and different legal arguments

may dictate a different outcome." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2281 (2024) (Gorsuch, J., concurring).

The Supreme Court, in other words, guides us with its reasoning, reasoning we follow unless later repudiated. This approach to precedent is familiar. For instance, when the Supreme Court overruled *Lochner*-era precedent invalidating minimum wage laws, there was no need for lower courts to follow other *Lochner*-era precedent. *See W. Coast Hotel v. Parrish*, 300 U.S. 379 (1937) (overruling *Adkins v. Child.'s Hosp.*, 261 U.S. 525 (1923)). If a maximum hour law for bakers, *see Lochner v. New York*, 198 U.S. 45 (1905), or a law regulating the weight of loaves of bread, *see Jay Burns Baking Co. v. Bryan*, 264 U.S. 504 (1924), was challenged after *West Coast Hotel*, the latter case's logic would control. This is because the Supreme Court, through its reasoning in *West Coast Hotel*, "signaled the demise of an entire line of important precedents that had protected an individual liberty right against state and federal health and welfare legislation." *See Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 265 (2022). And there is no shortage of other zombie precedents in the *United States Reports*—that is, cases technically still on the books, but whose logic has been discredited by the "court of history." *Trump v. Hawaii*, 585 U.S. 667, 710 (2018); *see also* Lee Epstein et al., *The Decision to Depart (or not) from Constitutional Precedent: An Empirical Study of the Roberts Court*, 90 N.Y.U. L. Rev. 1115, 1126 (2015) ("The Justices have many techniques for undermining the vitality of their precedents: overruling them *sub silentio*, as well as limiting, questioning, criticizing, or distinguishing previous decisions."). Courts that apply such cases without reflecting on their subsequent history do no more than treat them as "some ghoul . . . that repeatedly sits up in its grave and shuffles abroad, after being repeatedly killed and buried*." Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 398 (1993) (Scalia, J., concurring).

For decades, the circuit courts have heeded this direction. For example, in responding to the government's citation to *Wyandotte Transp. Co. v. United States*, 389 U.S. 191 (1967), and related argument that "statutory silence indicates congressional intent to create a cause of action by implication," the Third Circuit noted that it "would be blind to subsequent developments in a dynamic area of the law . . . if [it] failed to recognize that in recent years the [Supreme] Court has been far more reluctant to infer rights of action for silent statutes." *United States v. City of*

*Philadelphia*, 644 F.2d 187, 192 (3d Cir. 1980) (Aldisert, J.).   Likewise, in the context of Establishment Clause jurisprudence, it was the appellate courts that recognized the death of the three-prong test first announced in *Lemon v. Kurtzman*, 403 U.S. 602 (1971), taking their lead from intervening decisions of the Supreme Court.  *See, e.g.*, *Woodring v. Jackson County*, 986 F.3d 979, 981 (7th Cir. 2021) (holding that intervening Supreme Court decisions required the abandonment of the *Lemon* test); *Perrier-Bilbo v. United States*, 954 F.3d 413, 425 (1st Cir. 2020) (same); *Kondrat'yev v. City of Pensacola*, 949 F.3d 1319, 1326 (11th Cir. 2020) (recognizing that "*Lemon* is dead").  The Supreme Court only later penned the doctrine's formal obituary in *Kennedy v. Bremerton School District*, 597 U.S. 507 (2022).

We too have been sensitive to changes in the legal landscape.   Just last year in considering a nondelegation challenge to the Occupational Safety and Health Act, we declined to apply admittedly "binding" precedents—*Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935), and *A.L.A. Schechter Poultry Co. v. United States*, 295 U.S. 495 (1935)—because doing so would be to read Supreme Court decisions "in isolation." *Allstates Refractory Contractors, LLC v. Su*, 79 F.4th 755, 767 (6th Cir. 2023).   The year before, in considering the scope of the exhaustion requirement for federal habeas petitions, we refused to follow *Fay v. Noia*, 372 U.S. 391 (1963), understanding it to be an "opinion largely discarded to the dustbin of legal history." *Johnson v. Bauman*, 27 F.4th 384, 392 (6th Cir. 2022).   Three years earlier, we declined an invitation to extend the "inclination" in *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971), to create implied causes of action given subsequent Supreme Court precedent rejecting that approach. *Callahan v. Fed. Bureau of Prisons*, 965 F.3d 520, 523 (6th Cir. 2020).   And we similarly refused to apply *Bowers v. Hardwick*, 478 U.S. 186 (1986), where later Supreme Court precedent, which had not yet overruled *Bowers*, had nonetheless undermined its application beyond its specific facts. *Stemler v. City of Florence*, 126 F.3d 856, 873–74 (6th Cir. 1997).   In short, the inferior courts routinely read Supreme Court precedent with an eye to whether a precedent's vitality has been undermined by later jurisprudential developments.  Indeed, it is our duty to do so.

Viewed in this light, we would be remiss not to account for the wave of intervening precedent that leaves *Colorado II* essentially on no footing at all. Not only that, but both the statutory and factual backdrops have evolved deeply in the ensuing decades.

1. Most significant is the evolution in the law governing campaign finance. A key aspect of that evolution is the allowable grounds regulators may invoke under the First Amendment to justify restrictions on political speech. Today, the Supreme Court "recognizes only one permissible ground for restricting political speech: the prevention of '*quid pro quo*' corruption or its appearance." *Cruz*, 596 U.S. at 305; *see also McCutcheon*, 572 U.S. at 207. In this context, quid pro quo corruption is "a direct exchange of an official act for money." *McCutcheon*, 572 U.S. at 192.

To put these developments in perspective, look back at the legal landscape over the last five decades. Ten years ago, the Supreme Court recapped the "series of cases over the [then] past 40 years" that "have spelled out how to draw the constitutional line between the permissible goal of avoiding corruption in the political process and the impermissible desire simply to limit political speech." *Id.* This long history begins with *Buckley*. There, the Supreme Court considered a First Amendment challenge to FECA's restrictions on individual contributions and independent expenditures. 424 U.S. at 12–13. It treated the two differently. Applying "exacting scrutiny," the Supreme Court declared unconstitutional limits on expenditures "made totally independently of the candidate and his campaign." *Id.* at 44, 47, 51. It did so because restrictions on independent spending represented "substantial rather than merely theoretical restraints on the quantity and diversity of political speech." *Id.* at 19.

On the other hand, *Buckley* upheld FECA's contribution limits as a prophylactic measure against "corruption and the appearance of corruption spawned by the real or imagined coercive influence of large financial contributions on candidates' positions and . . . actions." *Id.* at 25. In so doing, *Buckley* blessed on constitutional grounds contribution limits (and, it seems, coordinated expenditure limits) so long as they are closely drawn means to achieve a sufficiently important governmental interest. *Buckley*, 424 U.S. at 28–29; *see also Colorado II*, 533 U.S. at 440 ("Ever since we first reviewed the 1971 Act, we have understood that limits on political expenditure deserve closer scrutiny than restrictions on political contributions.").

Further doctrinal developments came about in a case involving the Colorado Republican Party, one that would reach the Supreme Court twice. In *Colorado I*, the Supreme Court, citing *Buckley*, held that limits on a party's independent expenditures violated the First Amendment. *Colo. Republican Fed. Campaign Comm. v. FEC (Colorado I)*, 518 U.S. 604, 618 (1996) (plurality opinion); *see also id.* at 616 ("The independent expression of a political party's views is 'core' First Amendment activity no less than is the independent expression of individuals, candidates, or other political committees."). The case would return to the Supreme Court in *Colorado II*. The question presented there was whether all limits on political party spending, including those on coordinated party expenses, were facially unconstitutional. 533 U.S. at 437. The Supreme Court rejected the facial challenge, upholding limitations on coordination on the basis that they prevented circumvention of individual contribution limits and, thereby, potential corruption. *Id.* at 465. At this point in its history, it bears emphasizing, the Supreme Court understood "corruption" in this context to reach any form of "undue influence on an officeholder's judgement." *Id.* at 441. Along these lines, coordinated spending, the Supreme Court explained, could be as helpful to the candidate as direct contributions, which themselves raise the specter of corruption in this broad sense. *Id.* at 464–65.

That governing standard has been repudiated by the Supreme Court. And not once, but thrice. Begin with *Citizens United v. FEC*. There, the Supreme Court held that restrictions on political speech could not be justified by "[t]he fact that speakers may have influence over or access to elected officials." 558 U.S. 310, 359 (2010). This is because limits on speech that attempt to prevent "generic favoritism or influence" are "susceptible to no limiting principle." *Id.* (quoting *McConnell v. FEC*, 540 U.S. 93, 296 (2003) (Kennedy, J., concurring)).

A few years later, the Supreme Court reinforced the idea that the potential for mere influence alone does not justify restrictions on political speech. *See McCutcheon*, 572 U.S at 207. At issue in *McCutcheon* was a First Amendment challenge to FECA's "aggregate limits" on individual contributions, which capped the total amount a donor could contribute to all candidates. *Id.* at 192–93. In siding with the challengers, the Supreme Court held that only the prevention of quid pro quo corruption or its appearance could justify limits on political speech. *Id.* at 207. While "[t]he line between *quid pro quo* corruption and general influence may seem

vague at times," the Supreme Court emphasized that "the distinction must be respected in order to safeguard basic First Amendment rights." *Id.* at 209. And aggregate contribution limits, the Supreme Court held, could not be justified on the basis of guarding against corruption, as that concept was properly understood. *Id.* at 210–18. Justice Breyer confirmed these understandings in his dissenting opinion. Making a point our concurring colleague fails to acknowledge, Justice Breyer recognized that the definition of "corruption" adopted in *McCutcheon* was "inconsistent with the Court's prior case law," including *Colorado II*, which "upheld limits imposed upon coordinated expenditures among parties and candidates because it found they thwarted corruption and its appearance, again understood as including 'undue influence' by wealthy donors." *Id*. at 235, 240 (quoting *Colorado II*, 533 U.S. at 441)). *But see* Stranch Concurring Op. at 50 n.2 (suggesting that Justice Breyer's dissent "never asserted that *Colorado II* turned on the broader understanding" of corruption).

Any ambiguity on this point was wiped away in *Cruz*. There, the Supreme Court struck down a restriction on the amount candidates may raise after election day to repay loans they made directly to their own campaigns. 596 U.S. at 313. In so doing, it reaffirmed that the prevention of quid pro quo corruption or its appearance was the lone government interest warranting a restriction on political speech. *Id.* at 305. What is more, in both *McCutcheon* and *Cruz*, the Supreme Court went so far as to suggest that strict scrutiny may be the proper lens through which such restrictions are analyzed. *See McCutcheon*, 572 U.S. at 199; *Cruz*, 596 U.S. at 305. And even in applying "closely drawn" scrutiny, in each instance the Supreme Court saw fit to strike down restrictions on political spending. *See, e.g.*, *McCutcheon*, 572 U.S. at 199.

Having made clear that only fears of quid pro corruption may justify infringements on political speech, the Supreme Court also refined what that manner of corruption entails under federal law, further antiquating *Colorado II*. Borrowing from case law in the criminal context, *McCutcheon* understood quid pro quo corruption narrowly as "a direct exchange of an official act for money." 572 U.S. at 192 (citing *McCormick v. United States*, 500 U.S. 257, 266 (1991)) (recognizing as a subset of such corruption "dollars" for official acts); *see also id.* at 239 (criticizing the plurality's importation of "corruption" from federal criminal law as "flatly inconsistent" with *Buckley*) (Breyer, J., dissenting). Other jurisprudential developments have

narrowed what constitutes an "official act." The leading example is *McDonnell v. United States*. There, the government prosecuted the former Governor of Virginia for arranging meetings, hosting events, and contacting officials allegedly in return for loans and gifts. 579 U.S. 550, 555–56 (2016). From that collection of activity, the government argued that "nearly anything a public official does—from arranging a meeting to inviting a guest to an event—counts as a *quo*," that is, an official act by a public official. *Id.* at 575. The Supreme Court rejected that expansive view. It defined quid pro quo corruption as "the exchange of a thing of value for an 'official act.'" *Id.* at 574. And "an 'official act,'" the Supreme Court explained, "is a decision or action on a 'question, matter, cause, suit, proceeding or controversy,'" and "must involve a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee." *Id.* A long line of other cases has similarly narrowed our understanding of public corruption as well as the ways in which lawmakers and law enforcers may regulate public conduct. *See, e.g.*, *Snyder v. United States*, 144 S. Ct. 1947, 1954 (2024) (holding that a federal statute does not criminalize state and local officials "accept[ing] gratuities for their past official acts"); *Percoco v. United States*, 598 U.S. 319, 330–31 (2023) (declaring as impermissibly vague a standard that extended a duty of honest services to private citizens who "dominated and controlled any governmental business" or were relied on by "people working in the government"); *Kelly v. United States*, 590 U.S. 391, 404 (2020) (holding that a scheme to reduce a town's access to the George Washington Bridge as political payback did not violate federal fraud laws because it "did not aim to obtain money or property").

Importing this understanding of quid pro quo corruption into the present setting, campaign finance regulations must narrowly target the exchange of money for an official's formal exercise of the powers of her office. *See McDonnell*, 579 U.S. at 574. Merely bestowing titles, access to top officials, or convention box seats to a donor, as just some examples, are not a "quo" that campaign finance laws can legitimately target in an effort to stamp out quid pro quo corruption or its appearance. *Cf.* Br. for Campaign Legal Ctr. & Citizens for Resp. and Ethics in Wash. as Amici Curiae Supporting Defendants at 24–25 (describing perks in the form of titles, access to officials, and convention passes for big backers). The corruption targeted by regulators, in other words, must be concrete, not ephemeral in the ways envisioned by *Colorado*

II. Again, *Colorado II*, embracing decisions that preceded it, recognized a notion of corruption encompassing mere "undue influence on an officeholder's judgment." 533 U.S. at 441 (citing *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 389 (2000)). That understanding reflected "a concern not confined to bribery of public officials, but extending to the broader threat from politicians too compliant with the wishes of large contributors." *Shrink Mo.*, 528 U.S. at 389. But that far-reaching legal standard no longer governs. *See McCutcheon*, 572 U.S. at 208 ("[T]he Government may not seek to limit the appearance of mere influence or access.").

Judge Stranch views these developments in a different light. Her concurring opinion sees this legal evolution more as a coronation of *Colorado II* rather than an abdication. Why? Because *Colorado II*'s "discussion of party coordinated spending," to her eye, "focused explicitly on quid pro quo corruption." Stranch Concurring Op. at 50. A fair reading of *Colorado II* says otherwise. By and large, the Supreme Court spoke in broad conceptual points, nebulously invoking a fear of potential corruption tied to coordinated spending, without further explanation. *See, e.g.*, *Colorado II*, 533 U.S. at 460 ("If suddenly every dollar of spending could be coordinated with the candidate, the inducement to circumvent [contribution limits] would almost certainly intensify."); *id.* at 464 ("Coordinated expenditures of money donated to a party are tailor-made to undermine contribution limits."). When *Colorado II* spoke more concretely, it did not limit its focus to quid pro quo exchanges. *See, e.g.*, *id.* at 462 (worrying that candidates may give undue weight to "interests particular donors . . . seek[] to promote" (quotation omitted)). And when the decision identified specific examples of the harms the law was seeking to remedy, the list included things like increased donor influence at "special meetings and receptions" that political parties facilitate to afford "donors the chance to get their points across to the candidates" in the absence of coordinated expenditure limits. *Id.* at 461. *But see McConnell*, 540 U.S. at 297 (Kennedy, J., concurring) ("Favoritism and influence are not . . . avoidable in representative politics."). From every angle, in short, *Colorado II* turned on an expansive notion of corruption, not merely the perceived risk of quid pro quo arrangements, as our colleague's concurring opinion would have the reader believe. If one is looking for a writing that has veered into the forbidden territory of "seiz[ing] the prerogative of overturning Supreme Court precedent," Stranch Concurring Op. at 45, the concurring opinion's rewriting of *Colorado II* would be a good place to start.

Adding all of this together, *Colorado II* is not a decision that merely "appears to rest on reasons rejected in some other line of decisions"—its reasoning, rather, has been repeatedly and expressly rejected in the same precedential line. *See Rodriguez de Quijas*, 490 U.S. at 484.

2. Next, consider the changed statutory regime. Congress has amended FECA since the Supreme Court interpreted it in *Colorado II*. Today, FECA allows political parties to maintain "separate, segregated account[s]" to cover expenses incurred for "a presidential nominating convention"; "the construction, purchase, renovation, operation, and furnishing of one or more headquarters buildings of the party"; or "the preparation for and the conduct of election recounts and contests and other legal proceedings." 52 U.S.C. § 30116(a)(9). Notably, party expenditures from these accounts are exempted from the otherwise applicable coordinated expenditure limits. 52 U.S.C. § 30116(d)(5). That Congress has amended the Act in these ways fairly justifies a legal challenge, even against the background of a judicial interpretation of an earlier version of the statute. *See United States v. McNeil*, 362 F.3d 570, 574 (9th Cir. 2004) ("[W]hen Congress amends statutes, our decisions that rely on older versions of the statutes must be reevaluated in light of the amended statute."); *Sassy Doll Creations, Inc. v. Watkins Motor Lines, Inc.*, 331 F.3d 834, 840 (11th Cir. 2003) ("[A] clear change in the law by Congress could justify a panel of this court in not following an earlier panel's decision, where the prior panel's decision was based on legislation that had been changed or repealed." (cleaned up)). Indeed, it likely goes without saying that "stare decisis doesn't apply to statutory interpretation unless the statute being interpreted is the same one that was being interpreted in the earlier case." *See* Bryan A. Garner et al., *The Law of Judicial Precedent* 343 (2016). Otherwise, statutory amendments would be shielded from review so long as the revised law retained some semblance to a prior version. The same logic extends to constitutional challenges to a revised statute. *See Pollock v. Farmers' Loan & Tr. Co.*, 157 U.S. 429, 579 (1895) (declining to resolve a constitutional challenge to a tax statute under decisions considering a different law); Stranch Concurring Op. at 52 (reexamining the statutory changes anew with an eye toward whether they "carry a lighter risk of quid pro quo corruption").

What is more, the nature of the statutory changes here confirms the need for judicial review. Congress exempted from the coordination limits expenses that, in many respects, have a

less direct connection with speech, for example, building party headquarters. The remaining limits reveal Congress's and the FEC's target in a way not contemplated by *Colorado II*: political advertising coordinated by a party committee and its candidates. *See* 11 C.F.R. § 109.37. In other words, bedrock First Amendment activity. We owe it to the parties before us to address the constitutional significance of these statutory changes head on.

3. Nor can we overlook that the factual foundation underlying *Colorado II* hardly resembles current realities. *Colorado II* rested on the premise that "political parties are dominant players . . . in federal elections." 533 U.S. at 450 (citation omitted). However true that may have been at the turn of the century, it is far from true today. We have that on good authority. "The current mix of statutes, regulations, and court decisions has left a campaign finance system that reduces the power of political parties as compared to outside groups." *See Republican Nat'l Comm. v. FEC*, 698 F. Supp. 2d 150, 160 n.5 (D.D.C. 2010) (Kavanaugh, J.). One reason for the decline in party power is the passage of the Bipartisan Campaign Reform Act of 2002 (BCRA). Enacted just one year after *Colorado II*, BCRA prohibited national party committees from receiving and spending "soft money," that is, money raised at the state and local levels that could nevertheless be used for "generic party advertising" to influence federal elections. *McConnell*, 540 U.S. at 115, 123; *see also* 52 U.S.C. § 30125(a). That ban, upheld by the Supreme Court in *McConnell*, 540 U.S. at 161, resulted in political contributions being directed away from parties and into Super PACs. *See* Sarah Isgur et al., *Restoring the Guardrails of Democracy Project: Report by Team Conservative*, Nat'l Const. Ctr. (July 2022), https://perma.cc/SV4C-ZPNM ("Instead of getting money out of politics, [BCRA] simply transferred power away from the political parties."); Samuel Issacharoff, *Outsourcing Politics: The Hostile Takeover of Our Hollowed-Out Political Parties*, 54 Hous. L. Rev. 845, 866 (2017); Joseph Fishkin & Heather K. Gerken, *The Party's Over: McCutcheon, Shadow Parties, and the Future of the Party System*, 2014 Sup. Ct. Rev. 175, 188 (2014) ("Money is the oxygen of campaign politics, and it is plainly flowing toward the shadow parties, not the official ones.").

These developments cannot be understated. As the record certified by the district court reflects, Super PAC expenditures for federal elections now far exceed those of political parties. R. 49-1 at 40 ¶ 171 PageID 5535. This reality is impacting all levels of the electoral system,

including the grassroots—aided, perhaps ironically, by the FEC.  That agency recently issued an advisory opinion instructing that FECA's limits on coordinated communications do not apply to door-to-door canvassing activities undertaken by Super PACs.  FEC, Advisory Op. 2024-01 (2024).  As a result, campaigns may now effectively delegate on-the-ground political operations—once a staple of the political party apparatus—to Super PACs, leaving even less room for party influence over the political process.  *See* Theodore Schleifer, *Trump Gambles on Outside Groups to Finance Voter Outreach Efforts*, N.Y. Times (Aug. 14, 2024), https://www.nytimes.com/2024/08/14/us/politics/trump-voter-outreach-super-pacs.html; Scot J. Zentner, *Revisiting* McConnell*: Campaign Finance and the Problem of Democracy*, 23 J. L. & Pol. 475, 510 (2007) (noting that parties focus on raising and spending for "get-out-the-vote efforts, precinct canvassing, and independent campaign advocacy").

We cannot turn a closed eye to these drastic shifts in the landscape of electoral politics. Yet that is the approach our concurring colleague, in "explain[ing] why" this opinion "is wrong," embraces.  Stranch Concurring Op. at 45.  She views Super PACs as confined to independent expenditures only, *see id.* at 53, a notion that would no doubt come as a surprise to the FEC.

B.  Even if one thought that a facial challenge to FECA was not in order, plaintiffs also challenge FECA's coordination limits as applied to party coordinated communications.  First Br. at 48–49.  While *Colorado II* rejected a facial challenge to the coordination rule, that resolution does not control later as-applied challenges.  *See, e.g.*, *Wis. Right to Life, Inc. v. FEC*, 546 U.S. 410, 411–12 (2006) (per curiam) ("In upholding [the statute] against a facial challenge, we did not purport to resolve future as-applied challenges."); *United States v. Rahimi*, 144 S. Ct. 1889, 1910 (2024) (Gorsuch, J., concurring) (warning that "future litigants and courts" should not "read any more into" a decision on a facial challenge than its limited holding that the law has some "lawful scope").  *Colorado II*, in fact, envisioned as much.  It expressly left open whether a future as-applied challenge might succeed.  *See* 533 U.S. at 456 n.17 ("Whether a different characterization, and hence a different type of scrutiny, could be appropriate in the context of an as-applied challenge focused on application of the limit to specific expenditures is a question that . . . we need not reach in this facial challenge.").  Because we are "confronted with a . . . different

legal argument[]" today, nothing prevents us from taking up plaintiffs' as-applied challenge. *McCutcheon*, 572 U.S. at 203.

Indeed, plaintiffs' as-applied attack on the coordination limits leaves room for a narrower resolution than in *Colorado II*. There, the Supreme Court upheld the facial challenge by pointing to permissible limits on de facto "contributions" directly by a party committee to a candidate, that is, instances where "political parties would simply foot the candidate's bills." *In re Cao*, 619 F.3d 410, 437 (5th Cir. 2010) (en banc) (Jones, C.J., dissenting in part, joined by Smith, Clement, Elrod, and Haynes, JJ.) (describing the holding in *Colorado II*); *see also Colorado II*, 533 U.S. at 464 ("There is no significant functional difference between a party's coordinated expenditure and a direct party contribution to the candidate."). But a party committee and its candidates may coordinate in ways that fall well short of that threshold. As then–Chief Judge Jones put the question in *In re Cao*, "[a]t what point does 'coordination' between a candidate and a political party transform the party's communicative speech into a mere 'contribution' subject to strict dollar limits?" 619 F.3d at 436.

I agree that this question "was left open by the Supreme Court" in *Colorado II*, *id.*, which recognized the reality that "[c]oordinated spending by a party . . . covers a spectrum of activity." *Colorado II*, 533 U.S. at 445; *see also id.* at 467 (observing that coordinated spending "covers a broad array of conduct, some of which is akin to an independent expenditure") (Thomas, J., dissenting). To be sure, a candidate could create and produce an advertisement before handing it off to a party committee for publication and payment, leaving the committee in essence to foot the candidate's bill. But coordination between a party and its candidate may well occur in more mundane ways. It seems equally likely that a party committee itself would produce, place, and fund ads supporting its candidates, with the candidate merely offering input as to matters like the advertisement's content (national security or the economy?), tone (positive or negative?), or timing (early voting period or near election day?). And even when such input is sought, a candidate "cannot be certain that the party will heed his advice." *In re Cao*, 619 F.3d at 448 (Jones, C.J., dissenting). In the end, these modest efforts at coordination do not resemble the party simply reimbursing its candidate for campaign expenses. At the very least, then, whether a

party committee can coordinate with a candidate in more limited respects is fairly before us for resolution.

*     *     *

All things considered, it becomes abundantly clear that we may review the constitutionality of FECA's limitations on coordinated party expenditures. In *McCutcheon*, the Supreme Court declined to follow *Buckley*'s conclusion that aggregate limits on contributions were constitutional. 572 U.S. at 200–03. That was because *McCutcheon* "confronted" the Supreme Court "with a different statute and different legal arguments, at a different point in the development of campaign finance regulation." *Id.* at 203. Here, those same markers, from statutory changes to the declining influence of political parties to the Supreme Court's evolving campaign finance jurisprudence, together indicate that, in the words of the esteemed Judge Friendly, this is the rare instance where "opinions already delivered [by the Supreme Court] have created a near certainty that only the occasion is needed for the pronouncement of the doom" of the outdated *Colorado II* decision. *Salerno v. Am. League of Pro. Baseball Club*s, 429 F.2d 1003, 1005 (2d Cir. 1970) (Friendly, J.). Perhaps a change in either the controlling law, statutory regime, or factual foundation for an earlier decision would not justify revisiting the matter. But with all three factors calling *Colorado II* into deep question, we are remiss not to do so. In this instance, "it remains our role to decide whether a particular legislative choice is constitutional." *Cruz*, 596 U.S. at 313. Failing to do so "is to apply the dead, not the living, law." *Norris v. United States*, 687 F.2d 899, 904 (7th Cir. 1982) (Posner, J.).

II.

Measured by the Supreme Court's modern campaign finance jurisprudence, the FEC's coordination restrictions on party committees violate the First Amendment. *Colorado II* examined coordination limits under the "closely drawn" standard. 533 U.S. at 456. More recently, the Supreme Court has invigorated that measure, even suggesting that the proper lens might be strict scrutiny. *See McCutcheon*, 572 U.S. at 199; *Cruz*, 596 U.S. at 305. Either way, the party coordination restrictions at issue here fail. Following *McCutcheon*, we ask two questions. 572 U.S. at 197. First, has the government identified a sufficiently important interest

served by the coordination limits? *Id.* Today, that means only quid pro quo corruption or its appearance. *See Cruz*, 596 U.S. at 305; *McCutcheon*, 572 U.S. at 207. And quid pro quo corruption, in turn, "must involve a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee," not merely the ordinary acts of a politician in consulting, honoring, or representing their supporters. *McDonnell*, 579 U.S. at 574. Second, are the limits closely drawn means to achieve that interest? *McCutcheon*, 572 U.S. at 197. Recent decisions give teeth to that standard as well, examining restrictions on political speech under a "rigorous" standard of review that requires the limitations be "narrowly tailored" to the government's professed interest. *See McCutcheon*, 572 U.S. at 199, 218 (cleaned up). Otherwise, there is a "mismatch between the Government's stated objective and the means selected to achieve it." *Id.* at 199.

A. The restraints at issue here come up short in each respect. Begin with the FEC's failure to demonstrate a sufficient governmental interest justifying restrictions on coordinated speech between party committees and their candidates. There is no denying that the coordination ban limits political speech. Above relatively low limits, party committees are forced to decide how to support their candidates without input from the candidate herself, even when all involved share the same goal. These rules are the equivalent of prohibiting communication between a coach and quarterback late in a tied game. Not only that, but the restraints also seemingly raise the cost of permissible party committee speech. *See, e.g.*, R. 49-1 at 16–17 ¶ 75, PageID 5511–12. Simply put, the prohibitions are significant. So too, then, must be the government's justification.

To set the regulatory stage, as it stands today, FECA imposes several contribution limits. First, it caps direct individual contributions to federal candidates at $3,300 per election, indexed to inflation. 52 U.S.C. § 30116(a)(1)(A), (c)(1)(B). Second, it restricts direct individual contributions to national party committees at $41,300 per year. *Id.* § 30116(a)(1)(B). Taking these restrictions together in the context of Senate elections, an individual donor can donate just a few thousand dollars to individual Senate candidates, and just over $40,000 to a party's senatorial committee.

That donor limits are relatively higher when it comes to party committees does not soften FECA's bite. FECA limits direct party committee contributions to candidates at $5,000 per election. 52 U.S.C. § 30116(a)(2)(A). So a party committee is limited in the direct help it can provide a candidate. Were there concern that a party committee's coordination process might be co-opted by a committee donor, FECA prohibits a donor's contributions from being "earmarked or otherwise directed through an intermediary or conduit to [a particular] candidate." *Id.* § 30116(a)(8). The Act also includes public disclosure provisions requiring political committees to file detailed reports of receipts and disbursements. *See id.* § 30104.

Yet the FEC demands more. On top of this mountain of regulation, the FEC seeks to limit a party committee's expenditures coordinated with its own candidates. It justifies these speech restraints as a necessary means to combat the risk of quid pro quo corruption or its appearance. Without the coordination limits, the FEC worries, parties could spend unlimited funds in direct coordination with candidates, resulting in large expenditures "indistinguishable" from direct contributions to party nominees.

1. At the outset, it is difficult to see how a party committee itself could corrupt its own candidates. Parties, of course, have influence over their candidates, just as candidates have influence over their parties. That is by design. Coordination, in fact, is the essence of the party system in our representative democracy. *See Colorado I*, 518 U.S. at 630 (Kennedy, J., concurring in part) ("We have a constitutional tradition of political parties and their candidates engaging in joint First Amendment activity . . . ."). Parties work with their candidates to pursue favored policies. *See id.* at 646 (Thomas, J., concurring in part) ("The very aim of a political party is to influence its candidate's stance on issues and, if the candidate takes office or is reelected, his votes."). Candidates, in turn, sway their party, pushing it in one direction or the other on issues of the day. Each, in other words, influences the other. But influence alone does not risk corruption. Nor does coordination, the primary role parties seek to play in working with their candidates. That desire arises from the "practical identity of interests between the two entities during an election," not a nefarious intent to instigate a wave of quid pro quo corruption. *Id.* at 630 (Kennedy, J., concurring in part). Against this backdrop, it is difficult to see the necessity of prohibiting a party committee from coordinating with players on its own team.

Even were party committees prime vehicles for fueling such corruption, a committee faces deep practical limits in directing their candidates and the political process more broadly. As any political science student would recognize, parties desire to maximize their election victories and achieve functioning legislative majorities. *See* Samuel Issacharoff, *Private Parties with Public Purposes: Political Parties, Associational Freedoms, and Partisan Competition*, 101 Colum. L. Rev. 274, 300 (2001) (describing "the conception of politics as a contested terrain in which political actors seek to devise a winning coalition strategy for electoral success"). In theory, that would mean promoting candidates with the best odds of winning an election. *Id*. Yet parties are often unable to achieve that result. Today, the political process is increasingly dominated by candidates with more extreme views, both making those candidates' election odds longer and often bringing consternation to their party. *See generally* Stephen Yang & Baozhong Yang, *Endogenous Fracturing under Partisan Voting* (October 23, 2023), https://perma.cc/857D-FDZB; *see als*o Isgur et al., *supra* (noting that candidates are incentivized "to build support with the most extreme factions of voters"). Just ask former House Speaker Kevin McCarthy, among others. As his abbreviated tenure as speaker reflects, one major party could barely elect its own legislative leader, let alone retain him for a full term. *See* Aaron Zitner & Lindsay Wise, *How Polarization Sent Washington to the Brink of a Shutdown*, Wall St. J. (Sept. 30, 2023), https://www.wsj.com/politics/policy/how-polarization-sent-washington-hurtling-into-a-shutdown-83d806c?reflink=desktopwebshare. It is difficult to imagine that same party devising an intricate plan to corrupt the legislative process. In short, in an age where parties increasingly face frayed relationships with their candidates, it becomes even less likely that party committee support will "be given as a quid pro quo for improper commitments from the candidate." *McCutcheon*, 572 U.S. at 208 (citation omitted).

2. That leaves one final target for the FEC: individual donors. The FEC warns that a party committee's donors, absent limits on coordinated party expenditures, can act through the committee to corrupt a party's candidates. Without those limits, the FEC contends, individuals will circumvent the base limit on individual candidate contributions by donating amounts above that threshold to the candidate's party committee. The committee, in turn, can coordinate its expenditure of those funds with the candidate, making the donations, in the FEC's mind, "indistinguishable from contributions made directly to the candidate."

Setting aside the fact that donors are prohibited from "earmarking" their party committee contributions to a specified candidate, 52 U.S.C. § 30116(a)(8), the FEC's argument likewise sidesteps the obvious point that contributions to a party are not contributions to a candidate. "When an individual contributes to . . . a party committee, . . . the individual must by law cede control over the funds." *See McCutcheon*, 572 U.S. at 210–11. Once received, the party controls when, how, and where the money is spent, curtailing the risk of quid pro quo corruption. *See id.* at 210. In *McCutcheon*, in fact, the FEC conceded that should a third party's funds be "subsequently re-routed to a particular candidate, such action occurs at the initial recipient's discretion—not the donor's." *Id.* at 211. That remains true today, with party committees "retain[ing] final approval" over how its funds are spent. R. 49-1 at 10 ¶ 53 PageID 5505.

What is more, party committees, at day's end, are rational actors. Above all else, they value winning. *See* Kathleen Bawn et al., *A Theory of Political Parties: Groups, Policy Demands and Nominations in American Politics*, 3 Perspectives on Pol. 571, 571–72 (2012). So when it comes to spending critical campaign dollars, it is fair to expect that parties will use these sums to help the candidates that will benefit most, regardless of perceived donor preference. As even the FEC acknowledges, parties divert funds to candidates in close races rather than padding campaign coffers in easily won contests. *See* Second Br. at 38 (noting that "[c]ampaign spending has become highly concentrated in a limited number of decisive races").

True, on the margins, a party committee might feel some pressure to honor a donor's assumed preferences. That is human nature. Donation recipients of all types, from politicians to non-profits, would likely acknowledge as much. But recognizing a donor's interests is not illegal. Nor is taking them into consideration. *See McCutcheon*, 572 U.S. at 192 ("[A] central feature of democracy" is "that constituents support candidates who share their beliefs and interest, and candidates who are elected can be expected to be responsive to those concerns."). The touchstone, remember, is express quid pro quo corruption (or its appearance). And the FEC's theory falls well short of that high bar.

The FEC responds by invoking *Colorado II* and its warning about the corruptive influence of donors who contribute to party committees. Two flaws in the FEC's position are readily apparent. One, the Supreme Court, it bears repeating, has wholly rejected the FEC's

theory of corruption in the years since *Colorado II*. "Of course," the Supreme Court more recently observed, "a candidate would be pleased with a donor who contributed not only to the candidate himself, but also to other candidates from the same party . . . [and] to party committees." *Id.* at 225. But that is far afield from contributions to the candidate herself, where the recipient might feel "obligated" in one sense or another to the donor. *Id.* For donations to party committees and beyond, on the other hand, the candidate at most has a sense of "gratitude." *Id.* at 226. Characterizing that gratitude as tantamount to quid pro quo corruption stretches the notion beyond recognition. Remember, quid pro quo corruption as it is now understood requires a direct exchange of money for an official's "formal exercise of governmental power." *McDonnell*, 579 U.S. at 574. We should not accept the FEC's invitation to relax those standards. Doing so would not only ignore the Supreme Court's direction on what amounts to actionable corruption, but it would also be a vehicle for "dramatically expand[ing] government regulation of the political process." *McCutcheon*, 572 U.S. at 226.

Two, the FEC's theory is mismatched with *Colorado II*'s underpinnings. In *Colorado II*, the government highlighted a concern about "tallying" used by the Democratic Senatorial Campaign Committee. 533 U.S. at 459; *see also* Stranch Concurring Op. at 59. In effect, a donor would contribute money to a party committee at the direction of the party's candidate, with an implicit understanding that the party would then direct that contribution back to the candidate through coordinated expenditures, leaving the committee as little more than a pass through. *Id.* Yet that is not how the FEC justifies the coordination ban today. Instead, it argues that the concentration of campaign spending in a small number of decisive contests risks "donors seeking to extract official action from various candidates for party contributions supporting candidates in competitive races that determine Congress's balance of power." Second Br. at 38. The FEC seemingly fears that a candidate in a safe seat will direct a donor to contribute to the candidate's party committee, with the committee then funneling that contribution to a candidate in a tight race, allowing the donor to curry favor with both potential officeholders. *See id.* at 39 ("[L]arge contributions will flow to candidates running in those decisive races enabling donors to leverage contributions for quid pro quo exchanges with those candidates in addition to candidates and officeholders unaffiliated with any close election, but who value winning those races to cement a majority."). But under this construct, a candidate's theoretical quo (the official

action) is far more attenuated from a donor's quid (the contribution) than before. *Colorado II*, again, targeted a direct relationship, one where a candidate instructs a donor to contribute to a party committee in anticipation of the donation's direct return.

The FEC's premise that most party committee contributions are spent in close races places yet another hurdle in its way. If this assumption is correct, any chance that one contributor (or even a group of contributors) will have a corrupting influence all but fades away. Generally speaking, "the influence of any one person or the importance of any single issue within a political party is significantly diffused." *Colorado I*, 518 U.S. at 647 (Thomas, J., dissenting). That is particularly true the more contributions a candidate receives, as any single contributor will be "significantly diluted by all the contributions from others." *McCutcheon*, 572 U.S. at 212. The donor's "salience as a . . . supporter" of the candidate in a tight race thus "has been diminished, and with it the potential for corruption." *Id.* This much the FEC all but concedes. *See* Fourth Br. at 13 ("[A] greater number of donors in a jurisdiction enables greater coordinated spending before rising to a level risking corruption."). And that is all the more true when one remembers that contributors face a cap on the amount they can donate to a party committee. 52 U.S.C. § 30116(a)(1)(B). "[A]s long as . . . those limits are uniform as to all donors, . . . there is little risk that an individual donor could use a party as a conduit for bribing candidates." *Colorado I*, 518 U.S. at 647 (Thomas, J., dissenting).

In practice, donors enjoy a far better vehicle for influencing a candidate: independent, expenditure-only political action committees, or Super PACs. In large part creatures of judicial decisions, "Super PACs were officially born when the FEC handed down a pair of advisory opinions" in 2010. Richard Briffault, *Super PACs*, 96 Minn. L. Rev. 1644, 1645, 1665 (2012); *see also* FEC, Advisory Op. 2010-09 (2010); FEC, Advisory Op. 2010-11 (2010). A Super PAC's defining feature is the ability to raise unlimited sums of money from individuals for independent expenditures. *See SpeechNow.org v. FEC*, 599 F.3d 686, 690, 696 (D.C. Cir. 2010) (en banc). The allowance of unlimited contributions to these entities means that motivated donors can choose Super PACs as the "better vehicle for channeling campaign finances." Issacharoff, *Outsourcing Politics*, *supra*, at 861. And choose they have. In 2023, for example, Super PACs far outpaced national party committees in receipts, with Super PACs raising roughly

$957,100,000 compared to parties' $572,100,000 in contributions. *See Statistical Summary of 12-Month Campaign Activity of the 2023-2024 Election Cycle*, Fed. Election Comm'n (Apr. 2, 2024), https://perma.cc/SH37-DX6Z; R. 49-1 at 40 ¶ 171 ("[C]ontributions from political action committees to federal campaigns ha[ve] consistently exceeded the contributions and expenditures made by party-affiliated committees to federal campaigns."). Oftentimes, Super PAC donors let it be known who they are helping, and in what amounts. *See* Ryan Mac & Lisa Lerer, *The Right's Would-Be Kingmaker*, N.Y. Times, Feb. 14, 2022 (reporting that Peter Thiel wrote "$10 million checks to PACs supporting [J.D.] Vance and [Blake] Masters"); Christopher Cadelago et al., *Bloomberg Pumps $10 Million More into House Campaigns as Red Wave Looms*, Politico, Oct. 26, 2022 (describing a donation of $10 million to the "House Majority PAC"). If one is worried about the potential for quid pro quo corruption in politics, Super PACs present an inviting target. Yet the FEC zeroes in on donations to party committees—capped at $41,300 per year—which, it bears repeating, both may not be earmarked for particular candidates and are subject to the party committee's independent allocation decisions.

3. Given the FEC's big swing, one would expect it to offer a wave of evidence justifying the need to restrict party committee coordination. It is well understood that the government "must point to record evidence or legislative findings demonstrating the need to address a special problem." *Cruz*, 596 U.S. at 307 (cleaned up). But the record here reveals very little in that regard. At the FEC's request, the district court allowed the parties to engage in discovery. Yet what did the FEC's efforts produce? It points to nothing in the certified record demonstrating quid pro quo corruption tied to donations to party committees. At best, it gestures to newspaper articles and items it submitted unsuccessfully to the district court for inclusion as record evidence. *See* Second Br. at 40–43. And even as to those disallowed items, an expert for the FEC acknowledged that evidence of quid pro quo corruption in this context is scant, admitting that "scandals specifically involving coordinated federal expenditures have not been . . . common." R. 36-1, PageID# 411. For example, the FEC highlights tax cuts enacted by Congress in 2017, which the agency posits followed from "Republican party donors conditioning further party contributions on that legislation." R. 43, ¶ 126, PageID# 5165; *see* Second Br. at 41. It likewise points to Sam Bankman-Fried's donations to Democratic party committees, contributions that purportedly "appeared to obtain a favorable regulatory environment." R. 43, ¶

139, PageID# 5170; *see* Second Br. at 41.   At most, these hazy illustrations reflect the "appearance of mere influence or access," well short of outright quid pro quo corruption. *McCutcheon*, 572 U.S. at 208.

Nor, it bears adding, has the absence of coordination limits at the state level led to an avalanche of quid pro quo corruption.   Far from it, in fact.   As summarized by the Institute for Free Speech, most states do not bar coordination between political parties and their candidates. Br. for Inst. for Free Speech as Amicus Curiae Supporting Plaintiffs at 5.   Yet examples of quid pro quo corruption involving parties' coordinated expenses in those jurisdictions are all but absent as well.   *Id*. at 5–7.   At day's end, "mere conjecture" supported by "a handful of media reports and anecdotes" is inadequate to meet the FEC's evidentiary burden.   *Cruz*, 596 at 307 (citation omitted).

All things considered, the FEC fails to show a sufficiently important government interest justifying the coordinated party expenditure limits.   With no evidence of genuine quid pro quo corruption, the FEC cannot explain how "parties . . . would dramatically shift their priorities" if the limits were removed.   *McCutcheon*, 572 U.S. at 220.   Either way, party committees will spend money to elect their candidates.   Were those committees and their candidates allowed to coordinate their efforts, they could act in more informed, presumably mutually beneficial ways. But otherwise, the process would go on as it has, with parties and candidates working to achieve shared electoral goals.   The First Amendment well tolerates those full-throated efforts.

B.   Nor are the coordination limits "closely drawn to avoid unnecessary abridgment of associational freedoms."   *Id.* at 197 (quoting *Buckley*, 424 U.S. at 25).   Here, we require a fit between means and ends "that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served, . . . that employs not necessarily the least restrictive means but . . . a means narrowly tailored to achieve the desired objective."   *Id.* at 218 (cleaned up).

The FEC fails in this respect too.   One, recall that FECA was amended in 2014 to allow unlimited coordinated expenditures to cover expenses for presidential nominating conventions, the construction of a party headquarters, and certain legal proceedings, such as election recounts.

*See* 52 U.S.C. § 30116(a)(9), (d)(5).  These exemptions render the statute underinclusive for the government's professed purpose of limiting quid pro quo corruption.  If, as the FEC believes, a donor can corrupt a candidate through party committee contributions later spent on coordinated advertising supporting the candidate, it is unclear why these same concerns would not attend donations supporting the candidate's party's convention or a candidate's legal fees.  *See Cruz*, 596 at 306 (explaining the government's argument that post-election contributions "raise a heightened risk of corruption" if the contributor has good reason to believe the recipient "will be in a position to do him some good").  For instance, the whole point of a political convention is to advertise party and candidate political messages to voters.  *See* Aaron Johnson, *Interning Dissent: The Law of Large Political Events*, 9 Duke J. Const. L. & Pub. Pol'y 87, 89–90 (2013) ("Modern major political conventions are not debates—they are publicity extravaganzas, devoted to promoting the platform and candidate of a dominant political party.").  Why contributions supporting those coordinated advertising expenses would create less of an appearance of corruption goes largely unexplained.  This manner of "[u]nderinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes."  *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 802 (2011); *see also Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 773–75 (2018) (recognizing that a law's exceptions can show the law is not "sufficiently drawn to achieve" the purported governmental interest).

Two, that the FEC advances a "prophylaxis-upon-prophylaxis" approach "requires that we be particularly diligent in scrutinizing the law's fit."  *McCutcheon*, 572 U.S. at 222–23 (citation omitted).  The vast realm of campaign finance regulations obviates the need for further restrictions on party committee spending as a means for targeting quid pro quo corruption. The base limits on individual contributions to both candidates and parties go a long way in curtailing any fear of an individual donor's corruptive influence over a candidate or a party.  *See McCutcheon*, 572 U.S. at 209 ("[B]ase limits remain the primary means of regulating campaign contributions.").  As these limits themselves are "a prophylactic measure," they undermine the need for further prophylactic measures "layered on top."  *Id.* at 221.

Beyond the base limits on contributions, striking down the coordination restrictions would not touch FECA's earmarking rule.  That rule, it bears repeating, subjects donations to an

intermediary earmarked for "a particular candidate" to the limits on individual contributions. *See* 52 U.S.C. § 30116(a)(8); 11 C.F.R. § 110.6(b)(1) (defining "earmarking" as "a designation, instruction, or encumbrance, whether direct or indirect, express or implied, oral or written, which results in all or any part of a contribution or expenditure being made to, or expended on behalf of, a clearly identified candidate or a candidate's authorized committee"). These limitations seemingly already prohibit the hypothetical sketched out by the FEC of a donor attempting to circumvent the base contribution limits through party committee contributions. *See* *McCutcheon*, 572 U.S. at 222–23.

And then there are the disclosure provisions requiring political committees to file detailed reports of receipts and disbursements. *See* 52 U.S.C. § 30104. Those requirements further deter corruption "by exposing large contributions and expenditures to the light of publicity." *McCutcheon*, 572 U.S. at 223 (citation omitted). Although they burden speech, "they do not impose a ceiling on" expressive conduct as do the coordination limits before us today. *Id.* And the disclosure rules, all of which would remain in place were coordination limits eased, represent a less restrictive alternative to the coordination restrictions.

Finally, were Congress still concerned about donors using parties as conduits for quid pro quo corruption despite these extensive regulations, it could resort to a much simpler measure: reducing the base limits on individual contributions to party committees. That solution, it bears noting, seemingly is one plaintiffs would prefer over the significant coordination restrictions they now confront. *See* Third Br. at 18–19. Many donors may feel the same. A party's influence grows when its candidates hold a legislative majority. And so many donors may have more interest in seeing their preferred party gain a majority in Congress than seeing any particular candidate hold one of those seats. Such donors may contribute to party committees rather than particular candidates, allowing the party to decide how best to allocate funds to win a majority. Yet FECA's limits on coordinated spending inhibit a party committee's ability to disburse money in the most efficient manner and, as a result, the party's chances to secure a majority. *See* R. 49-1 at 19–20 ¶¶ 85–86, PageID 5514–15 (noting the efficiencies of coordinated spending compared to independent expenditures). In the end, the FEC's enforcement efforts disfavor

donors who trust party committees over individual candidates to best navigate the election process.

*     *     *     *     *

Much more could be said on the poor fit between the FEC's enforcement efforts and the narrow goal of preventing quid pro quo corruption. *See generally, e.g.*, Thapar Concurring Op.; Bush Concurring Op. For today's purposes, an amicus party may have summed up the matter best. The coordinated party expenditure limits "fight against a harm that either does not exist, or that is effectively managed by other more narrowly drawn rules." Br. for Inst. for Free Speech as Amicus Curiae Supporting Plaintiffs at 2. For all of these reasons, the challenged limits on political speech fail the "closely drawn" standard. Were my colleagues to reach the merits of that question, I suspect many would agree.